# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

1. STATE OF OKLAHOMA;

2. J. KEVIN STITT, in his official capacity as Governor of the State of Oklahoma; and

3. JOHN M. O'CONNOR, in his official capacity as Attorney General of the State of Oklahoma,

*Plaintiffs*,

v.

Case No. CIV-21-1069-G

1. JOSEPH R. BIDEN, JR., in his official capacity as President of the United States;

2. SAFER FEDERAL WORKFORCE TASK FORCE;

3. FEDERAL ACQUISITION REGULATORY COUNCIL;

4. OFFICE OF PERSONNEL MANAGEMENT;

5. OFFICE OF MANAGEMENT AND BUDGET;

6. GENERAL SERVICES ADMINISTRATION;

7. KIRAN AHUJA, in her official capacity as Director of the Office of Personnel Management and as Co-Chair of the Safer Federal Workforce Task Force;

8. SHALANDA D. YOUNG, in her official capacity as Acting Director of the Office of Management and Budget and as a member of the Safer Federal Workforce Task Force;

9. MATHEW C. BLUM, in his official capacity as Chair of the Federal Acquisition Regulatory Council;

10. JEFFREY A. KOSES, in his official capacity as Senior Procurement Executive & Deputy Chief Acquisition Officer, General Services Administration;

11. LESLEY A. FIELD, in her official capacity as Acting Administrator for Federal Procurement, Office of Management and Budget;

12. JOHN M. TENAGLIA, in his official capacity as a member of the Federal Acquisition Regulatory Council;

13. KARLA S. JACKSON, in her official capacity as a member of the Federal Acquisition Regulatory Council;

14. ROBIN CARNAHAN, in her official capacity as Administrator of the General Services Administration and as Co-Chair of the Safer Federal Workforce Task Force;

15. JEFFREY ZIENTS, in his official capacity as Co-Chair of the Safer Federal Workforce Task Force and COVID-19 Response Coordinator;

16. L. ERIC PATTERSON, in his official capacity as Director of the Federal Protective Service;

17. JAMES M. MURRAY, in his official capacity as Director of the U.S. Secret Service;

18. DEANNE CRISWELL, in her official capacity as Director of the Federal Emergency Management Agency;

19. ROCHELLE WALENSKY, in her official capacity as Director of the Centers for Disease Control and Prevention;

20. TERRY COSBY, in his official capacity as Chief of the Natural Resources Conservation Service;

21. MARTHA WILLIAMS, in her official capacity as Principal Deputy Director of the U.S. Fish and Wildlife Service;

22. U.S. FISH AND WILDLIFE SERVICE;

23. MICHAEL S. REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency;

24.   U.S. ENVIRONMENTAL PROTECTION
      AGENCY;

25.   MIGUEL CARDONA, in his official capacity as
      Secretary of the U.S. Department of Education;

26.   U.S. DEPARTMENT OF EDUCATION;

27.   FRANK KENDALL, in his official capacity as
      Secretary of the U.S. Department of the Air
      Force;

28.   U.S. DEPARTMENT OF THE AIR FORCE;

29.   THE UNITED STATES OF AMERICA,

                              *Defendants*.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     The President of the United States has unilaterally issued a mandate compelling employees of federal contractors and subcontractors (the "covered contractors") to receive a COVID-19 vaccine or lose their jobs (the "vaccine mandate").

2.     This mandate requires COVID-19 vaccination for all covered contractors' employees, including persons working remotely and those working in a covered contractor's workplace, irrespective of whether the employees work on a covered federal contract. *See* Exec. Order No. 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed. Reg. 50985 (Sept. 9, 2021) ("EO 14042").

3.     The vaccine mandate applies not only to new contracts awarded on or after November 14, 2021, it also prohibits renewal of existing contracts after October 15, 2021, unless contractors force their agents and employees to receive a COVID-19 vaccine.

4.      In short, entities seeking new or renewed federal contracts are ordered, in no uncertain terms, that their employees must receive the COVID-19 vaccine.  Otherwise, they face financial ruin.

5.      By orchestrating the mandate unilaterally, the President has arrogated to himself powers belonging to Congress and the States, and then exercised those powers contrary to the religious conscience, privacy rights, bodily integrity, and individual autonomy and dignity of covered contractors and their employees.  In so doing, the President has violated the Constitution, trampled on the sovereign rights and dignity of States, and acted without any authorization in, and indeed by disobeying, federal law.

6.      That is the diametrical opposite of how a "compound republic"— constitutionally enshrining a separation of powers among the three branches of the federal government and a further federalist allocation of federal and state power—is designed to function.  THE FEDERALIST No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961).  These actions flagrantly are contrary to the Executive's obligation to "take care that the laws be faithfully executed."  U.S. CONST. art. II, § 3 (capitalizations altered).

7.      The vaccine mandate denigrates the sovereign dignity of Oklahoma and her sister States by exceeding Congress' constitutional authority under Article I and violates the Tenth Amendment.  In fact, the mandate is not even authorized by any statute enacted by Congress.  The federal procurement laws do not give the Executive any authority to issue the vaccine mandate.  Worse, the vaccine mandate violates a law Congress *has* enacted.

8.      A major question of such political and economic significance like a vaccine mandate on federal contractors needs, at the very least, a clear delegation from Congress. Yet even then, it would be invalid as Congress could not make such a momentous delegation to the Executive concerning a matter of great political or economic significance or one that goes to the core of individual dignity.  That offends the core of constitutional separation of powers and the Constitution's Legislative and Executive Vesting Clauses.

9.      What is more, the vaccine mandate violates the religious liberty protected by the Free Exercise Clause of the First Amendment and a super-statute such as the Religious Freedom Restoration Act ("RFRA").  It violates the due process right to bodily integrity enjoyed by individual Oklahomans who are employees of federal contractors.  This mandate, moreover, contravenes the Fourth Amendment right against unconstitutional seizures also enjoyed by those Oklahomans.  The federal government violates these rights of *individuals* both by coopting and conscripting their federal contractor employers into the role of carrying out this federal mandate and by setting such unlawful conditions.

10.      That is not all.  The vaccine mandate interferes with the sovereign prerogatives of the State of Oklahoma.  It also harms state agencies and academic institutions by forcing them to require their employees to vaccinate, or face losing millions of dollars—money without which the State would not be able to function.  And this is on top of the mandate's undermining of the laws, dignity, and interests of the State of Oklahoma in governing the field of public health, including vaccinations.

11.      But the Biden Administration's work in this space extends deeper.  The President has made clear his animus towards unvaccinated Americans by conceding that

his "patience is wearing thin" with them.[1]   In concrete terms, the President has also threatened to take away, again without congressional authorization, the jobs and livelihood of federal employees who choose to be unvaccinated.[2]

12.     Then on November 4, 2021, the U.S. Department of Labor ("Labor Department") under President Biden announced that about 84 million private employees working at businesses with 100 or more employees will be forced to get vaccinated by January 4, 2022.[3]  Today's Labor Department requirement also requires that by December 5, 2021, all unvaccinated employees wear masks; and on a weekly basis, they must provide a negative COVID-19 test once the January 4 deadline lapses.[4]  And the Administration is still not done yet.  President Biden's rule issued today makes clear that he might extend it to cover smaller businesses too.

13.     The vaccine mandate on covered contractors is patently unfair, clearly devoid of common sense, and manifestly unlawful.  It is also dangerously Un-American.

---

[1] President Joseph R. Biden, Jr., Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021) (transcript available at https://tinyurl.com/3ky6c3rt).

[2] Exec. Order No. 14043, Requiring Coronavirus Disease 2019 Vaccination for Federal Employees, 86 Fed. Reg. 50989 (Sept. 9, 2021) ("EO 14043").

[3] Interim final rule: COVID-19 Vaccination and Testing; Emergency Temporary Standard, U.S. Dep't of Labor: Occupational Safety and Health Administration, Docket No. OSHA-2021-0007, RIN 1218-AD42, 29 CFR Parts 1910, 1915, 1917, 1918, 1926, and 1928, https://public-inspection.federalregister.gov/2021-23643.pdf; Spencer Kimball & Leslie Josephs, *Businesses have until after the holidays to implement Biden Covid vaccine mandate*, CNBC (Nov. 4, 2021), https://www.cnbc.com/2021/11/04/biden-vaccine-mandate-businesses-have-until-after-christmas-to-comply.html.

[4] *See id.*

## JURISDICTION AND VENUE

14.    This Court has jurisdiction under 5 U.S.C. §§ 702–703 and 28 U.S.C. §§ 1331 and 1361.

15.    The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

16.    Venue is proper within this District pursuant to 28 U.S.C. § 1391(e) because: (1) Plaintiffs reside in Oklahoma and no real property is involved, and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

17.    Venue also lies in this district under 28 U.S.C. § 1391(e)(1) because the State of Oklahoma is a resident of every judicial district in its sovereign territory—and that includes the Western District of Oklahoma (as well as the Oklahoma City Division).

## PARTIES

18.    Plaintiff State of Oklahoma is a sovereign state of the United States of America.

19.    Plaintiff J. Kevin Stitt is the Governor of the State of Oklahoma.  He is the State's chief executive.

20.    Plaintiff John M. O'Connor is the Attorney General of the State of Oklahoma.  He is the State's chief legal officer and has the authority to represent the State in federal court.

21.    Defendant Joseph R. Biden, Jr. is the President of the United States.  He signed Executive Order No. 14042, titled *Ensuring Adequate COVID Safety Protocols for Federal Contractors* ("EO 14042").

22.     Defendant Safer Federal Workforce Task Force (the "SFWTF") was established pursuant to President Biden's Executive Order No. 13991, Protecting the Federal Workforce and Requiring Mask-Wearing, 86 Federal Register 7045 (Jan. 20, 2021).  The three co-chairs who oversee the SFWTF are: (1) the Director of the Office of Personnel Management ("OPM"); (2) the Administrator of the General Services Administration ("GSA"); and (3) the COVID-19 Response Coordinator.

23.     Defendant Federal Acquisition Regulatory Council ("FAR Council") is the agency exclusively charged with creating "[g]overnment-wide procurement regulation[s]." 41 U.S.C. § 1303(a)(1).

24.     Defendant Office of Personnel Management ("OPM") is an agency of the United States Government.

25.     Defendant Office of Management and Budget ("OMB") is an agency of the United States Government.

26.     Defendant General Services Administration ("GSA") is an agency of the United States Government.  Defendant Office of Personnel Management Director, Kiran Ahuja ("Director Ahuja"), is a co-chair and member of the SFWTF and represents the federal agency responsible for managing human resources for civil service of the federal government.

27.     Defendant Office of Management and Budget Acting Director, Shalanda D. Young (the "OMB Director"), is a member of the SFWTF and represents the federal agency with delegated authority, by President Biden, to publish determinations relevant to EO 14042 and the SFWTF Guidance to the Federal Register.

28.     Defendants Mathew C. Blum, Lesley A. Field, John M. Tenaglia, Jeffrey A. Koses, and Karla S. Jackson are members of the FAR Council on account of their roles in their respective agencies.  They are sued in their official capacities.  Defendant Blum is the Chair of the FAR Council.  Defendant Field is the Acting Administrator for Federal Procurement of OMB.

29.     Defendant Robin Carnahan, Administrator of General Services (the "GSA Administrator"), is a co-chair and member of the SFWTF and represents the federal agency responsible for managing and supporting the basic functioning of federal agencies.

30.     Defendant Jeffrey Zients, COVID-19 Response Coordinator (the "COVID-19 Response Coordinator"), is a co-chair and member of the SFWTF.

31.     Defendant L. Eric Patterson, Director of the Federal Protective Service (the "FPS Director"), is a member of the SFWTF.

32.     Defendant James M. Murray, Director of the United States Secret Service (the "Secret Service Director"), is a member of the SFWTF.

33.     Defendant Deanne Criswell, Director of the Federal Emergency Management Agency (the "FEMA Director") is a member of the SFWTF.

34.     Defendant Rochelle Walensky, Director of the Centers for Disease Control and Prevention (the "CDC Director"), is a member of the SFWTF and is also the head of the agency which stands to exclude Oklahoma from some federal contracts on the basis of this vaccine mandate.

35.     Defendant Terry Cosby is Chief of the Natural Resources Conservation Service (the "NRCS Chief").

9

36.     Defendant Martha Williams is Principal Deputy Director of the U.S. Fish and Wildlife Service (the "Principal Deputy USFWS Director").

37.     Defendant U.S. Fish and Wildlife Service ("USFWS") is an agency of the United States Government.

38.     Defendant Michael S. Regan is Administrator of the U.S. Environmental Protection Agency (the "EPA Administrator").

39.     Defendant U.S. Environmental Protection Agency ("EPA") is an agency of the United States Government.

40.     Defendant Miguel Cardona is Secretary of the U.S. Department of Education (the "ED Secretary").

41.     Defendant U.S. Department of Education ("ED") is an agency of the United States Government.

42.     Defendant Frank Kendall is the Secretary of the U.S. Department of the Air Force (the "Air Force Secretary").

43.     Defendant U.S. Department of the Air Force ("USAF") is an agency of the United States Government.

44.     Defendant United States of America includes the departments and agencies thereof.

45.     All these Defendants have acted in the color of federal law with their authority purportedly derived from Defendant United States of America.

## FACTUAL ALLEGATIONS

46.     On January 20, 2021—his very first day in office—President Biden signed Executive Order ("EO") 13991 (86 Fed. Reg. 7045) creating the SFWTF.  *See* Exhibit 1.

47.     The President charged the SFWTF with "provid[ing] ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic."  86 Fed. Reg. at 7046.

48.      The SFWTF is led by the White House COVID-19 Response Team, the GSA, and the OPM.  It includes: the CDC, the OMB, FEMA, the Department of Veterans Affairs ("VA"), the Federal Protective Service ("FPS"), and the United States Secret Service ("USSS").

49.     Three co-chairs lead the SFWTF: (1) the Director of the OPM; (2) the Administrator of GSA; and (3) the COVID-19 Response Coordinator.  EO 13991 also required the GSA to "provide funding and administrative support for the" SFWTF.  *Id.*

50.     At that time, the federal government's position was that it lacked power to impose vaccines on contractors or employees.  Thus, during a July 23, 2021 press briefing, White House Press Secretary Jen Psaki admitted that the federal government's role is not to impose vaccine mandates.  She added: "What our role is and what we are going to continue to do is make the vaccine available. We're going to continue to work in partnership to fight misinformation.  And we're going to continue to advocate and work in

partnership with local officials and—and trusted voices to get the word out."[5]  By contrast, Psaki noted, it was the role of "institutions, private-sector entities, and others" to impose vaccine mandates.[6]

51.     These remarks aligned with then-President-Elect Biden's assertion, on December 4, 2020, that "[n]o, I don't think [a COVID-19 vaccine] should be mandatory. I wouldn't demand it to be mandatory."[7]

52.     That changed at some point between July and September of this year.  On September 9, 2021, President Biden signed EO 14042 requiring federal contractors to ensure that all their employees are vaccinated against COVID-19.  *See* Exhibit 2.  The SFWTF was required to adopt and issue COVID protocols by September 24, 2021.  The EO failed to expressly provide for religious or medical exemptions to these protocols.  And, through another EO (EO 14043), the President also concurrently ordered federal employees to receive a COVID-19 vaccine.  *See* Exhibit 3.

53.     On September 24, 2021, the SFWTF issued some guidance telling federal agencies how they can implement EO 14042's contractor mandate.[8]  *See* Exhibit 4.  Yet,

---

[5] Jen Psaki, White House Press Sec'y, Press Briefing in the White House Press Briefing Room (July 23, 2021), https://tinyurl.com/52ru4fut.

[6] *Id.*

[7] Jacob Jarvis, *Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020?,* NEWSWEEK (Sept. 10, 2021), https://tinyurl.com/37z7p8y5.

[8] *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*, SFWTF (Sept. 24, 2021), https://tinyurl.com/sh7j732e.

this guidance was never submitted to or published in the Federal Register, depriving the

American People of an opportunity to comment.

54.     This SFWTF guidance states:

a.     Covered contractor employees must fully be vaccinated by December 8, 2021, meaning that they must get their final shot (or only shot, as the case may be) by November 24 of this year.

b.     "[C]overed contractor employee" includes "employees of covered contractors who are not themselves working on or in connection with a covered contract"—so long as they are situated at the same place. Those employees need have nothing to do with their federal contractor employer's federal government functions.

c.     The Federal Acquisition Regulatory Council ("FAR Council") is required to amend, by rulemaking, the Federal Acquisition Regulation ("FAR") to impose the vaccine mandate.

d.     The FAR Council must, by October 8 of this year, create a contract clause for federal agencies to use in their contracts with contractors. Actually, agencies were asked to use this clause in contracts even before the FAR could formally be amended.

e.     Federal agencies must use that contract clause in solicitations no later than October 15, 2021.

f.     By November 14 of this year, all awarded contracts are required to have that clause.  And contracts that were executed between October 15 and November 14 are encouraged to have that clause.

g.     When a contract is awarded before October 15, but "where performance is ongoing," the contract clause was required to "be incorporated at the point at which an option is exercised or an extension is made."

h.     The SFWTF declared itself as superior to vaccine exemptions under State law or municipal ordinances.  It therefore "supersede[d]" policies like Oklahoma's.  By a gubernatorial Executive Order authorized by the Oklahoma Constitution, most state agencies of Oklahoma are precluded from requiring "a vaccination against COVID-19 as a condition of admittance to any public building." Okla. Admin. Code 1:2021-16 (citing art. VI, §§ 1 and 2 of Okla.

Const.).  This includes most state agencies that partner with or have the potential to partner with the federal government as covered contractors.[9]

55.     In addition, covered contractors are required to verify the full vaccination status of their employees and other safety protocols related to COVID-19.  The federal contractor requirements are triggered by any new, renewal, or extension of a contract and contract-like instrument exceeding $250,000.

56.     On September 28, 2021, Acting OMB Director, Shalanda Young published a Federal Register notice—without giving the public an opportunity to comment— suggesting that "compliance with COVID–19-related safety protocols improves economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."[10]

57.     The Acting OMB Director also expressed that she had "determined that compliance by Federal contractors and subcontractors with the COVID-19-workplace safety protocols detailed in [the SFWTF] guidance will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."[11]

---

[9] This gubernatorial EO does not "apply to employees and buildings of state agencies primarily involved in medical patient-facing activities including research participant areas and facilities where patient care is the primary function."  Okla. Admin. Code 1:2021-16.

[10] Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 Fed. Reg. 53691, 53692 (Sept. 28, 2021).

[11] *Id.*

58.     Ms. Young failed to cite any information or evidence that would support the claims in her determination, nor did she explain how she reached her conclusion.  She also did not mention, much less explain, why she had rejected any of the alternatives.  Nor did her Federal Register notice include a waiver required by 41 U.S.C. § 1707(d) that would have allowed procurement policies to take effect before the statutory waiting period of 60 days was up.  And her notice failed to invoke the Administrative Procedure Act's ("APA") good-cause exception to that statute's notice-and-comment procedure.  Crucially, the Acting OMB Director did not explain what urgent and compelling circumstances justified these shortcuts.

59.     Many agencies, instrumentalities, institutions, and entities of the State of Oklahoma are federal contractors and thus are subject to this vaccine mandate.

60.     Federal authorities have already let it be known that Oklahoma state agencies that are federal contractors must impose the vaccine mandate on their employees in a manner consistent with EO 14042 and the SFWTF guidance.  This, of course, stands in direct contravention of Oklahoma's own law and public policy, not to mention the United States Constitution.  The State of Oklahoma's sovereign dignity as well as its constitutional and legal powers and authority under the Federal and State Constitutions are therefore injured by this vaccine mandate.

61.     This mandate, furthermore, will lead many unvaccinated Oklahoma State Government employees to resign, depriving the State of Oklahoma of the officials it needs to carry out its responsibilities.  It is doubtful whether Oklahoma or any State would ever

be able to fully recover from this damage and, in any event, the economic and human capital costs of doing so would be staggering and unprecedented.

62.     And then there is the matter of the dollars Oklahoma receives as a federal contractor.  This mandate will cause massive confusion within and tremendous loss of funds to the State of Oklahoma.  The State has long depended on these funds and its agencies, instrumentalities, institutions, and entities will not be able to function meaningfully without these federal contractor dollars.

63.     Just a few illustrative, though non-exhaustive, examples are provided below.

64.     Just the two flagship universities in Oklahoma—the University of Oklahoma ("OU") and the Oklahoma State University ("OSU")—currently receive $400 million and $90 million, respectively, in federal contractor dollars.  They cannot survive without this income.  And they cannot ensure that all their employees or even a vast majority will get vaccinated.   OU has almost 20,000 employees and OSU has approximately 14,200 employees.

65.     The Oklahoma Space Industry Development Authority ("OSIDA"), which has an agreement with the U.S. Department of the Air Force to maintain runways, currently receives approximately $7.5 million in federal contractor dollars.  OSIDA has seven employees.

66.     The Oklahoma Conservation Commission ("OCC") currently receives more than $5 million in federal contractor dollars from the NRCS; the USFWS; and the EPA. The OCC has 54 employees.

67.     The Oklahoma Student Loan Authority ("OSLA") currently receives more than $5 million in federal contractor dollars from ED.  OSLA's employees will be affected by this vaccine mandate.

68.     The Oklahoma State Department of Health ("OSDH") currently receives up to approximately $2 million in federal contractor dollars from CDC.  OSDH has 2,103 employees.

69.     These effects, individually and collectively, injure the State's interests.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Procurement Act
### (Asserted Under 40 U.S.C. §§ 101 and 121)

70.     The allegations in the preceding paragraphs are reincorporated herein.

71.     The "[p]urpose" underlying the Federal Property and Administrative Services Act (the "Procurement Act") "is to provide the Federal Government with an economical and efficient system for" procurement. 40 U.S.C. § 101.

72.     Notably, the Procurement Act allows the President to "prescribe policies and directives that the President considers necessary to carry out" the Act but these policies *must* "be consistent with" the Procurement Act.  40 U.S.C. § 121(a).

73.     No such policy is valid unless there is "a nexus between the regulations and some delegation of the requisite legislative authority by Congress;" what is more, "the reviewing court [must] reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 308 (1979).

74.     No nexus exists when such policies are "too attenuated to allow a reviewing court to find the requisite connection between procurement costs and social objectives." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981).

75.     Nor does any such nexus exist when these policies are imposed on subcontractors or others, who obviously have "no direct connection to federal procurement." *Id*. at 171–72.  Such policies are well outside the scope of the Procurement Act.

76.     Furthermore, the Procurement Act does not grant the President the authority to issue policies in "conflict with another federal statute."  *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1333 (D.C. Cir. 1996).

77.     Additionally, the Procurement Act's providing the federal government with an "economic and efficient system for" procurement is not a sweeping nationwide delegation to impose a policy like this vaccine mandate.

78.     Under the Major Questions Doctrine, the Supreme Court repeatedly has cautioned that courts should not assume that Congress has delegated questions of "deep economic and political significance" to the Executive Branch unless, of course, Congress has done so expressly.  *See King v. Burwell*, 576 U.S. 473, 486 (2015).  This is a form of the clear-statement rule applicable to this context.  *See FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 160 (2000).

79.     Recently, Justice Kavanaugh perfectly summed the Major Questions Doctrine up: "In order for [the] [E]xecutive … to exercise regulatory authority over a major policy question of great economic and political importance [that the Constitution does not

preemptively assign to the Executive], Congress must either: (i) expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce; or (ii) expressly and specifically delegate to the agency the authority both to decide the major policy question and to regulate and enforce." *Paul v. United States*, 140 S. Ct. 342 (2019) (statement respecting denial of certiorari).

80.   In that vein, the Supreme Court often has observed that "[w]e expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

81.   And this is never truer than when Congress is "intrud[ing] into an area that is the particular domain of state law"—a space like public health. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489; Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 290–94 (2012).   The Supreme Court "require[s] Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (cleaned up).

82.   There is a good reason for this canon of interpretation: "The constitutionally mandated balance of power between the States and the Federal Government" exists "to ensure the protection of our fundamental liberties." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (cleaned up).

83.     The Procurement Act conspicuously lacks any language affording the President the power to impose anything akin to a vaccine mandate.

84.     Under the Major Questions Doctrine, there is no connection whatsoever between this vaccine mandate and the Procurement Act's purpose of providing an "economical and efficient system" of procurement, 40 U.S.C. § 101—even if such a vaguely-stated statutory *purpose* were enough.  This is because had Congress intended to give the Executive or its agencies discretion to decide which kinds of vaccinations for what malaises should be mandatory to which categories of people (and whether they include certain religious persons), then Congress would have legislated to that effect.  After all, Congress does not upend or even "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  Also, the vaccine mandate unequivocally and severely will damage our economy and efficiency because it will lead to a mass exodus of the employees of federal contractors from the contractors' workforces.

85.     Defendants' attempt to impose sweeping controls on one-fourth of the economy via procurement is a question of deep economic and political significance and goes to the heart of individual dignity and liberty concerning bodily integrity and the right to decline even life-saving treatment.

86.     Nothing in the Procurement Act allows the President to exercise such sweeping authority under the guise of "procurement," particularly in the absence of clear and explicit congressional authorization.  Such concentration of power in the Executive

flies in the face of the Major Questions Doctrine, which of course is a core principle of statutory interpretation. *See Utility Air Regulatory Grp.* 573 U.S. 302; *Brown & Williamson Tobacco Corp.*, 529 U.S. 120; *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994).

87.     "It is especially unlikely that Congress would have delegated this decision to" the Executive (especially the SFWTF), which lacks "expertise in crafting" sensible rules "of this sort" in the absence of clear statutory guidance. *King*, 576 U.S. at 486 (citing *Gonzales v. Oregon*, 546 U.S. 243, 266–67 (2006)).

88.     On account of the narrow "breadth of the authority" that Congress has afforded the Executive Branch, this Court should not "defer … to the [Executive's] expansive construction of the statute." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 160.

89.     Defendants' vaccine mandate is therefore invalid under the Procurement Act.

**COUNT II**
**Violation of Procurement Policy Act**
**(Asserted Under 41 U.S.C. § 1707(a))**

90.     The allegations in the preceding paragraphs are reincorporated herein.

91.     The Office of Federal Procurement Policy Act ("Procurement Policy Act") requires that "a procurement policy, regulation, procedure, or form (including an amendment or modification thereto) may not take effect until *60 days after it is published for public comment in the Federal Register* … if it—(A) relates to the expenditure of appropriated funds; and (B)(i) has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form; or (ii) has a

significant cost or administrative impact on contractors or offerors." 41 U.S.C. § 1707(a) (emphasis added).

92.     Federal law permits this requirement to be "waived by the officer authorized to issue a procurement policy, regulation, procedure, or form if urgent and compelling circumstances make compliance with the requirements impracticable."   41 U.S.C. § 1707(d).

93.     A point about both the federal procurement statutes: Nowhere do the federal procurement statutes authorize the President to take over more than one-quarter of our national economy—and to do so flying solo, without congressional authorization.  And in the absence of such authorization, the President certainly is not entitled, with the stroke of his own pen, to displace state law or preclude state authority in an area of State police powers such as public health.

94.     Defendants' vaccine mandate is a procurement "policy" as well as a procurement "procedure" under 41 U.S.C. § 1707(a).

95.     This mandate concerns the expenditure of funds Congress has appropriated and earmarked for particular objectives; it has a huge impact on the national economy, well beyond internal operating procedures; and imposes great monetary and administrative cost on those subject to the mandate.

96.     Defendants failed to publish their mandate for public comment in the Federal Register in violation of 41 U.S.C. § 1707.

97.     Nor did Defendants provide the required 60-day comment period before the vaccine mandate became effective either.  *See id.*

98.     What is more, no authorized officer from the OMB, FAR Council, or any federal entity ever waived the Procurement Policy Act's requirements insofar as this mandate is concerned.

99.     In the process of issuing this mandate, Defendants did not conform to the Procurement Policy Act.  This mandate, accordingly, is invalid under 41 U.S.C. § 1707.

**COUNT III**
**Agency Action Not in Accordance with Law and in Excess of Authority and**
**Arbitrary and Capricious Agency Action in Violation of the APA**
**(Asserted Under the APA, 5 U.S.C. § 706)**

100.     The allegations in the preceding paragraphs are reincorporated herein.

101.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

102.     Defendants' vaccine mandate exceeds the bounds set by Congress in the Procurement Act and the Procurement Policy Act.

103.     Defendants' vaccine mandate—specifically the OMB rule—is unlawful for at least two additional reasons:

> a.   The OMB rule contravenes 41 U.S.C. § 1303(a) because only the FAR Council may issue such all-of-government procurement regulations, *see Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President."); and

> b.   The President lacks the power to issue procurement orders that have the force or effect of law, *see* 40 U.S.C. § 121(a), even though he may direct procurement operations, *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of

23

the statute and different language in another, the court assumes different meanings were intended.").

104.   Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013).   A federal agency is entirely a creature of Congress' will and "literally has no power to act … unless and until Congress confers power upon it," and only to that limited extent.   *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

105.   Put simply, the agency is devoid of any "power to act unless and until Congress" so confers on it.   *See Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018).   And the federal government is completely powerless to ignore congressional dictates expressed in statutes.   *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

106.   For these reasons, the vaccine mandate is not in accordance with law and exceeds the authority granted to the Executive by Congress.   It thus violates the APA.

107.   Furthermore, under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious."   5 U.S.C. § 706(2)(A).

108.   Defendants' policy is arbitrary and capricious for several reasons, including because it ignores costs to the States, a "centrally relevant factor when deciding whether to regulate."   *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015).   The injuries inflicted by this mandate on Oklahoma and her sister States or the other Plaintiffs are not mentioned, let alone explained, in the mandate or the attendant administrative record.

109.    Defendants have also failed to explain its departure from prior practice, as the APA requires; and such an "unexplained inconsistency" is fatal.  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).

110.    Moreover, Defendants have neither accounted for Oklahoma's sovereignty, laws, reliance interests, costs, and other pertinent factors nor considered lesser alternatives, each of which renders Defendants' policy arbitrary and capricious.  *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

111.    Here are some related and non-exhaustive considerations that compel the conclusion that this mandate is arbitrary and capricious:

    a.  Defendants' failure to consider the mass exodus of unvaccinated employees of federal contractors in our current economy that is already facing a vast dearth of labor, inflation, and supply-chain challenges;

    b.  Defendants' failure to consider the legal claims and factual assertions made in this Complaint as well as in the parallel lawsuits filed to challenge this vaccine mandate;

    c.  Defendants' failure to exempt those who have a natural immunity to COVID-19; and

    d.  Defendants' failure to exempt those who work in their own homes or other venues that render them unlikely to catch or spread COVID-19.

As a result, the vaccine mandate is arbitrary and capricious.  And it runs afoul of the APA.

## COUNT IV
### Tenth Amendment Violation
### (Asserted Under Tenth Amendment to the U.S. Constitution and Because this Vaccine Mandate Exceeds the Federal Government's Constitutional Authority)

112.    The allegations in the preceding paragraphs are reincorporated herein.

113.   It is well-known that "our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).  "[A]llocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States … in part, [as] an end in itself, to ensure that States function as political entities in their own right." *Bond v. United States*, 564 U.S. 211, 221 (2011) (*Bond I*).

114.   Furthermore, individual liberty itself is preserved by divided government: "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Id*. at 222.

115.   The Supreme Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems." *Oregon v. Ice*, 555 U.S. 160, 171 (2009). "[T]he States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear," so that the welfare and autonomy of citizens may be optimized. *See United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring); *see also New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

116.   In addition, meaningful deference to State-level policymaking "allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic

processes,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.'" *Bond I*, 564 U.S. at 221.

117.    Under core principles of federalism, the federal government is one of enumerated powers, *see Lopez*, 514 U.S. at 552; it lacks the general police power to regulate health, safety, and morals—which are the preserve of the States, *see Printz v. United States*, 521 U.S. 898, 919 (1997) ("Residual state sovereignty was also implicit, of course, in the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones, Art. I, § 8, which implication was rendered express by the Tenth Amendment's assertion that '[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'").

118.    Indeed, "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite."  THE FEDERALIST No. 47, at 298 (James Madison) (Clinton Rossiter ed., 2003).  This vaccine mandate wants to flip that allocation of power and hand total control over our bodies to just one person.

119.    The Tenth Amendment merely reinforced what was already manifest to the Founding generation—and the Tenth Amendment was a failsafe mechanism added to ensure that the rights of the States did not go usurped or otherwise dishonored by the federal government.

120.    Our States possess "a residuary and inviolable sovereignty."  THE FEDERALIST No. 45, at 289 (James Madison) (Clinton Rossiter ed., 2003).  "The powers

reserved to the several States," it was understood by the living community at the time of the Founding, "will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." *Id*. at 45.

121.   Consequently, the "police power" is "inherent in the states" and certainly is "reserved from the grant of powers to the federal government by the Constitution." *United States v. Constantine*, 296 U.S. 287, 295–96 (1935).  But that power stems from an earlier source primordial to a State's entering into the Union.

122.   A police power, encompassing public health, public safety, and public morals, is "a power which the state did not surrender when becoming a member of the Union under the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 24–25 (1905).

123.   The power to regulate vaccinations belongs to the State, not to the federal government.  Indeed, it is well-settled that the power to impose vaccine mandates, if any such power exists at all, is a component of a *State's* police powers—quite separate and apart from matters of *federal* control.  *See*, *e.g.*, *Zucht v. King*, 260 U.S. 174, 176 (1922) ("it is within the *police power of a state* to provide for [or to decline to require] compulsory vaccination") (emphasis added).

124.   To that end, a State may "invest local bodies called into existence for purposes of local administration with authority in some appropriate way to safeguard the public health and the public safety." *Jacobson*, 197 U.S. at 25.

125.   Indeed, the seminal case upholding compulsory vaccinations—*Jacobson*— was explicitly predicated on the law's being an exercise of *State* police powers.  *Id*. at 25

28

(Harlan, J.) ("According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety.").  The federal government has little role to play here.

126.    *Jacobson* left little doubt that the "numerous and indefinite" powers a State enjoys encompassed public health measures whereas the federal government's enumerated authority would not:

> The mode or manner in which those results are to be accomplished is within the discretion of the state, subject, of course, so far as Federal power is concerned, *only* to the condition that no rule prescribed by a state, nor any regulation adopted by a local governmental agency acting under the sanction of state legislation, shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument.

197 U.S. at 25.  In other words, *Jacobson* confirmed that it is the State's police power that allows any government to regulate public health and left just one serious principle on the table: Unless the State's public health measure violates the Constitution's grant of individual liberties or some other clear constitutional provision, it will be upheld.

127.    This federalism debate as to vaccinations and other public-health policies was settled in the State's favor.  Although *Jacobson* preceded the Court's New Deal jurisprudence, nothing in that jurisprudence stamps out the State's police powers.

128.    The only remaining question—Does the President have the unilateral executive power granted in Article II of the Constitution to issue a vaccine mandate like the one at issue here amidst a pandemic?—was settled certainly no later than in the Steel Seizure Cases.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  The

source of that power must either come from the U.S. Constitution Article II, Section 1, or be altogether absent.

129.   *Youngstown* is dispositive.  In *Youngstown*, amidst a war (a crisis, if a crisis there ever were), the Supreme Court invalidated President Truman's unilateral effort to seize steel mills in order to ramp up steel production during wartime.  343 U.S. 579.  The President's failure to seek congressional authorization was held by the Supreme Court to be fatal to his cause and indispensable to the separation of powers.  *See id*.

130.   Just as the seizure of steel mills even for the production of wartime supplies—doubtless an important aspect of national defense—was law-making, so is the issuance of a vaccine mandate, no matter the governmental interests invoked.  But as the Supreme Court reminded us in *Youngstown*, "[i]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad."  *Id*. at 587.

131.   Our Founders carefully and deliberately opted for a kind of government that was powerfully different from an autocracy, thus stopping the President from venturing outside his limited Article II preserve.  This means, for our purposes, that law-making is *exclusively* a congressional preserve.  *See id.* at 589 ("The Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times.").  The President has no unilateral power under Article II to issue a vaccine mandate any more than he has the authority to seize private property.

132.   It follows that the vaccine mandate contravenes the Tenth Amendment and the principles of federalism enshrined in the Constitution.  Nor does anything in Article II give the President the power to issue a vaccine mandate.

133.   This mandate also exceeds the federal government's Commerce Clause authority because, under *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), and *Lopez*, the subject matter of this mandate is neither the "channel[] of interstate commerce;" nor is it the "instrumentalit[y] of interstate commerce, [n]or [does it concern] persons or things in interstate commerce;" nor, finally, does it have "a substantial relation to interstate commerce."  *Lopez*, 514 U.S. at 558–59.

134.   The taking or lack thereof of this vaccine is not an economic activity in the Commerce Clause sense any more than buying health insurance was so in *Sebelius*, 567 U.S. at 558, or having guns near schools was so in *Lopez*, 514 U.S. at 567.  Just as those federal laws did not survive Commerce Clause scrutiny, nor should the President's unilateral vaccine mandate.

135.   Moreover, this mandate compels Oklahoma and her sister States to spend precious state resources to be eligible for federal contracts.  The federal government is commandeering Oklahoma's state means and apparatus to achieve its own policy ends— in contravention of the anti-commandeering principle undergirding the Tenth Amendment. *See New York v. United States*, 505 U.S. 144 (1992).

136.   Because it is not economically viable for Oklahoma, which depends on the federal contracts—generating almost half a billion dollars for the Oklahoma

Government—to keep its economy going and to support its public employees and other citizens, to let go of these federal dollars, this mandate is unlawfully compulsory.

137.    Even assuming that the government is empowered to impose a vaccine mandate, that must be a police power reserved to the States.  No entity within the federal government is entitled to issue a vaccine mandate.

138.    For all these reasons, Defendants' vaccine mandate on federal contractors exceeds federal power and commandeers the resources and apparatus of the State of Oklahoma; and therefore should be struck down.

**COUNT V**
**Non-Delegation Principle**
**(Asserted Under the Separation of Powers and the Legislative and Executive Vesting Clauses of the U.S. Constitution)**

139.    The allegations in the preceding paragraphs are reincorporated herein.

140.    The separation of powers and the Legislative and Executive Vesting Clauses in the Constitution, *see* U.S. Constitution Article I, Section 1, and Article II, Section 1, do not permit Congress to delegate the momentous question of vaccine mandate to the Executive.  That question is one of great political and economic significance and involves matters that go to the core of human dignity, the individual's bodily integrity, and his right to refuse treatment.

141.    The Supreme Court has held that "Congress" may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935).

142.    Even with legislative acquiescence, the Executive may not act unilaterally in this space.  *See Gundy v. United States*, 139 S. Ct. 2116, 2131 (2019) (Alito, J., concurring in judgment) ("If a majority of this Court were willing to reconsider the approach [to the non-delegation principle] we have taken for the past 84 years, I would support that effort."); *id*. at 2131 (Gorsuch, J., dissenting) ("The Constitution promises that only the people's elected representatives may adopt new federal laws restricting liberty.").

143.    The delegation here fails because it is neither intelligible nor permissible, as Congress simply cannot delegate away its own powers on an issue as significant as a vaccine mandate, and certainly not through the generalized delegation upon which Defendants rely.  Furthermore, under our separation of powers, Congress categorically lacks the authority to delegate to other entities lawmaking functions.

144.    Therefore, even if Congress had delegated to the Executive the power to issue this vaccine mandate, the mandate still would be an unconstitutional delegation of legislative power.

## COUNT VI
## Violation of Rights to Due Process, to Bodily Integrity, and to Refuse Medical Treatment
## (Asserted Under Fifth Amendment to the U.S. Constitution)

145.    The allegations in the preceding paragraphs are reincorporated herein.

146.    As the Supreme Court recently reminded us, "even in a pandemic, the Constitution cannot be put away and forgotten."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020).

147.    This is not, or should not be, a new realization or insight.  Almost seventy years ago, the Supreme Court also held that the liberty interest in bodily integrity is protected by the Due Process Clauses of the Fifth and Fourteenth Amendments—a holding it has reaffirmed time and again.  *See Albright v. Oliver*, 510 U.S. 266, 272 (1994); *Rochin v. California*, 342 U.S. 165, 173–74 (1952).

148.    The Supreme Court has also held that "a competent person has a constitutionally protected liberty interest [under due process] in refusing unwanted medical treatment."  *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990).

149.    Each and "[e]very violation of a person's bodily integrity is an invasion of his or her liberty."  *Washington v. Harper*, 494 U.S. 210, 237 (1990) (Stevens, J., concurring in part).  "The invasion is particularly intrusive if it creates a substantial risk of permanent injury and premature death.  Moreover, any such action is degrading if it overrides a competent person's choice to reject a specific form of medical treatment."  *Id.* (footnote omitted).

150.    As the Supreme Court observed, it "ha[s] [long] assumed, and strongly suggested, that the Due Process Clause [of the Fifth Amendment or of the Fourteenth Amendment] protects the [individual's] traditional right to refuse unwanted life saving medical treatment." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Cruzan*, 497 U.S. at 278–79).

151.    A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty."  *Harper*, 494 U.S. at 229.

34

152.    This aligns with the unconstitutional-conditions doctrine, under which the government may not condition employment "on a basis that infringes [an employee's] constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.").

153.    That same core principle applies, with undiminished force, to governmental contracts. *See Bd. of Cty. Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 678 (1996).

154.    A State has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Oklahoma seeks to protect its residents' health and well-being from the vaccine mandate; consequently, the State has standing to bring this cause of action in federal court.

155.    Putting these principles together, the due process rights to bodily integrity and to refuse medical treatment survive through, and perhaps are most necessary during, grave crises. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 532 (2004) (plurality opinion) ("It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad."); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164–65 (1963) ("The imperative necessity for safeguarding these

35

rights to procedural due process under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit government action"); *United States v. Robel*, 389 U.S. 258, 264 (1967) ("It would indeed be ironic if, in the name of [health and safety], we would sanction the subversion of one of those liberties … which makes the [health and safety] of the Nation worthwhile"); *Does 1–3 v. Mills*, 2021 WL 5027177, *3 (2021) (Gorsuch, J. dissenting) ("If human nature and history teach anything, it is that civil liberties face grave risks when governments proclaim indefinite states of emergency").

156.   The Founders would have been unnerved and indeed deeply dismayed by this vaccine mandate.  As Justice Douglas described things more than five decades ago, this is part of "an alarming trend whereby the privacy and dignity of our citizens is being whittled away by sometimes imperceptible steps."  *Osborn v. United States*, 385 U.S. 323, 343 (1966) (dissenting opinion).  Of course, "[t]aken individually, each step may be of little consequence.  But when viewed as a whole, there begins to emerge a society quite unlike any we have seen—a society in which government may intrude into the secret regions of man's life at will."  *Id*. (Douglas, J., dissenting).

157.   Defendants' vaccine mandate violates the constitutional rights of federal contractors to bodily integrity and to refuse medical treatment.

158.   These constitutional rights encompass the right to refuse vaccinations. Vaccinations are supposed to immunize the individual being vaccinated.  Being vaccinated does not stop *anyone* from being a carrier of COVID-19.

36

159.    Consequently, Defendants' vaccine mandate violates the Fifth Amendment to the Constitution and is unlawful.

### COUNT VII
### This Vaccine Mandate is a Constitutionally Infirm Seizure of the Individual Effectuated by Means of Unconstitutional Conditions
### (Asserted Under the Fourth Amendment to the U.S. Constitution)

160.    The allegations in the preceding paragraphs are reincorporated herein.

161.    The Supreme Court has long held, and reaffirmed just last Term, that "the 'seizure' of a 'person'" may "take the form of … a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

162.    The Supreme Court has also held that a "compelled intrusio[n] into the body," *Schmerber v. California*, 384 U.S. 757, 767–68 (1966), one "penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable" under the Fourth Amendment, *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 616 (1989).  Such seizures "implicate[] privacy interests" and "concern[] … bodily integrity." *Id*. at 616–17.

163.    A private entity "that complies with [the governmental demands of seizing the person of that entity's employee] does so by compulsion of sovereign authority, and the lawfulness of its acts is controlled by the Fourth Amendment." *Id*. at 614.  In the Fourth Amendment context, that is never truer than when the government "encourage[s], endorse[s], and participat[es]" in the seizure. *Id*. at 615–16.

164.    This is also true when the government sets unconstitutional conditions to the enjoyment of a benefit.  "[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."  *Koontz,* 570 U.S. at 606; *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006); *Perry*, 408 U.S. at 597.

165.    Simply put, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected [right] even if he has no entitlement to that benefit." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 210 (2003) (cleaned up).

166.    A State has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607.  Oklahoma seeks to protect its residents' health and well-being from the vaccine mandate; thus, the State has standing to bring this cause of action in federal court.

167.    The vaccine mandate is an unconstitutional seizure of the person under the Fourth Amendment.  It certainly restrains the liberty of the person.  *See Torres*, 141 S. Ct. at 995; *Terry*, 392 U.S. at 19 n.16.

168.    This mandate forcibly intrudes into the physical person of the federal contractor's employee; it penetrates not just into the individual's skin but into her bloodstream—and becomes a component of her body.  *See Skinner*, 489 U.S. at 616; *Schmerber*, 384 U.S. at 767–68.  This involves the person's privacy, bodily integrity, and

dignity.   Society certainly recognizes the right to avoid such a compelled intrusion as reasonable.

169.    The federal government invokes its authority to force this mandate on to the federal contractors who then shift that burden on to their employees.   The federal government invokes its "sovereign authority" to impose this unconstitutional seizure on the federal contractor's employees, *Skinner*, 489 U.S. at 616, because it "encourage[s], endorse[s], and participat[es]" in this seizure of the individual, *id*. at 615–16.

170.    Through this vaccine mandate, the federal government also sets unconstitutional conditions on the contractor employees' ability to stay employed.   *See Rumsfeld*, 547 U.S. at 59.  It is of no moment whether those contractor employees had any legal right to such employment in the first place.   *See American Library Ass'n, Inc.*, 539 U.S. at 210; *Perry*, 408 U.S. at 597.

171.    Consequently, the vaccine mandate violates the Fourth Amendment.

## COUNT VIII
### Violation of the Free Exercise Clause
### (Asserted Under First Amendment to the U.S. Constitution)

172.    The allegations in the preceding paragraphs are reincorporated herein.

173.    The Supreme Court recently reaffirmed that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1876 (2021).  In fact, courts have held that the "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id*. at 1877.

174.   This means that a law will not be considered generally applicable if it "invites the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'"  *Id*. (cleaned up).  A corollary is that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason."  *Id*.

175.   Based on these principles, the Supreme Court has held laws not generally applicable under the following circumstances: the "good cause" standard to receive unemployment benefits (due to religious reasons) enabled the government to grant exemptions based on the individual circumstances underlying each application, *see Sherbert v. Verner*, 374 U.S. 398, 401 n.4 (1963); ordinances prohibiting animal sacrifice surgically targeted religion because they "did not regulate hunters' disposal of their kills or improper garbage disposal by restaurants," which all posed public-health risks, *see Fulton*, 141 S. Ct. at 1877 (referring to *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 544–45 (1993)); and city contracts requiring adoption agencies to be open on equal terms to straight and gay prospective foster parents but permitting exemptions at the "sole discretion of" the government decision-maker, *id.* at 1879.

176.   The Supreme Court held last Term that, whether or not an exemption actually is granted, "[t]he [very] creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it invite[s] the government to decide which reasons for not complying with the policy are worthy of solicitude."  *Id*.

177.   At this point in the analysis, the governmental policy will survive strict scrutiny only if it advances "interests of the highest order" and is narrowly tailored to achieve those interests. *Lukumi*, 508 U.S. at 546.   Courts must not examine any of the asserted interests at a high level of generality but instead must "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006).

178.   Governmental interests that in the abstract might be important will not necessarily justify the denial of a religious exemption in the immediate case.   And the burden is lopsidedly on the government, for "[t]he [very] creation of a system of exceptions … undermines the [government's] contention that its … policies can brook no departures." *Fulton*, 141 S. Ct. at 1882.   In recent years, the Supreme Court has not upheld any governmental interests in the face of such strict-scrutiny analysis. *See*, *e.g.*, *id.* at 1881–82; *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 (2017).

179.   A State has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607.   Oklahoma seeks to protect its residents' health and well-being from the vaccine mandate; accordingly, the State has standing to bring this cause of action in federal court.

180.   The vaccine mandate is undermining the sincerely held religious beliefs of Oklahoma residents.   This mandate is not a law of general applicability because it contains exemptions that almost certainly will be unavailable to private religious Plaintiffs and will

41

certainly be unavailable to the other private Plaintiffs.  Nor is there any compelling justification for the denial of such a religious exemption.

181.    Accordingly, the vaccine mandate violates the private religious Plaintiffs' Free Exercise Clause rights.

## COUNT IX
### Imposition of a Substantial Burden on Exercise of Religion
### (Asserted Under RFRA)

182.    The allegations in the preceding paragraphs are reincorporated herein.

183.    RFRA's text—the best indicator of its scope, *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 n.13 (1985)—forbids the federal government from "substantially burden[ing] a person's exercise of religion *even if the burden results from a rule of general applicability*," 42 U.S.C. § 2000bb-1(a) (emphasis added).

184.    RFRA also instructs courts to interpret the term "substantial burden" in a way that provides "broad protection of religious exercise, to the maximum extent permitted by [its] terms … and the Constitution." *Id.* §2000cc-3(g).  Under RFRA, a burden counts as "substantial" even if it "results from a rule of general applicability." § 2000bb-1(a).

185.    If the federal government does substantially burden a person's exercise of religion, that person is entitled to an exemption from the governmental policy *unless* the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb–1(b).

186.    A State has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in

the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607.  Oklahoma seeks to protect its residents' health and well-being from the vaccine mandate; the State, therefore, has standing to bring this cause of action in federal court.

187.    The vaccine mandate is undermining the sincerely held religious beliefs of Oklahoma residents.  This mandate imposes a substantial burden on their exercise of religion and is unsupported by any compelling governmental interests.  Nor is it the least restrictive means of furthering any valid governmental interest.

188.    Accordingly, the vaccine mandate violates the private religious Plaintiffs' RFRA rights.

### COUNT X
### President's Obligation to Faithfully Enforce the Laws Congress Has Enacted
### (Asserted Under the Separation of Powers and the Take Care Clause of the U.S. Constitution)

189.    The allegations in the preceding paragraphs are reincorporated herein.

190.    Even before the United States was founded, there was furor over the executive tendency to neglect enforcing or simply to overlook laws that the legislature had actually enacted—and those which it expected the executive to implement.  *See* Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* 118 (2020).  Known as the "dispensing power," it greatly troubled republican thinkers as well as the population at large.

191.    Indeed, the Constitution's requirement that the President must "'take care that the laws be faithfully executed' … means that the president is not permitted to

dispense with or suspend statutes the way King James II did before the Glorious Revolution of 1688." *Texas v. United States*, 524 F. Supp. 3d 598, 649 (S.D. Tex. 2021) (quoting Michael Stokes Paulsen, et al., *The Constitution of the United States* 317 (Robert C. Clark et al. eds., 2d ed. 2013)).

192.    Second, the President's Take Care Clause obligation clashes with the idea that he could ever ignore valid laws enacted by Congress, much less violate them.  In the Supreme Court's eyes, the Take Care Clause sets forth the President's "constitutionally appointed *duty*." *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988) (emphasis added).

193.    Numerous opinions of the Supreme Court and statements by individual Justices—spanning a long range of time—so reflect.  *See*, *e.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2228 (2020) (Kagan, J., concurring in part) ("To begin with, the provision—'he shall take Care that the Laws be faithfully executed'—speaks of *duty*, not *power*.") (emphases added); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 863 (1982) ("The Constitution imposes on the President the *duty* to take Care that the Laws be faithfully executed.") (cleaned up and emphasis added); *Myers v. United States*, 272 U.S. 52, 117 (1926) ("[James] Madison and his associates in the discussion in the House dwelt at length upon the necessity there was for construing article 2 to give the President the sole power of removal in his responsibility for the conduct of the executive branch, and enforced this by emphasizing his *duty* expressly declared in the third section of the article to take care that the laws be faithfully executed.") (cleaned up and emphasis added); Brett M. Kavanaugh, *Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution*, 89 Notre Dame L. Rev.

1907, 1911 (2014) ("To be sure, the President has the duty to take care that the laws be faithfully executed.").

194.    As does the original meaning of the Take Care Clause.  *See Texas v. United States*, No. 6:21-cv-00016, 2021 WL 3683913, at *39 (S.D. Tex. Aug. 19, 2021) (articulating and analyzing the original meaning of the Clause using contemporary dictionary definitions and other primary sources).

195.    A State has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607.  Oklahoma seeks to protect its residents' health and well-being from the vaccine mandate; thus, the State has standing to bring this cause of action in federal court.

196.    The President and his Administration have an obligation to comply with the federal procurement statutes, not to mention the APA.  But the President and the other Defendants are exceeding the authority given to them by the federal procurement statutes and violating the APA by committing process foul after process foul.  In particular, Defendants have cut the American People out of the equation by depriving them of the right to comment on this vaccine mandate.  The President and his Administration are breaking the law.

197.    Consequently, the President is doing anything but taking care that the laws enacted by Congress are faithfully executed.  He and the other Defendants are in violation of the separation of powers and the Take Care Clause of the Constitution.

45

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a)      Declaring the vaccine mandate unlawful under the Procurement Act;

b)      Declaring the vaccine mandate unlawful under the Procurement Policy Act;

c)      Declaring the vaccine mandate unlawful under the APA as an agency action not in accordance with law and in excess of authority as well as one that is arbitrary and capricious;

d)      Declaring the vaccine mandate unconstitutional because the Constitution does not confer the federal government the authority to issue this vaccine mandate under its federalism provisions or Article II;

e)      Declaring the vaccine mandate unconstitutional under the Constitution's non-delegation principle;

f)      Declaring the vaccine mandate unconstitutional under the Fifth Amendment's Due Process Clause;

g)      Declaring the vaccine mandate unconstitutional under the Fourth Amendment as an unreasonable seizure;

h)      Declaring unconstitutional under the Free Exercise Clause of the First Amendment the vaccine mandate;

i)      Declaring unlawful under RFRA, as applied to private religious Plaintiffs, the vaccine mandate;

j)      Declaring the vaccine mandate unconstitutional under the Constitution's separation of powers and the Take Care Clause;

k)      Awarding Plaintiffs costs of litigation, including reasonable attorneys' fees, under the Equal Access to Justice Act, 28 U.S.C. § 2412;

l)      Granting a temporary restraining order and/or preliminary injunction, followed by a permanent injunction, enjoining Defendants from enforcing the vaccine mandate; and

m)      Granting any and all other such relief as the Court finds appropriate.

Respectfully submitted,

*s/ Mithun Mansinghani*
Mithun Mansinghani
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF THE STATE OF OKLAHOMA
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Mithun.mansinghani@oag.ok.gov

H. Christopher Bartolomucci*
Riddhi Dasgupta*
Brian J. Field*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com
sdasgupta@schaerr-jaffe.com
bfield@schaerr-jaffe.com
* *Pro hac vice* motion forthcoming

*Counsel for Plaintiffs The State of*
*Oklahoma; J. Kevin Stitt, Governor of*
*Oklahoma; and John M. O'Connor,*
*Attorney General of Oklahoma*

Dated:  November 4, 2021