**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

STATE OF OKLAHOMA, *et al.*,

                                    *Plaintiffs*,

              v.                                              Case No: CIV-21-1069-G

JOSEPH R. BIDEN, JR., in his official capacity as
President of the United States, *et al.*,

                                    *Defendants*.

**PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... ii, iii, iv, v, vi

BACKGROUND ....................................................................................................... 1

ARGUMENT ............................................................................................................. 4

I.     Oklahoma Has Standing to Sue in Federal Court; and, in the Absence of a
Preliminary Injunction, Will Suffer Irreparable Harm. ....................................... 4

II.    Plaintiffs Are Likely to Succeed on the Merits .................................................. 7

      A.    The Vaccine Mandate Violates the Federal Property and
Administrative Services Act (the "Procurement Act") ........................... 7

      B.    The Mandate Violates the Office of Federal Procurement Policy Act
("Procurement Policy Act") .................................................................... 13

      C.    The Mandate Violates the Administrative Procedure Act. ................... 155

      D.    The Mandate Contravenes the Tenth Amendment and Other
Federalism Provisions in the Constitution. ............................................ 17

      E.    The Vaccine Mandate Violates the Constitution's Non-Delegation
Principle. ................................................................................................. 20

      F.    The Vaccine Mandate is an Unreasonable Search and Seizure
Under the Fourth Amendment. ............................................................... 21

      G.    The Mandate Violates the President's Obligation to Faithfully
Enforce the Laws Congress Has Enacted Under the Separation of
Powers and the Take Care Clause of the U.S. Constitution. ................. 23

III.    The Balance of the Equities as well as the Public Interest Counsel in
Favor of Preliminary Injunction Here. .............................................................. 24

IV.    Under Rule 65, No Bond Should Be Required Here. ....................................... 25

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ..................... 20, 21

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485 (2021) .... 9, 11

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982) .. 4, 5

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................... 25

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) .............................................. 12

*American Ins. Assn. v. Garamendi*, 539 U.S. 396 (2003) ................................................ 19

*Atascadero State Hosp. v. Scanlon*, 473 U.S. 234 (1985) ............................................... 10

*B.A.B., Jr. v. Board of Educ. of City of St. Louis*, 698 F.3d 1037 (8th Cir. 2012) ........... 21

*Bd. of Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668 (1996) .......................... 22, 23

*Bond v. United States*, 564 U.S. 211 (2011) .................................................................... 17

*BST Holdings, LLC v. OSHA*, No. 21-60845, 2021 WL 5279381
   (5th Cir. 2021) ...................................................................................... 13, 16, 18, 20

*California v. Greenwood*, 486 U.S. 35 (1988) ................................................................. 23

*Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321 (D.D.C. 2015) .......................... 24

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ................................................................. 8

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ............................................................... 15

*Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990) ............................ 10

*Deerfield Medical Center v. Deerfield Beach*, 61 F.2d 328 (5th Cir. 1981) ...................... 5

*DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891 (2020) ................................................ 16

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149
   (10th Cir. 2001) .......................................................................................................... 4

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ................................. 10

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ...................................................................... 11

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ...................................................................... 17

*Gundy v. United States*, 139 S. Ct. 2116 (2019) .............................................................. 21

**TABLE OF AUTHORITIES (cont'd)**

**Cases (cont'd)**

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ................................................................. 11, 16

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ......................................................................... 19

*J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) ..................................... 8

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ............................................................. 18

*King v. Burwell*, 576 U.S. 473 (2015) ......................................................................... 9, 11

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ................................ 22

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ..................................................... 15

*Lehman v. Nakshian*, 453 U.S. 156 (1981) ........................................................................ 5

*Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164 (4th Cir. 1981) ..................................... 8

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..................................................................... 4

*Michigan v. EPA*, 576 U.S. 743 (2015) ........................................................................... 16

*Mistretta v. United States*, 488 U.S. 361 (1989) ............................................................... 8

*Morrison v. Olson*, 487 U.S. 654 (1988) ......................................................................... 13

*Myers v. United States*, 272 U.S. 52 (1926) .................................................................... 24

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ......... 16

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) ....... 19, 20

*New York v. United States*, 505 U.S. 144 (1992) ............................................................. 20

*Pac. Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) ........................................ 24

*Paul v. United States*, 140 S. Ct. 342 (2019) ............................................................... 9, 21

*Planned Parenthood Ark. & E. Okla. v. Jegley*, 864 F.3d 953 (8th Cir. 2017) ............... 25

*Printz v. United States*, 521 U.S. 898 (1997) .................................................................. 18

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ........................... 25

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006) .......... 22, 23

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014) .......................................................... 11

**Cases (cont'd)**

*Schmerber v. California*, 384 U.S. 757 (1966)...................................................21

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020).........................24

*Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989) ............21, 22, 23

*Terry v. Ohio*, 392 U.S. 1 (1968)................................................................21, 22

*Texas v. United States*, 524 F. Supp. 3d 598 (S.D. Tex. 2021)........................................24

*Torres v. Madrid*, 141 S. Ct. 989 (2021) ........................................................21, 22

*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979).................................12

*United States v. Constantine*, 296 U.S. 287 (1935)........................................................18

*United States v. Dalm*, 494 U.S. 596 (1990) ...................................................................4

*United States v. Jacobsen*, 466 U.S. 109 (1984) .........................................................23

*United States v. Lopez*, 514 U.S. 549 (1995)................................................................20

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982) ...........................................24

*Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014).............................................9, 13

*Vencor, Inc. v. Webb*, 829 F. Supp. 244 (N.D. Ill. 1993) ................................................25

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001)............................................10

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .................................................4

*Wyoming ex rel. Crank v. United States*, 539 F.3d 1236 (10th Cir. 2008) ..........................5

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)..................................18, 19

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) .................................................19

*Zucht v. King*, 260 U.S. 174 (1922)..............................................................................18

**Constitutional Provisions**

U.S. Constitution, Article I, Section 1 ...................................................................20

U.S. Constitution, Article I, Section 8, Clause 3.............................................................19

U.S. Constitution, Article II, Section 1 .......................................................................20

**Constitutional Provisions (cont'd)**

U.S. Constitution, Article II, Section 3 ............................................................24

Okla. Const. art. VI, §§ 1 and 2 ..................................................................... 6

**Statutes and Regulations**

5 U.S.C. § 706(2)(A) ............................................................................... 15, 16

5 U.S.C. § 706(2)(C) ....................................................................................15

Federal Property and Administrative Services Act, 40 U.S.C. § 101 ........................... 7, 9

40 U.S.C. § 121(a) .................................................................................. 8, 15

41 U.S.C. § 1303(a) ................................................................................. 8, 15

41 U.S.C. § 1707 ........................................................................................14

41 U.S.C. § 1707(a)–(b) ........................................................................... 13, 14

41 U.S.C. § 1707(d) .....................................................................................14

42 U.S.C. § 265 ..........................................................................................11

42 U.S.C. § 268 ..........................................................................................11

Okla. Stat. tit. 68, § 2355(E) .......................................................................... 7

Okla. Admin. Code 1:2021-16 ........................................................................... 6

**Rules**

Fed. R. Civ. P. 65(c) ...................................................................................25

**Other Authorities**

Katie Adams, *States ranked by percentage of population fully vaccinated*,
BECKER'S HOSPITAL REVIEW ............................................................................. 7

President Joseph R. Biden, Jr., Remarks by President Biden on Fighting the
COVID-19 Pandemic (Sept. 9, 2021) ................................................................. 1, 2

*Centralizing Border Control Policy Under the Supervision of the Attorney General*,
26 Op. OLC 22 (2002) ...................................................................................15

# TABLE OF AUTHORITIES (cont'd)

**Other Authorities (cont'd)**

Executive Order No. 13991, Protecting the Federal Workforce and Requiring
Mask-Wearing, 86 Federal Register 7045 (Jan. 20, 2021) .............................................. 2

Executive Order No. 14042, Ensuring Adequate COVID Safety Protocols
for Federal Contractors, 86 Fed. Reg. 50985 (Sept. 9, 2021) ........................... 1, 2, 3, 25

THE FEDERALIST No. 45 (James Madison) (Clinton Rossiter ed., 2003)................... 17, 18

THE FEDERALIST No. 47 (James Madison) (Clinton Rossiter ed., 2003)........................ 17

THE FEDERALIST No. 70 (Alexander Hamilton) (J. Cooke ed. 1961).............................. 19

Liz Hamel et al., *KFF COVID-19 Vaccine Monitor: September 2021*,
KAISER FAMILY FOUNDATION (Sept. 28, 2021) ............................................................ 7

Jacob Jarvis, *Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines
in December 2020?,* NEWSWEEK (Sept. 10, 2021) ....................................................... 12

Michael W. McConnell, *The President Who Would Not Be King: Executive Power
under the Constitution* (2020) ................................................................................. 23

Michael Stokes Paulsen, et al., *The Constitution of the United States*
(Robert C. Clark et al. eds., 2d ed. 2013)........................................................................ 24

Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over
Foreign Affairs*, 111 Yale L.J. 231 (2001)..................................................................... 19

Jen Psaki, White House Press Sec'y, Press Briefing in the White House Press
Briefing Room (July 23, 2021) .................................................................................. 12

*COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*,
Safer Federal Workforce Taskforce (Sept. 24, 2021) ................................................. 1, 2

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW (2012)................................. 9, 11

The contractor mandate unilaterally imposed by President Biden and his Administration—given in the form of an executive order ("EO") and elaborated upon by guidance from an Executive Branch task force—forces federal contractors' employees to receive COVID-19 vaccinations. *See* Exec. Order No. 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed. Reg. 50985 (Sept. 9, 2021) ("EO 14042"); *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*, SFWTF (Sept. 24, 2021), https://tinyurl.com/sh7j732e. This mandate is a circuitous pretext to force vaccinations into the bloodstreams of as many unwilling Americans as possible. It undermines state sovereignty and individual autonomy and dignity. Its substance and the procedure by which it was adopted lacked congressional authorization and constitutional basis. Because Plaintiffs have satisfied all the conditions to obtain a preliminary injunction, this unprecedented and unlawful vaccine mandate should be enjoined.

## BACKGROUND

On September 9 of this year, President Biden declared his intention to issue an EO commanding all federal employees and federal contractors' employees to be vaccinated against COVID-19. *See* EO 14042, *supra*. These employees must comply on pain of losing their jobs and federal contracts, respectively, if they failed to so obey. *See id*. Notably, the contractors' employees need have nothing whatsoever to do with their employers' federal contracts in order to be subject to this mandate. *See id*. That same day the President also forced federal employees to get vaccinated, *see* President Joseph R. Biden, Jr., Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021) (transcript available

at https://tinyurl.com/3ky6c3rt), and would go on to compel employees at large private businesses to do so as well.

The President issued this diktat: "If you want to work with the federal government and do business with us, get vaccinated. If you want to do business with the federal government, vaccinate your workforce." *Id*. In so announcing, the President observed that around 100 million Americans' lives and bodies would be affected by these policies. *See id*. The President's motivation for this mandate was undisguised—it had nothing to do with contracts and everything to do with forcing vaccines into the bodies of unwilling Americans. *See id*. The President casually admitted that his "patience" with unvaccinated Americans was "wearing thin." *Id.*

Then on September 24, the Safer Federal Workforce Task Force (the "SFWTF")[1] issued guidance telling federal agencies how they can implement EO 14042's contractor mandate.[2] The three co-chairs overseeing the SFWTF are: (1) the Director of the Office of Personnel Management ("OPM"); (2) the Administrator of the General Services Administration ("GSA"); and (3) the COVID-19 Response Coordinator. This SFWTF guidance was never submitted to or published in the Federal Register, so Americans never got to comment on it. The SFWTF guidance states:

- Covered contractor employees must fully be vaccinated by December 8, 2021.
- "[C]overed contractor employee" includes "employees of covered contractors who

---

[1] The SFWTF had been established the very first day of the Biden Presidency under Executive Order No. 13991, Protecting the Federal Workforce and Requiring Mask-Wearing, 86 Federal Register 7045 (Jan. 20, 2021).

[2] *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*, SFWTF (Sept. 24, 2021), https://tinyurl.com/sh7j732e.

are not themselves working on or in connection with a covered contract"—so long as they are situated at the same place. Those employees need not have *anything at all* to do with their employer's federal government-related functions.

- These requirements are triggered by any new, renewal, or extension of a contract and contract-like instrument exceeding $250,000.
- The Federal Acquisition Regulatory Council ("FAR Council") is required to amend, by rulemaking, the Federal Acquisition Regulation ("FAR") to impose the mandate.
- By October 8, the FAR Council has to create a contract clause for federal agencies to use in their contracts with contractors.
- By mid-October, federal agencies are required to use that contract clause in solicitations with vendors.
- By no later than November 14, all awarded contracts are required to have that clause.
- Contracts executed between October 15 and November 14 are so encouraged.
- When a contract is awarded before October 15, but "where performance is ongoing," the contract clause must "be incorporated at the point at which an option is exercised or an extension is made."
- The SFWTF's guidance supersedes all sources of state and local law.

On September 28, 2021, Acting Office of Management and Budget ("OMB") Director, Shalanda D. Young, published a Federal Register notice stating that "compliance with COVID–19-related safety protocols improves economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."[3] But this notice contained no evidence or information supporting the OMB's claims or reasons justifying the rejection of any of the alternatives. Nor did the Acting OMB Director abide by the waiting period or the notice-and-comment process required by law—or explain why these circumventions might be warranted. This vaccine mandate applies to Oklahoma because many of its agencies, instrumentalities, institutions, and entities are federal contractors subject to it.

---

[3] Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 Fed. Reg. 53691, 53692 (Sept. 28, 2021).

**ARGUMENT**

A temporary restraining order and preliminary injunction should issue if the plaintiff shows (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Here, Plaintiffs amply satisfy each of these prongs.

I.    **Oklahoma Has Standing to Sue in Federal Court; and, in the Absence of a Preliminary Injunction, Will Suffer Irreparable Harm.**

Oklahoma and her fellow sovereign sister States in the Union are owed "special solicitude" as far as their standing to sue in federal court is concerned. *See Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). A State, furthermore, has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Oklahoma seeks to protect its residents' health and well-being from the mandate; thus, the State has ample standing to bring this cause of action.

A State may sue in federal court in its sovereign capacity when it has suffered an economic injury or is forced to deploy its resources. Economic harm inflicted on a State by federal agency action counts as irreparable injury because it cannot be rectified by monetary remedies, *see Dominion Video Satellite, Inc. v. EchoStar Satellite Corp*., 269 F.3d 1149, 1156 (10th Cir. 2001); and because the United States retains sovereign immunity in these circumstances, *see United States v. Dalm*, 494 U.S. 596, 608 (1990);

*Lehman v. Nakshian*, 453 U.S. 156, 160 (1981). Furthermore, a federal agency action's interference with the state's exercise of its sovereign "power to create and enforce a legal code" or any other violation of its legal rights is also an injury inflicted on the State's sovereignty and is irreparable. *Snapp*, 458 U.S. at 601; *see also Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008); *Deerfield Medical Center v. Deerfield Beach*, 61 F.2d 328, 338 (5th Cir. 1981).

Oklahoma's agencies and other state entities are federal contractors on a regular basis. These federal contracts are worth millions of dollars. To illustrate, the University of Oklahoma ("OU") receives around $400 million in federal contractor dollars, and the Oklahoma State University ("OSU") receives $90 million in federal contractor dollars. They cannot survive without this income. And they cannot ensure that all their employees or even a vast majority will get vaccinated. OU has almost 20,000 employees and OSU has approximately 14,200 employees.

Similarly, the Oklahoma Space Industry Development Authority ("OSIDA"), which has an agreement with the U.S. Department of the Air Force to maintain runways, currently receives approximately $7.5 million in federal contractor dollars. OSIDA has seven employees. Moreover, the Oklahoma Conservation Commission ("OCC") currently receives more than $5 million in federal contractor dollars from the NRCS; the USFWS; and the Environmental Protection Agency ("EPA"). The OCC has 54 employees. In addition, the Oklahoma Student Loan Authority ("OSLA") currently receives more than $5 million in federal contractor dollars from ED. OSLA's employees will be affected by this vaccine mandate. And the Oklahoma State Department of Health ("OSDH") currently

receives up to approximately $2 million in federal contractor dollars from CDC. OSDH has 2,103 employees. These effects, individually and collectively, injure the State's interests. All of these contracts are cyclically renewed.

As the representative declarations attest and the illustrative exhibits show, all of Oklahoma's federal contracts are now on the chopping block due to the vaccine mandate. *See* Ex. 1-5. Defendants are coercing Oklahoma to vaccinate not only as a condition of being eligible for *new* contracts but also to be eligible for renewals of existing ones. As the OU President's letter to his community shows, Oklahoma entities know much too well that refraining from foisting the vaccine mandate on their employees will cut those state entities off from being eligible for federal contracts going forward. *See* Ex. 6.

This vaccine mandate has put Oklahoma in this untenable and unenviable dilemma. As already noted, Oklahoma does not demand that anyone be vaccinated from COVID-19 in order to be able to enter its public buildings. *See* Okla. Admin. Code 1:2021-16 (citing art. VI, §§ 1 and 2 of Okla. Const.). This, of course, includes most state agencies that are or could be covered contractors.[4] As a result, the vaccine mandate holds a gun to Oklahoma's head, forcing it to choose between either amending or breaking state law *or* losing millions of federal contractor dollars.

Needless to say, Oklahoma will also suffer a grievous financial harm because of this vaccine mandate. About two-thirds of unvaccinated persons are estimated to quit their jobs

---

[4] This gubernatorial EO does not "apply to employees and buildings of state agencies primarily involved in medical patient-facing activities including research participant areas and facilities where patient care is the primary function." Okla. Admin. Code 1:2021-16.

if they are forced to take the COVID-19 vaccine.[5] And just over half of Oklahoma residents—50.49%, to be precise—are vaccinated.[6] This means that Oklahoma-based federal contractors, not to mention the State itself, soon will start to hemorrhage their labor supply on account of this vaccine mandate. This drop of available labor will harm Oklahoma economically by generating diminished income tax revenues. *See* Okla. Stat. tit. 68, § 2355(E) (noting that Oklahoma's new corporate income tax rate is 4 percent) (eff. Jan. 1, 2022). Since this mandate requires that federal contractors' employees be vaccinated by December 8, the irreparable harm to be inflicted on Oklahoma is imminent.

## II.  Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits because the mandate violates several statutes and constitutional provisions.

### A.  The Vaccine Mandate Violates the Federal Property and Administrative Services Act (the "Procurement Act").

The first such statute is the Procurement Act. The ostensible "[p]urpose" of this law was "to provide the Federal Government with an economical and efficient system for" certain specific procurement activities. 40 U.S.C. § 101. But Congress did not hand the President a blank check. The Procurement Act confers no authority on the President to issue binding regulations—he only has the power to "prescribe policies and directives" to

---

[5] Liz Hamel et al., *KFF COVID-19 Vaccine Monitor: September 2021*, KAISER FAMILY FOUNDATION (Sept. 28, 2021), https://tinyurl.com/2rxbdyv5.

[6] Katie Adams, *States ranked by percentage of population fully vaccinated*, BECKER'S HOSPITAL REVIEW, https://tinyurl.com/5fssp4dd (last visited Nov. 11, 2021).

pertinent federal agencies to execute this law. 40 U.S.C. § 121(a). Instead, Congress has empowered the FAR Council to issue such binding procurement regulations. That group is vested with the exclusive authority to issue "[g]overnment-wide procurement regulation[s]." 41 U.S.C. § 1303(a)(1)–(2).

A federal procurement regulation is invalid unless there is "a nexus between [it] and some delegation of the requisite legislative authority by Congress;" "the reviewing court [must] reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 308 (1979). No such nexus exists when such policies are "too attenuated to allow a reviewing court to find the requisite connection between procurement costs and social objectives." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981). Otherwise, where's the constitutionally required (at minimum) "intelligible principle" justifying the regulation? *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Critically, no such intelligible principle-type nexus exists when these policies are imposed on those who have "no direct connection to federal procurement." *Liberty Mut. Ins. Co.*, 639 F.2d at 171–72.

Additionally, the Procurement Act's providing the federal government with an "economic and efficient system for" procurement is not a sweeping delegation to the Executive for a breathtakingly broad coast-to-coast mandate. To this end, for decades now the Supreme Court has applied the Major Questions Doctrine canon of statutory interpretation, one with deep constitutional underpinnings. Premised on the separation of powers, this doctrine means that Congress will not be deemed to have *implicitly* delegated

questions of "deep economic and political significance" to the Executive Branch. *Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting denial of certiorari); *King v. Burwell*, 576 U.S. 473, 486 (2015). Congress is "expect[ed]" to "speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

This principle has additional weight when Congress is "intrud[ing] into an area that is the particular domain of state law." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489; ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 290–94 (2012). The Supreme Court "require[s] Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (cleaned up).

Nothing in the Procurement Act provides the President with the authority to impose this mandate. It is also clear that no nexus connects this vaccine mandate and the Procurement Act's purpose of providing an "economical and efficient system" of procurement through specifically enumerated means. 40 U.S.C. § 101. Because "[n]o [statutory] text pursues its purpose at all costs," purpose is a thin reed on which to base such a claim. SCALIA & GARNER, *supra*, at 57. And because it is geared towards specific procurement activities inapplicable here, it gives Defendants nothing. Had Congress afforded the Executive discretion to decide which vaccinations for what malaises should be compulsory, then Congress would have so stated in its operative provisions. But it has done no such thing.

On the *other* side of the ledger, a vaccine mandate on such a wide swath of the national economy—one-fourth—is a profound question of deep economic and political significance. This matter goes to the heart of individual dignity and liberty concerning bodily integrity and the *constitutional* right to decline even life-saving treatment. *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990). In addition, the vaccine mandate will inflict a deleterious impact on our national economy, efficiency, and culture because it will cause a mass exodus of employees. This mandate implicates transformative applications of economics, politics, epidemiology, and law. The mandate also undermines the sovereignty and police powers of Oklahoma by undoing its policy choice *not* to impose a vaccine mandate. Does anyone really think Congress furtively signed off on all this?

In order to deem this mandate to be a Procurement Act delegation, this Court would have to run roughshod over the presumption that Congress speaks clearly when it permits changes to the federal-state balance, *see Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985); when it "alter[s] the fundamental details of a [legal] scheme" by permitting the Executive to condition federal contracts on private parties' getting vaccinated, *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001); or when it concerns massive changes to the lives of Americans, *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

No one has ever deemed the Procurement Act to be a *carte blanche* to the Executive until the possibility of this mandate entered the current Executive's selective *zeitgeist*. That is just as well because the words of a law "mean what they conveyed to reasonable people at the time they were written"—its ordinary, contemporary meaning—not what they ought

to have said in light of present concerns. SCALIA & GARNER, *supra*, at 16; *see also Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014).

Context too bears out this inference regarding the Procurement Act's scope. Congress has shown itself adept at giving the Executive public-health authority in *other* circumstances. *See*, *e.g.*, 42 U.S.C. §§ 265, 268 (giving the Centers for Disease Control and Prevention ("CDC") Director wide discretion to prohibit "introduction of persons and property from [certain] countries or places as he shall designate"). But the Procurement Act gives the President no such authority. And "[n]othing prevents the President from returning to Congress to seek the authority he believes necessary." *Hamdan v. Rumsfeld*, 548 U.S. 557, 636 (2006) (Breyer, J., concurring).

Another contextual clue: Congress would be *most* "unlikely" to "have delegated this decision to" the SFWTF, which lacks "expertise in crafting" sensible rules "of this sort" in the absence of clear statutory guidance. *King*, 576 U.S. at 486 (citing *Gonzales v. Oregon*, 546 U.S. 243, 266–67 (2006)). True, the SFWTF includes the CDC, but it is unclear what the CDC would know about the subject matter of *mandating* vaccines. Surely, it knew little about eviction moratoria; and even that stratagem did not work with the Supreme Court. *See Ala. Ass'n of Realtors*, 141 S. Ct. 2485. And this vaccine mandate is not, in any event, a delegation to the CDC; it is a delegation to a broader group with complex dynamics that are not necessarily cohesive. After all, the SFWTF also contains agencies that have no special expertise whatsoever about vaccine mandates. And Congress never made or countenanced a delegation to them about vaccine mandates.

Common sense too militates against reading too much into the Procurement Act.

Let's remember it is a *procurement* statute whose meaning this Court is called upon to expound. Lest it be forgotten, the proper name of this statute is the *Federal Property and Administrative Services Act*. That does not sound like a statute Congress intended to allow anyone in the federal government to mandate anything on any Americans merely because they work in the same office as a federal contractor. It is merely an operational statute about the federal government's buying goods and services to keep itself running. As the Supreme Court has acknowledged, "the title of a statute" is a "tool[] available for the resolution of a doubt about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (cleaned up). And nothing about "Federal Property and Administrative Services Act" even whispers public-health mandate. A rational Congress would not absentmindedly have snuck vaccine mandate authority into the law. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 (1979).

A court, consequently, should resist presuming that Congress somehow snuck into this procurement law a major delegation to the Executive to mandate a large group of Americans to get vaccinated as a condition for keeping their jobs. Look no further than the present Administration's course of dealing. For the longest time, the Administration resisted the notion of issuing a vaccine mandate,[7] presumably because it knew that it had no such authority. But now Defendants' vaccine-mandate plan has become all-

---

[7] Jen Psaki, White House Press Sec'y, Press Briefing in the White House Press Briefing Room (July 23, 2021), https://tinyurl.com/52ru4fut; Jacob Jarvis, *Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020?,* NEWSWEEK (Sept. 10, 2021), https://tinyurl.com/37z7p8y5.

encompassing. The rub is that "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [courts] typically greet its announcement with a measure of skepticism." *Utility Air Regulatory Grp.*, 573 U.S. at 324 (cleaned up). Defendants' imaginative lawmaking is unpersuasive.

Nothing in the Procurement Act allows the President to exercise such sweeping authority. This mandate claims to "derive[] its authority from an old statute employed in a novel manner, imposes ... [m]illion[s] in compliance costs, involves broad medical considerations that lie outside of [the FAR Council's] core competencies, and purports to definitively resolve one of today's most hotly debated political issues." *BST Holdings, LLC v. OSHA*, No. 21-60845, 2021 WL 5279381, at *8 (5th Cir. Nov. 12, 2021). It conspicuously fails the straight-face test. Such concentration of power violates our Republic's "proud boast" that we live under "a government of laws, and not of men." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting) (cleaned up). Defendants' vaccine mandate violates the Procurement Act.

### B.    The Mandate Violates the Office of Federal Procurement Policy Act ("Procurement Policy Act")

As noted above, the vaccine mandate violates the Procurement Act. But if the mandate *is* permitted under the Procurement Act, then it violates the Procurement Policy Act, which requires that a "procurement policy, regulation, procedure, or form" be subject to a 60-day notice-and-comment process, if it—"(A) relates to the expenditure of appropriated funds; and (B)(i) has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form; or (ii) has a

significant cost or administrative impact on contractors or offerors." 41 U.S.C. § 1707(a)–(b). This requirement may be waived if the federal government can demonstrate that "urgent and compelling circumstances make [notice-and-comment] compliance … impracticable," *id*. § 1707(d). Waived by whom? "[B]y the officer authorized to issue a procurement policy, regulation, procedure, or form if urgent and compelling circumstances make compliance with the requirements impracticable." *Id*.

This mandate is a procurement "policy" and a procurement "procedure" under § 1707(a). It satisfies each of the conditions set forth by the Procurement Policy Act. *See id.* § 1707(a)–(b). Not only does this mandate concern the expenditure of funds Congress has appropriated for particular objectives, it fully reshuffles SFWTF's internal operating procedures and has an enormous impact on the national economy; and this mandate imposes great monetary and administrative costs on everyone subject to it.

Defendants failed to publish their mandate for public comment in the Federal Register in violation of 41 U.S.C. § 1707. Nor did Defendants provide the required 60-day comment period before the vaccine mandate became effective either. *See id*. Not a single authorized officer from the OMB, FAR Council, or any federal entity ever waived the Procurement Policy Act's requirements insofar as this mandate is concerned prior to its issue. The conclusion, then, is inescapable: When issuing the vaccine mandate, Defendants did not conform to the Procurement Policy Act's rigorous requirements. That deficiency renders this mandate facially invalid under 41 U.S.C. § 1707.

### C. The Mandate Violates the Administrative Procedure Act ("APA").

Defendants have also violated the APA, in two ways. First, under the APA, a court is required to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). As discussed, Defendants' vaccine mandate exceeds the bounds set by Congress in the Procurement Act and the Procurement Policy Act.

Defendants' vaccine mandate, specifically the OMB rule, is unlawful for at least two further reasons. That rule violates 41 U.S.C. § 1303(a) because *only* the FAR Council may issue such government-wide procurement regulations. *See Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President."). In addition, the President is not permitted to issue procurement orders that have the force or effect of law, *see* 40 U.S.C. § 121(a), even though he may direct procurement operations.

Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). And that's important because federal agencies are creatures of the congressional will and "literally ha[ve] no power to act … unless and until Congress confers power upon [them]"—and only to *that* limited extent. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Neither more nor less.

The mandate was issued, it is clear, without congressional authorization. Indeed, as Justice Breyer once said, "judicial insistence upon that [Executive] consultation [with Congress] [would] not weaken our Nation's ability to deal with danger" or challenges.

*Hamdan*, 548 U.S. at 636 (concurring opinion). Therefore, this mandate is not in accordance with law and exceeds the authority granted to the Executive Branch by Congress. It thus violates the APA.

The vaccine mandate violates the APA in a second respect as well. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). This policy is arbitrary and capricious for several reasons, including because it ignores the costs to the States, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015). Neither this mandate nor its administrative record even mentions the harm it might cause States or private persons.

Defendants' omissions run deeper. They have failed to explain their departure from prior practice; and such an "unexplained inconsistency" is impermissible under the APA. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). Although "[a]n initial agency interpretation is not instantly carved in stone," it is equally true that an "agency ... must consider varying interpretations and the wisdom of its policy on a continuing basis," be it "in response to changed factual circumstances, or a change in administrations." *Id.* at 981 (cleaned up). Furthermore, neither the mandate's text nor its administrative record "makes [any] serious attempt to explain why [the Administration] and the President himself were against vaccine mandates before they were for one here." *BST Holdings*, 2021 WL 5279381, at *5 (footnote omitted). Nor have Defendants accounted for Oklahoma's sovereignty, laws, reliance interests, and other pertinent factors or considered lesser alternatives, thereby rendering this mandate arbitrary and capricious. *See DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

Additional considerations compel the same conclusion. As an initial matter, Defendants have failed to consider the mass exodus of unvaccinated employees of federal contractors in our current economy that is already facing a vast labor shortage, inflation, and supply-chain challenges. What is more, Defendants have failed to consider the legal and factual assertions made in this Motion, the preceding Complaint, and in the parallel lawsuits challenging this mandate. Defendants have also failed to exempt those who have a natural immunity to COVID-19. And Defendants have failed to exempt those who work in their own homes or other venues that render them unlikely to catch or spread COVID-19. Consequently, this mandate is arbitrary and capricious under the APA.

### D. The Mandate Contravenes the Tenth Amendment and Other Federalism Provisions in the Constitution.

This mandate also violates the Constitution. For example, an axiom undergirding our constitutional structure is that the federal government is one of limited powers and does not get to control all aspects of our lives: "our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991); *see also* THE FEDERALIST No. 47, at 298 (James Madison) (Clinton Rossiter ed., 2003). "[A]llocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States … in part, [as] an end in itself, to ensure that States function as political entities in their own right." *Bond v. United States*, 564 U.S. 211, 221 (2011).

That's where the Tenth Amendment, which protects the States' "residuary and inviolable sovereignty," THE FEDERALIST No. 45, at 289 (James Madison) (Clinton

Rossiter ed., 2003), comes in. "The powers reserved to the several States," it was understood at the Founding, "will extend to all the objects … concern[ing] the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." THE FEDERALIST No. 45, at 45. This "inherent[ly]" includes the States' police powers, *United States v. Constantine*, 296 U.S. 287, 295–96 (1935)—and is separate and apart from anything within federal control. The police power, encompassing public health, safety, and morals, is the "power which the state did not surrender when becoming a member of the Union under the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 24–25 (1905); *see also Printz v. United States*, 521 U.S. 898, 919 (1997).

If there is any power to mandate vaccinations, it belongs only to the State. *See*, *e.g.*, *Zucht v. King*, 260 U.S. 174, 176 (1922); *BST Holdings*, 2021 WL 5279381, at *7. Furthermore, *Jacobson*, which upheld compulsory vaccinations, was explicitly predicated on the Massachusetts law's being an exercise of *State* police powers. 197 U.S. at 25 ("[T]he police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety."). Long ago, this federalism debate as to vaccinations and other public-health policies was settled in the State's favor.

Just one serious question remains: Does the President have the unilateral executive power granted in Article II of the Constitution to issue a vaccine mandate like the one at issue here amidst a pandemic? This question was resolved certainly no later than in the Steel Seizure Cases. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). The source of that power must either come from the U.S. Constitution Article II, Section 1,

or be altogether absent. For our purposes, *Youngstown* is dispositive. In *Youngstown*, amidst a martial conflict, the Supreme Court invalidated President Truman's unilateral effort to seize steel mills in order to ramp up steel production during wartime. 343 U.S. 579. The President's failure to seek congressional authorization proved fatal to his cause and indispensable to the separation of powers. *See id.*

Issuing vaccine mandates falls well outside the President's limited Article II preserve. Conducting foreign policy and advancing national security are part of the President's residual executive power—because in those spheres, he speaks for the Nation in one voice and must do so with "activity, secrecy, and dispatch," traits that derive from the Executive's "unity," THE FEDERALIST No. 70, at 472 (Alexander Hamilton) (J. Cooke ed. 1961)—but issuing a vaccine mandate by trampling on State police powers, individual autonomy, and the constitutional functions of Congress certainly is not. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14–15 (2015); *American Ins. Assn. v. Garamendi*, 539 U.S. 396, 424 (2003); *Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting); Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs*, 111 Yale L.J. 231, 252–65 (2001). This also means, for our purposes, that law-making is *exclusively* a congressional preserve. *See Youngstown*, 343 U.S. at 589. The President has no unilateral power under Article II to issue a vaccine mandate. This mandate also violates the Tenth Amendment and the Constitution's federalism principles.

In addition, this mandate exceeds the federal government's Commerce Clause authority, *see* U.S. Constitution, Article I, Section 8, Clause 3, because, under *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), and *United States v.*

*Lopez*, 514 U.S. 549, 558–59 (1995), the subject matter of this mandate is neither the "channel[] of interstate commerce;" nor is it the "instrumentalit[y] of interstate commerce, [n]or [does it concern] persons or things in interstate commerce;" nor still does it have "a substantial relation to interstate commerce." "A person's choice to remain unvaccinated and forgo regular testing" is not an economic activity in the Commerce Clause sense, *BST Holdings*, 2021 WL 5279381, at *7—any more than buying health insurance was so in *Sebelius*, 567 U.S. at 558, or having guns near schools was so in *Lopez*, 514 U.S. at 567.

This mandate also forces Oklahoma and her sister States to spend precious state resources to be eligible for federal contracts. The federal government is commandeering Oklahoma's means and apparatus to achieve its own policy ends—in contravention of the anti-commandeering principle undergirding the Tenth Amendment. *See New York v. United States*, 505 U.S. 144 (1992). And Defendants know that Oklahoma has no real choice in the matter—being forced to choose between sustaining its economy and the livelihoods of its residents or obeying its laws—which renders this mandate unconstitutionally coercive. Consequently, Defendants' vaccine mandate exceeds all limitations on federal power and unconstitutionally commandeers Oklahoma's resources.

### E.     The Vaccine Mandate Violates the Constitution's Non-Delegation Principle.

The mandate also runs afoul of the separation of powers, which does not permit Congress to delegate the momentous question of vaccine mandate to the Executive. The Supreme Court has held that "Congress" may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp.*

*v. United States*, 295 U.S. 495, 529–30 (1935). Even with legislative acquiescence, the Executive may not act unilaterally in this space. *See Paul*, 140 S. Ct. 342 (Kavanaugh, J., respecting denial of certiorari); *Gundy v. United States*, 139 S. Ct. 2116, 2131 (2019) (Alito, J., concurring in judgment); *id.* (Gorsuch, J., dissenting).

The delegation here fails because it is neither intelligible nor permissible, as Congress simply cannot delegate away its own powers on an issue as significant as a vaccine mandate, and certainly not through the generalized delegation upon which Defendants rely. Furthermore, under our separation of powers, Congress categorically lacks the authority to delegate to other entities lawmaking functions.

### F.     The Vaccine Mandate is an Unreasonable Search and Seizure Under the Fourth Amendment.

The Fourth Amendment forbids "unreasonable searches and seizures" by the government. The Supreme Court reaffirmed just last Term that "the 'seizure' of a 'person'" may "take the form of … a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Forcible vaccinations have been treated as "search[es] and seizure[s]" for the Fourth Amendment purposes. *See, e.g.*, *B.A.B., Jr. v. Board of Educ. of City of St. Louis*, 698 F.3d 1037, 1039–40 (8th Cir. 2012) (rejecting Fourth Amendment claim on other grounds).

A "compelled intrusio[n] into the body," *Schmerber v. California*, 384 U.S. 757, 767–68 (1966), one "penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable" under the Fourth Amendment, *Skinner v.*

*Railway Labor Executives' Association*, 489 U.S. 602, 616 (1989). Such seizures "implicate[] privacy interests" and "concern[] … bodily integrity." *Id*. at 616–17. Here, we are not just talking about beneath-the-skin penetration but about into-the-bloodstream intrusion. *A fortiori*, the search and seizure here is unreasonable and unconstitutional.

A private entity "that complies with [the governmental demands of seizing the person of that entity's employee] does so by compulsion of sovereign authority, and the lawfulness of its acts is controlled by the Fourth Amendment." *Id*. at 614. That is never truer than when the government "encourage[s], endorse[s], and participat[es]" in the seizure. *Id*. at 615–16. This principle holds true when the government sets unconstitutional conditions to the enjoyment of a benefit. "[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Koontz v. St. Johns River Water Mgmt. Dist.,* 570 U.S. 595, 606 (2013); *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) ("*FAIR*"). In essence, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected [right] even if he has no entitlement to that benefit." *Bd. of Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 674 (1996) (cleaned up).

The vaccine mandate is an unconstitutional search and seizure of the person under the Fourth Amendment. In its search and seizure of unvaccinated workers, it restrains the liberty of the person. *See Torres*, 141 S. Ct. at 995; *Terry*, 392 U.S. at 19 n.16. This mandate forcibly intrudes into the physical person of the federal contractor's employee; it penetrates into her bloodstream. *See Skinner*, 489 U.S. at 616. This intrusion violates the person's

privacy and bodily integrity. Society clearly recognizes the right to avoid such a compelled intrusion as reasonable. *See California v. Greenwood*, 486 U.S. 35, 43 (1988); *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

The federal government invokes its "sovereign authority" to impose this unconstitutional seizure on the federal contractor's employees, *Skinner*, 489 U.S. at 616, because it "encourage[s], endorse[s], and participat[es]" in this seizure of the individual, *id*. at 615–16. Through this mandate, it also sets unconstitutional conditions on the contractor employees' ability to stay employed. *See FAIR*, 547 U.S. at 59. It is immaterial whether those employees had any legal right to such employment in the first place. *See Umbehr*, 518 U.S. at 674. As a result, the mandate violates the Fourth Amendment.

G.     **The Mandate Violates the President's Obligation to Faithfully Enforce the Laws Congress Has Enacted Under the Separation of Powers and the Take Care Clause of the U.S. Constitution.**

The mandate also violates other constitutional provisions. Even before our Founding, colonists were troubled by the British Crown's proclivity to neglect enforcing laws that the Crown did not like as well as to claim authority that the Parliament never had committed to the Crown. *See* Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* 118 (2020). Known as the "dispensing power," it deeply offended adherents of the rule of law as well as everyday colonists. By enshrining the separation of powers in the Constitution, the Framers repudiated any miasma of the dispensing power. Moreover, the Constitution's requirement that the President must "'take care that the laws be faithfully executed' … means that the president is not permitted

to dispense with or suspend statutes." *Texas v. United States*, 524 F. Supp. 3d 598, 649 (S.D. Tex. 2021) (quoting Michael Stokes Paulsen, et al., *The Constitution of the United States* 317 (Robert C. Clark et al. eds., 2d ed. 2013)); *see also* U.S. Const. Art. II, § 3.

Numerous opinions of the Supreme Court and statements by individual Justices so reflect. *See*, *e.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2228 (2020) (Kagan, J., concurring in part) ("[T]he provision—'he shall take Care that the Laws be faithfully executed'—speaks of duty, not power."); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 863 (1982) ("The Constitution imposes on the President the duty to take Care that the Laws be faithfully executed.") (cleaned up); *Myers v. United States*, 272 U.S. 52, 117 (1926) (noting Presidential "duty expressly declared in the third section of the article to take care that the laws be faithfully executed.") (cleaned up).

The President and his Administration are obligated to comply with the federal procurement statutes as well as the APA. By acting well outside the scope of their statutory authority, Defendants are violating the separation of powers and the Take Care Clause.

*   *   *

Plaintiffs are more than likely to succeed on the merits of their Complaint.

## III.    The Balance of the Equities as well as the Public Interest Counsel in Favor of Preliminary Injunction Here.

Both the equities and the public interest favor an injunction here. "Forcing federal agencies to comply with the law is undoubtedly in the public interest," *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015); *see also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994), even amidst COVID-19. For "even in a

pandemic, the Constitution [and laws] cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). Additionally, "[t]he effect on the health of the local economy is a proper consideration in the public interest analysis." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011). It also is "against the public interest to force a person out of a job." *Vencor, Inc. v. Webb*, 829 F. Supp. 244, 251 (N.D. Ill. 1993). And enabling a State to "implement[]" its "duly enacted state statute" is a public interest of the highest order. *Planned Parenthood Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957–58 (8th Cir. 2017).

## IV.    Under Rule 65, No Bond Should Be Required Here.

Under Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A trial court has "wide discretion under Rule 65(c) in determining whether to require security." *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (cleaned up). No bond should be required here.

## CONCLUSION

The Court should temporarily restrain and preliminarily enjoin Defendants from enforcing, implementing, or giving any effect to EO 14042, the OMB rule, or FAR Council guidance in Oklahoma.

Respectfully submitted,

*s/ Mithun Mansinghani*
Mithun Mansinghani
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF THE STATE OF OKLAHOMA
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Mithun.mansinghani@oag.ok.gov

Gene C. Schaerr*
H. Christopher Bartolomucci**
Riddhi Dasgupta**
Brian J. Field**
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
cbartolomucci@schaerr-jaffe.com
sdasgupta@schaerr-jaffe.com
bfield@schaerr-jaffe.com
* *Pro hac vice* motion forthcoming
** *Pro hac vice* motion pending

*Counsel for Plaintiffs The State of Oklahoma; J. Kevin Stitt, Governor of Oklahoma; and John M. O'Connor, Attorney General of Oklahoma*

Dated: November 15, 2021