# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

THE STATE OF OKLAHOMA et al.,

           Plaintiffs,

   v.

JOSEPH R. BIDEN et al.,

           Defendants.

No. CIV-21-1069-G

## OPPOSITION TO OKLAHOMA'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRAD P. ROSENBERG
Assistant Director

KRISTIN TAYLOR
MADELINE M. MCMAHON
JODY D. LOWENSTEIN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch

# TABLE OF CONTENTS

INTRODUCTION ................................................................. **Error! Bookmark not defined.**

BACKGROUND ................................................................... **Error! Bookmark not defined.**

I.      The COVID-19 Pandemic ............................................ **Error! Bookmark not defined.**

II.     Vaccination Requirements for Federal Contractors.... **Error! Bookmark not defined.**

III.    This Lawsuit ................................................................ **Error! Bookmark not defined.**

ARGUMENT .......................................................................... **Error! Bookmark not defined.**

I.      Oklahoma lacks standing. ............................................. **Error! Bookmark not defined.**

II.     Even assuming this Court reaches the merits, none of Oklahoma's various
        theories establishes a substantial likelihood of success................**Error! Bookmark not
        defined.**

        A.      The vaccine requirement does not violate FPASA..........**Error! Bookmark not
                defined.**

        B.      Oklahoma is not likely to succeed on its Administrative Procedure Act
                ("APA") claims. ................................................... **Error! Bookmark not defined.**

        C.      Oklahoma's 41 U.S.C. § 1707 claims are not likely to succeed. .................**Error!
                Bookmark not defined.**

                1.      Section 1707 challenges to the September OMB Determination
                        and EO must fail.................................... **Error! Bookmark not defined.**

                2.      The Task Force Guidance and FAR Memo are not "policies"
                        subject to 41 U.S.C. § 1707.................... **Error! Bookmark not defined.**

        D.      Oklahoma is not likely to succeed on its constitutional claims..................**Error!
                Bookmark not defined.**

                1.      The challenged actions do not offend the Tenth Amendment. .....**Error!
                        Bookmark not defined.**

                2.      FPASA does not violate the nondelegation doctrine. **Error! Bookmark
                        not defined.**

                3.      EO 14042's vaccine requirement does not violate the Fourth
                        Amendment. ......................................... **Error! Bookmark not defined.**1

4.      Oklahoma cannot proceed with its Take Care Clause or
        separation-of-powers claims.................**Error! Bookmark not defined.**

III.    Oklahoma does not face irreparable harm. .................**Error! Bookmark not defined.**

IV.     The equities and the public interest weigh against injunctive relief. . **Error! Bookmark not defined.**

V.      In all events, this court should not enter relief extending beyond federal
        contracts with Oklahoma and should only enjoin enforcement of the
        challenged provisions. ....................................................**Error! Bookmark not defined.**

CONCLUSION .........................................................................**Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

## CASES

*AFGE v. Carmen,*
  669 F.2d 815 (D.C. Cir. 1981) ...................................................................................................18

*AFL-CIO v. Kahn,*
  618 F.2d 784 (D.C. Cir. 1979) .............................................................................................*passim*

*Akiachak Native Cmty. v. U.S. Dep't of Interior,*
  827 F.3d 100 (D.C. Cir. 2016) ..................................................................................................20

*Alabama Association of Realtors v. Department of Health & Human Services,*
  141 S. Ct. 2485 (2021).............................................................................................................19

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
  458 U.S. 592 (1982)........................................................................................................8, 11-12

*Am.'s Frontline Drs. v. Wilcox,*
  No. EDCV 21-1243, 2021 WL 4546923 (C.D. Cal. July 30, 2021).....................................42

*Arbitraje Casa de Cambio, S.A. de CV. v. United States,*
  79 Fed. Cl. 235 (Fed. Cl. 2007)...............................................................................................15

*B.A.B., Jr. v. Board of Education of City of St. Louis,*
  698 F.3d 1037 (8th Cir. 2012)..................................................................................................33

*Beckerich v. St. Elizabeth Med. Ctr.,*
  ---F. Supp. 3d---, 2021 WL 4398027 (E.D. Ky. Sept. 24, 2021) *denying reconsideration,*
  2021 WL 4722915 (E.D. Ky. Sept. 30, 2021)........................................................................43

*Bennett v. Spear,*
  520 U.S. 154 (1997)..................................................................................................................19

*Brackeen v. Haaland,*
  994 F.3d 249 (5th Cir. 2021), *petition for cert. filed,*
  No. 21-380 (U.S. Sept. 8, 2021)........................................................................................26-27, 29

*Brendlin v. California,*
  551 U.S. 249 (2007)..................................................................................................................33

*Bronson v. Swensen,*
  500 F.3d 1099 (10th Cir. 2007).............................................................................................. 7-8

*Brown v. Gilmore,*
  122 S. Ct. 1 (2001)....................................................................................................................44

*BST Holdings, L.L.C. v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ................................................................................................19

*Case v. Bowles,*
  327 U.S. 92 (1946) ..............................................................................................................29

*Chamber of Com. of U.S. v. Napolitano,*
  648 F. Supp. 2d 726 (D. Md. 2009) ..........................................................................13, 17-18

*Chamber of Com. of U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ) ....................................................................................15, 19

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council,*
  467 U.S. 837 (1984) ............................................................................................................15

*City of Albuquerque v. U.S. Dep't of Interior,*
  379 F.3d 901 (10th Cir. 2004) ................................................................................13, 18, 31

*City of Columbus v. Trump,*
  453 F. Supp. 3d 770 (D. Md. 2020) ....................................................................................35

*Cnty. of Sacramento v. Lewis,*
  523 U.S. 833 (1998) ............................................................................................................33

*Colorado v. U.S. Env't Prot. Agency,*
  989 F.3d 874 (10th Cir. 2021) .........................................................................................7, 36

*Connecticut v. Physicians Health Servs. of Conn., Inc.,*
  287 F.3d 110 (2d Cir. 2002) ...............................................................................................26

*Coyne-Delany Co. v. Capital Dev. Bd.,*
  616 F.2d 341 (7th Cir. 1980) ...............................................................................................42

*Dalton v. Specter,*
  511 U.S. 462 (1994) ......................................................................................................20, 34

*Dames & Moore v. Regan,*
  453 U.S. 654 (1981) ............................................................................................................14

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) .........................................................................................................22

*Detroit Int'l Bridge Co. v. Gov't of Canada,*
  189 F. Supp. 3d 85 (D.D.C. 2016) ......................................................................................21

*Doe v. Bd. of Educ. of City of Chi.,*
  --- F. Supp. 3d ----, 2020 WL 1445638 (N.D. Ill. Mar. 24, 2020) .....................................33

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
269 F.3d 1149 (10th Cir. 2001)................................................................7

*Farkas v. Tex. Instrument, Inc.*,
375 F.2d 629 (5th Cir. 1967)................................................................13

*Farmer v. Phila. Elec. Co.*,
329 F.2d 3 (3d Cir. 1964)................................................................13

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021)................................................................21-22

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)................................................................14-15

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)................................................................20

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019)................................................................7

*FW/PBS, Inc., v. City of Dallas*,
493 U.S. 215 (1990)................................................................8

*Garcia v. San Antonio Metro. Transit Auth.*,
469 U.S. 528 (1985)................................................................28

*Gaytan v. New Mexico*,
No. 19-cv-0778, 2021 WL 1634383 (D.N.M. Apr. 27, 2021)................................................................32

*Gill v. Whitford*,
138 S. Ct. 1916 (2018)................................................................45

*GTE Corp. v. Williams*,
731 F.2d 676 (10th Cir. 1984)................................................................41

*Gundy v. United States*,
139 S. Ct. 2116 (2019)................................................................30

*Heideman v. S. Salt Lake City*,
348 F.3d 1182 (10th Cir. 2003)................................................................36-37

*Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
702 F.3d 1156 (10th Cir. 2012)................................................................21

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
452 U.S. 264 (1981)................................................................29

*Holland v. Nat'l Mining Ass'n,*
  309 F.3d 808 (D.C. Cir. 2002) ...................................................................................45

*Hollingsworth v. Perry,*
  570 U.S. 693 (2013) ...................................................................................................32

*Hollis v. Biden,*
  No. 1:21-CV-163-GHD-RP, 2021 WL 5500500 (N.D. Miss. Nov. 23, 2021) .................... 10, 12, 45

*In re Nat'l Sec. Agency Telecomms. Recs. Litig.,*
  671 F.3d 881 (9th Cir. 2011) ......................................................................................30

*Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.,*
  31 F.3d 1536 (10th Cir. 1994) ....................................................................................41

*Kelley v. United States,*
  69 F.3d 1503 (10th Cir. 1995) ....................................................................................26

*Kentucky v. Biden,*
  No. 3:21-55, 2021 WL 5587446 (E.D. Ky. Nov. 30, 2021) .....................................12-13, 23

*Kyllo v. United States,*
  533 U.S. 27 (2001) .....................................................................................................32

*Las Ams. Immigrant Advoc. Ctr. v. Biden,*
  --- F. Supp. 3d ----, 2021 WL 5530948 (D. Or. Nov. 24, 2021) ................................35

*Le Sportsac, Inc. v. Dockside Rsch., Inc.,*
  478 F. Supp. 602 (S.D.N.Y. 1979) .............................................................................41

*Liberty Mut. Ins. Co. v. Friedman,*
  639 F.2d 164 (4th Cir. 1981) ......................................................................................16

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ..........................................................................................8, 11, 35

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020)) .................................8

*Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.,*
  810 F.3d 1161 (10th Cir. 2016) ..................................................................................42

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ...................................................................................................12

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) .....................................................................................................9

*Meyer v. Bush,*
    981 F.2d 1288 (D.C. Cir. 1993) ............................................................................19

*Minnesota v. Carter,*
    525 U.S. 83 (1998) ...............................................................................................32

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1867) ...............................................................................35

*Mistretta v. United States,*
    488 U.S. 361 (1989) .........................................................................................29-31

*Morris v. Noe,*
    672 F.3d 1185 (10th Cir. 2012) ...........................................................................33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...........................................................................................21-22

*Munaf v. Geren,*
    553 U.S. 674 (2008) ..............................................................................................7

*Murphy v. National Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018) .........................................................................................27

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior,*
    854 F.3d 1236 (10th Cir. 2017) .............................................................................7

*N.Y.C. Transit Auth. v. Beazer,*
    440 U.S. 568 (1979) .............................................................................................35

*Nagim v. Walker,*
    No. 10-CV-02973-WYD-KLM, 2011 WL 1542460 (D. Colo. Mar. 8, 2011),
    *report and recommendation adopted,* No. 10-CV-02973-WYD-KLM,
    2011 WL 1542157 (D. Colo. Apr. 25, 2011) ......................................................39

*Nat'l Ass'n of Mfrs. v. Perez,*
    103 F. Supp. 3d 7 (D.D.C. 2015) .........................................................................18

*Nat'l Res. Def. Council, Inc. v. U.S. Dep't of State (NRDC),*
    658 F. Supp. 2d 105 (D.D.C. 2009) ...............................................................20, 23

*New York v. United States,*
    505 U.S. 144 (1992) ......................................................................................25, 27

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................................41, 44

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) ............................................................................. 7

*Ohio v. United States,*
    849 F.3d 313 (6th Cir. 2017) ............................................................................. 28

*Oklahoma ex rel. Okla. Dep't of Pub. Safety v. United States,*
    161 F.3d 1266 (10th Cir. 1998) ....................................................................... 29

*Paul v. United States,*
    140 S. Ct. 342 (2019) ........................................................................................ 31

*Perkins v. Lukens Steel Co.,*
    310 U.S. 113 (1940) .............................................................................. 19, 40, 42

*Petrella v. Brownback,*
    787 F.3d 1242, 1265 (10th Cir. 2015) ............................................................ 34

*Phelps v. Hamilton,*
    122 F.3d 1309 (10th Cir. 1997) ......................................................................... 8

*Prairie Band of Potawatomi Indians v. Pierce,*
    253 F.3d 1234 (10th Cir. 2001) ....................................................................... 36

*Princeton Univ. v. Schmid,*
    455 U.S. 100 (1982) ......................................................................................... 20

*Printz v. United States,*
    521 U.S. 898 (1997) ..................................................................................... 27-28

*Raines v. Byrd,*
    521 U.S. 811 (1997) ........................................................................................... 8

*Reedy v. Werholtz,*
    660 F.3d 1270, 1277 (10th Cir. 2011) ............................................................ 34

*Rodden v. Fauci,*
    No. 3:21-CV-317, 2021 WL 5545234 (S.D. Tex. Nov. 27, 2021) .............. 19, 24

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) ......................................................................................... 42

*Schmerber v. California,*
    384 U.S. 757 (1966) ......................................................................................... 33

*Schrier v. Univ. of Colo.,*
    427 F.3d 1253 (10th Cir. 2005) ....................................................................... 36

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ....................................................................................22

*Skinner v. Ry. Lab. Execs.' Ass'n*,
   489 U.S. 602 (1989) ....................................................................................33

*Smith v. Biden*,
   No. 1:21-cv-19457, 2021 WL 5195688 (D.N.J. Nov. 8, 2021),
   *appeal filed*, No. 21-3091 (3d Cir. Nov. 10, 2021) ....................................34, 43, 45

*South Carolina v. Baker*,
   485 U.S. 505 (1988) ....................................................................................28

*Speech First, Inc. v. Killeen*,
   968 F.3d 628 (7th Cir. 2020) ........................................................................8

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 84 (1998) ......................................................................................8

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ....................................................................................2

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
   576 U.S. 519 (2015) ....................................................................................14

*Tigges v. Northam*,
   473 F. Supp. 3d 559 (E.D. Va. 2020) ............................................................42

*Touby v. United States*,
   500 U.S. 160 (1991) ....................................................................................31

*Town of Johnston v. Fed. Hous. Fin. Agency*,
   765 F.3d 80 (1st Cir. 2014) ..........................................................................28

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ................................................................................45

*Tulare Cnty. v. Bush*,
   185 F. Supp. 2d 18 (D.D.C. 2001),
   *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002) ..........................................................20, 23

*UAW-Lab. Emp. & Training Corp. v. Chao*,
   325 F.3d 360 (D.C. Cir. 2003) ....................................................................13, 16-18

*United States v. Comstock*,
   560 U.S. 126 (2010) ....................................................................................25

*United States v. Easley*,
    911 F.3d 1074 (10th Cir. 2018)............................................................33-34

*United States v. Hatch*,
    722 F.3d 1193 (10th Cir. 2013)...............................................................26

*United States v. Jones*,
    565 U.S. 400 (2012)................................................................................32

*United States v. Mikhel*,
    889 F.3d 1003 (9th Cir. 2018).................................................................26

*United States v. Poe*,
    556 F.3d 1113 (10th Cir. 2009)...............................................................32

*United States v. Rivera*,
    No. 11-cr-0196, 2012 WL 12919987 (D. Wyo. Mar. 22, 2012) ...............32

*United States v. Smythe*,
    84 F.3d 1240 (10th Cir. 1996).................................................................32

*United States v. Thomas*,
    372 F.3d 1173 (10th Cir. 2004)...............................................................32

*United States v. Virginia*,
    139 F.3d 984 (4th Cir. 1998)...................................................................29

*Valdez v. Grisham*,
    ---F. Supp. 3d---, 2021 WL 4145746 (D.N.M. Sept. 13, 2021), *appeal filed*,
    No. 21-2105 (10th Cir. Sept. 15, 2021) ...................................................42

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982)................................................................................26

*Vencor, Inc. v. Webb*,
    829 F. Supp. 244 (N.D. Ill. 1993)............................................................43

*Washington v. Unified Gov't of Wyandotte Cnty.*,
    847 F.3d 1192 (10th Cir. 2017)...............................................................33

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)............................................................................30-31

*Wilderness Soc'y v. Kane Cnty.*,
    632 F.3d 1162 (10th Cir. 2011)...............................................................32

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................7, 36, 44

*Wyoming ex rel. Crank v. United States,*
    539 F.3d 1236 (10th Cir 2008) ........................................................................................11

*Wyoming ex rel. Sullivan v. Lujan,*
    969 F.2d 877 (10th Cir. 1992) .........................................................................................12

*Wyoming v. U.S. Dep't of Agric.,*
    414 F.3d 1207 (10th Cir. 2005) ................................................................................. 20, 23

*Wyoming v. U.S. Dep't of Interior,*
    674 F.3d 1220 (10th Cir. 2012) .......................................................................................12

*Yakus v. United States,*
    321 U.S. 414 (1944) ........................................................................................................31

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ........................................................................................................26

## CONSTITUTION

U.S. Const. amend. X .........................................................................................................25

## STATUTES

3 U.S.C. § 301 ............................................................................................................... 3, 20

28 U.S.C. § 1491 .........................................................................................................36-37

40 U.S.C. § 101 ......................................................................................................12-13, 30

40 U.S.C. § 121 ......................................................................................................... *passim*

41 U.S.C. Chapter 17 .......................................................................................................23

41 U.S.C. § 133 ................................................................................................................23

41 U.S.C. § 1303 ........................................................................................................ 16, 21

41 U.S.C. § 1707 ..........................................................................................................23-24

41 U.S.C. § 6701 ................................................................................................................3

Pub. L. No. 99-500
    100 Stat. 1783-345 (1986) ..............................................................................................14

Pub. L. No. 99-591
    100 Stat. 3341-45 (1986) ................................................................................................14

Pub. L. No. 104-208
    110 Stat. 3009-355 (1996) .................................................................................................14

Pub. L. No. 107-217
    116 Stat.1062, 1068 (2002) ...............................................................................................14

Okla. Admin. Code 1:2021-16 .................................................................................................11

**REGULATIONS**

48 C.F.R. § 2.101 .....................................................................................................................4

Exec. Order No. 8802,
    6 Fed. Reg. 3109 (June 27, 1941) .....................................................................................15

Exec. Order No. 12072,
    43 Fed. Reg. 36869 (Aug. 16, 1978) .................................................................................14

Exec. Order No. 13465,
    73 Fed. Reg. 33285 (June 11, 2008) .................................................................................14

Exec. Order No. 13950,
    85 Fed. Reg. 60683 (Sept. 22, 2020) ...............................................................................14

Exec. Order No. 14042,
    86 Fed. Reg. 50,985 (Sept. 14, 2021) .........................................................................2, 12-13

Declaring a Nat'l Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,
    Proclamation No. 9994,
    85 Fed. Reg. 15,337 (Mar. 18, 2020) .................................................................................2

Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task
    Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis,
    86 FR 63418 (Nov. 16, 2021) ...................................................................................*passim*

Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to
    Executive Order No. 14042,
    (Sept. 28, 2021) .................................................................................................................4

Federal Acquisition Regulation; Contractor Responsibility, Labor Relations Costs, and Costs
    Relating to Legal and Other Proceedings, 66 Fed. Reg. 17754 (Apr. 3, 2001) ...................24

Federal Acquisition Regulation: Non-Retaliation for Disclosure of Compensation Information,
    81 Fed. Reg. 67732 (Sept. 30 2016) ..................................................................................24

November OMB Determination, 86 FR 63422 (Feb. 16, 2021) ................................21-22, 41

## OTHER AUTHORITIES

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)......................................14

CDC COVID Data Tracker, as of December 6, 2021,
    https://perma.cc/L6FU-3RKD .........................................................................................2

CDC, Rates of COVID-19 Cases and Deaths by Vaccination Status
    (date posted November 22, 2021),
    https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status....................................18

CDC, Rates of laboratory-confirmed COVID-19 hospitalizations by vaccination status
    (dated posted December 2, 2021),
    https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination ......................18

DoD, Open FAR Cases as of November 1, 2021, FAR Case No. 2021-021, Ensuring Adequate
    COVID-19 Safety Protocols for Federal Contractors,
    https://perma.cc/ZQ4Y-8Y9W.............................................................................5

Liz Hamel et al., *FFF COVID-19 Vaccine Monitor: September 2021*,
    KAISER FAMILY FOUNDATION (Sept. 28, 2021),
    https://perma.cc/U6HH-8KPW (captured Dec. 4, 2021)...........................................9-10

Memo. from FAR Council for Chief Acquisition Officers, et al., re: Issuance of Agency Deviations
    to Implement Executive Order 14042 (Sept. 30, 2021),
    https://perma.cc/9BQ8XBT6...........................................................................5, 25

*Monitor: September 2021*, KAISER FAMILY FOUNDATION (Sept. 28, 2021),
    https://perma.cc/U6HH-8KPW (captured Dec. 4, 2021)...............................................10

Oxford English Dictionary (3d ed. 2009)..................................................................16

Pandemic Response Accountability Committee, Top Challenges Facing Federal Agencies
    (June 2020),
    https://perma.cc/GGF4-F4FV...........................................................................41

Safer Federal Workforce, Federal Contractor FAQs, Compliance,
    https://perma.cc/RGR9-ZTES ..........................................................................45

SARS-CoV-2. HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020),
    https://perma.cc/VZ5X-CT5R...........................................................................2

Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors,
    https://perma.cc/H2MY-K8RT ..........................................................................4

White House, Fact Sheet: Biden Administration Announces Details of Two Major Vaccination
    Policies (Nov. 4, 2021),
        https://perma.cc/7FPV-PA2N      5

**INTRODUCTION**

Plaintiffs (together "Oklahoma") have sued the President and 28 federal agencies, officials, or bodies. Oklahoma challenges Executive Order ("EO") 14042 which requires federal agencies to include in new or renewed contracts, essentially, a clause requiring specified COVID-19 safety protocols, including vaccination by contractor employees. *See* Exec. Order No. 14042, 86 Fed. Reg. ("FR") 50,985 (Sept. 14, 2021) ("Executive Order" or "EO 14042"). Oklahoma characterizes the EO as an attack on "state sovereignty and individual autonomy and dignity," Mot. TRO. & Prelim. Inj., Dkt. 9 at 1 ("Mot."), but it is actually just a routine exercise of the Federal Government's right to contract on equal footing with others.

The EO solely relates to the President's authority to direct procurement policy across the Executive Branch. That authority is not regulatory in nature, but rather reflects the President's role as Chief Executive Officer of the Executive Branch acting as a market participant. The President's authority to direct the Federal Government's contracting policy is well settled and has with regularity included procurement- and supply-related decisions that also have broader social impact. Oklahoma's arguments to the contrary lack merit and have been routinely rejected by courts. Oklahoma therefore is unlikely to succeed on the merits.

Oklahoma also fails to show that it has standing to bring this suit, or to demonstrate irreparable harm. It has identified no contracts between itself and the Federal Government that will include the challenged contractual provision. The balance of equities and the public interest are also against Oklahoma. The Federal Government has a compelling interest in preventing the spread of COVID-19 among its contractors' employees.

At bottom, Oklahoma is asking this Court to impose, through the extraordinary remedy of a preliminary injunction, Oklahoma's view on what terms should be in contracts negotiated by the Federal Government—even for contracts to which Oklahoma is not a party. That relief

would constitute a remarkable intrusion into the ability of parties to enter into contracts on the terms they may choose, and cause enormous disruptions to the Federal Government's ability to receive services from contractors in an economical and efficient manner in light of the ongoing pandemic. It would also fundamentally undermine the federal government's sovereignty. This Court should deny the requested relief.

## BACKGROUND

### I.      The COVID-19 Pandemic

On January 31, 2020, the Secretary of Health and Human Services ("HHS") declared a public health emergency due to COVID-19, a respiratory disease caused by the novel coronavirus, SARS-CoV-2. HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R. On March 13, 2020, the President declared the COVID-19 outbreak a national emergency. Declaring a Nat'l Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation No. 9994, 85 FR 15,337 (Mar. 18, 2020). In July 2021, the United States began to experience "a rapid and alarming rise in . . . COVID-19 case and hospitalization rates," driven by an especially contagious strain. *See* Centers for Disease Control and Prevention ("CDC"), Delta Variant: What We Know About the Science (updated Aug. 26, 2021), https://perma.cc/4RW6-7SGB.[1] To date, almost 49 million Americans have been infected with, and more than 780,000 have died from, COVID-19. CDC COVID Data Tracker, as of December 6, 2021, https://perma.cc/L6FU-3RKD.

### II.     Vaccination Requirements for Federal Contractors

On September 9, the President issued EO 14042 to "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with

---

[1] The Court may take judicial notice of factual information available on government websites. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

a Federal Government contract or contract-like instrument." EO 14042 § 1. New safeguards would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." *Id.* Those safeguards would be set forth in guidance issued by the Safer Federal Workforce Task Force ("Task Force"), *id.* § 2(a), and become binding when the Office of Management and Budget ("OMB") Director, pursuant to a delegation of the President's statutory authority, determined the guidance would "promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors." *Id.* § 2(c) (citing 3 U.S.C. § 301).

Pursuant to the EO, the President, as the ultimate manager of federal procurement, directed federal executive departments and agencies to incorporate a clause (a "COVID-19 safety clause") implementing the Task Force's guidance (if approved by the OMB Director) into certain contracts. Specifically, they were, "to the extent permitted by law," to incorporate the COVID-19 safety clause into new contracts, new solicitations for a contract, extensions or renewals of an existing contract, and exercises of an option on an existing contract if those contracts also fall into one of the following categories (all requirements together, "covered contracts"): (i) a procurement contract for services, construction, or a leasehold interest in real property; (ii) a contract for services covered by the Service Contract Act, 41 U.S.C. §§ 6701-6707; (iii) a contract for concessions; or (iv) certain contracts entered into with the Federal Government in connection with Federal property or lands and related to offering certain services. EO 14042 § 5(a). The COVID-19 safety clause must specify compliance by the contractor or subcontractor with the Task Force's published guidance for workplace locations, again provided that guidance is approved by the OMB Director. *Id.* at § 2(a).

The EO also directs the Federal Acquisition Regulatory Council ("FAR Council"), "to the extent permitted by law," to make corresponding amendments to the Federal Acquisition

3

Regulation ("FAR") providing for inclusion of the COVID-19 safety clause in future covered contracts. Because that amendment process takes time, the EO directs the FAR Council to issue interim guidance to federal agencies on how to incorporate the COVID-19 safety clause into covered contracts until the FAR Amendment takes effect. *Id.* § 3(a).

The EO, however, is targeted and has exceptions. Its mandate does not apply to grants, or to most contracts for procurement of goods (versus services). *See id.* § 5(a)(i), (b)(i), (b)(v). Nor does its mandate apply to "contracts or subcontracts whose value is equal to or less than the simplified acquisition threshold" ("SAT"), which is essentially $250,000. *Id.* § 5(a)(iii). *See also* 48 C.F.R. § 2.101. And, although "agencies are strongly encouraged, to the extent permitted by law, to ensure that the safety protocols required under [existing] contracts . . . are consistent with" the Task Force's guidance, the EO does not require (or even give authority for) agencies to insert the COVID-19 safety clause into existing contracts. EO 14042 § 6(c).

Pursuant to the EO, the Task Force issued guidance on September 24, 2021. Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors, https://perma.cc/H2MY-K8RT ("September Guidance"). It required federal contractors who are party to a covered contract to ensure that all covered contractor employees are fully vaccinated for COVID-19 by December 8, 2021, except where an employee was legally entitled to an accommodation. *See id.* 5–6. Exercising the authority delegated to her by the President, the Acting OMB Director made the statutorily required determination that the Task Force Guidance would promote "economy and efficiency" in federal contracting. *See* Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 FR 53691, 53691–92 (Sept. 28, 2021) ("September OMB Determination"). The FAR Council then issued guidance on September 30, 2021, providing initial direction for the incorporation of the COVID-19 safety clause and a sample clause.

4

Memo. from FAR Council for Chief Acquisition Officers, et al., re: Issuance of Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021), https://perma.cc/9BQ8-XBT6 [hereinafter "FAR Memo"]. Separately, the FAR Council has begun the rulemaking process to amend the FAR in order to implement EO 14042. *See* DoD, Open FAR Cases as of November 1, 2021 at 2, FAR Case No. 2021-021, Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors, https://perma.cc/ZQ4Y-8Y9W.

On November 4, 2021, the President announced an extension of the vaccination deadline for contractor employees to January 18, 2022. White House, Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies (Nov. 4, 2021), https://perma.cc/7FPV-PA2N (extending deadline to receive final vaccine shot to January 4, 2022). On November 10, 2021, the Acting OMB Director issued a revised Determination ("November OMB Determination") and the Task Force issued updated guidance. *See* Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 FR 63418 (Nov. 16, 2021). The November OMB Determination rescinded and superseded the prior Determination and formally confirmed the extension of the compliance date to January 18, 2022. *Id.* at 63418, 63420. It also provided a detailed economic analysis of the Task Force Guidance's impact on the economy and efficiency of government contracting. *See id.* at 63418. Effective as of November 10, 2021, the November OMB Determination, provides for a public comment period through December 16, 2021.[2] *Id.*

The Task Force Guidance requires federal contractors—"prime contractor[s] or subcontractor[s] at any tier who [are] party to a covered contract," *id.* at 63419, to "ensure that

---

[2] Throughout, "Task Force Guidance" means the operative guidance at the time; so, for most of the discussion herein, it means the guidance in place as of November 10, 2021.

all covered contractor employees are fully vaccinated for COVID-19, unless the employee is legally entitled to an accommodation,"[3] *id.* at 63420.[4] After January 18, 2022, covered contractor employees not subject to the requirement (*i.e.*, where no COVID-19 safety clause is applicable) "must be fully vaccinated by the first day of the period of performance on a newly awarded covered contract, and by the first day of the period of performance on an exercised option or extended or renewed contract when the [COVID-19 safety] clause has been incorporated into the covered contract." *Id.* at 63420. Covered contractors oversee compliance with the Task Force Guidance, and also may have legal obligations to provide accommodations to covered contractor employees "who communicate to the covered contractor that they are not vaccinated against COVID-19 because of a disability (which would include medical conditions) or because of a sincerely held religious belief, practice, or observance." *Id.*

### III.   This Lawsuit

Oklahoma filed this lawsuit on November 4, 2021, but has not amended its Complaint to account for the November OMB Determination. *See* Compl., Dkt. 1. On November 15, 2021, Oklahoma filed a motion for a temporary restraining order and a preliminary injunction. *See generally* Mot. at 6. Defendants oppose the motion.

---

[3] "[P]eople are considered fully vaccinated if they have received COVID-19 vaccines currently approved or authorized for emergency use by the FDA (Pfizer-BioNTech, Moderna, and Johnson & Johnson/Janssen COVID-19 vaccines) or COVID-19 vaccines that have been listed for emergency use by the World Health Organization (e.g., AstraZeneca/Oxford)." 86 FR 63419. The timeline is dependent on whether the vaccine used requires a one- or two-dose application. *Id.*

[4] Covered contractor employees are "any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace." 86 FR at 63419. A covered contractor workplace is "a location controlled by a covered contractor at which any employee of a covered contractor working on or in connection with a covered contract is likely to be present during the period of performance for a covered contract." *Id.*

## ARGUMENT

"[A] preliminary injunction is an extraordinary remedy," so "the movant's right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001) (citation omitted). To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that a balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) (noting that "[a] difficult question of jurisdiction" makes a "likelihood of success on the merits" even "more *unlikely* due to potential impediments to even reaching the merits").

"Certain types of preliminary injunctions are disfavored and require a movant to satisfy a heightened standard." *Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883-84 (10th Cir. 2021) (citing *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1246 n.15 (10th Cir. 2017)). This applies when a request for injunction: (1) mandates (rather than prohibits) action, (2) changes the status quo or (3) would grant the movant all the relief it could expect to win at the conclusion of a trial (*e.g.*, the relief sought is redressable through monetary damages). *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citations omitted). "When seeking a disfavored injunction, the movant 'must make a strong showing' both on the likelihood of success on the merits and on the balance of the harms." *Colorado*, 989 F.3d at 884 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc)). As Oklahoma alleges economic injury and also seeks to upend the status quo, it requests a disfavored injunction. It does not meet its burden.

## I. Oklahoma lacks standing.

Oklahoma bears the burden to demonstrate that jurisdiction is proper. *Bronson v.*

*Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007). As "the Constitution extends the 'judicial Power' of the United States only to 'cases' and 'Controversies,'" this Court "cannot proceed at all" unless Oklahoma establishes the "irreducible constitutional minimum of standing." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 84, 102 (1998); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That involves: (1) an "injury in fact—an invasion of a legally protected interest which is concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a "causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (cleaned up). And where, as here, the case involves deciding "whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the "standing inquiry [is] especially rigorous." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

A plaintiff's burden to demonstrate standing in a preliminary injunction motion is "at least as great as the burden of resisting a summary judgment motion." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020)). "It is a long-settled principle that standing alone cannot be 'inferred argumentatively from averments in the pleadings,' but rather 'must affirmatively appear in the record.'" *FW/PBS, Inc., v. City of Dallas*, 493 U.S. 215, 231 (1990) (citations omitted); *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997) (quoting *FW/PBS*, 493 U.S. at 231). Oklahoma attempts to meet its burden to show standing (and irreparable harm) by alleging economic injury, "interference with the state's exercise of its sovereign 'power,'" and *parens patriae* grounds. Mot. at 4–5 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 60 (1982)). None of Oklahoma's efforts succeed, and thus this Court lacks the authority to enter the "extraordinary and drastic" relief that

Oklahoma seeks. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

*Economic Injury*. Oklahoma has made no serious effort to carry its "especially rigorous" burden of proof regarding economic injury: claims about the speculative and hypothetical loss of contracts or potential tax revenue do not satisfy the requirement that Oklahoma "clearly show" a concrete, particularized, and imminent injury to itself that can be traced to the EO and is likely to be redressed by a favorable decision. Though Oklahoma alleges there are "federal contracts . . . worth millions of dollars" with Oklahoma-state agencies impacted by the EO, Mot. at 5, it only offers evidence[5] of purportedly imperiled contracts with five Federal Government agencies; but the EO does not require the inclusion of the COVID-19 safety clause in any of those contracts. All of the contracts identified in Oklahoma's evidence predate the EO, are not up for renewal in the near future, fall below the SAT (*i.e.*, they are exempt from the EO's direct application), or otherwise fall outside the EO's scope of express authority. *See generally* Exs. A–F; *see also infra* 37–39; EO 14042 § 5. And, although Oklahoma's declarations identify two existing contracts not subject to the EO's requirements where a federal agency (the CDC) asked for a modification to include a COVID-19 safety clause, those contracts have not been amended and the CDC intends to rescind its modification request. Ex. F, Lopez Decl. ¶ 10. None of this proof demonstrates standing to sue.

Nor can Oklahoma demonstrate standing due to an alleged "hemorrhag[ing] . . . labor supply", Mot. at 7, from objectors to vaccination leaving their positions without (1) identifying any contracts that include the COVID-19 safety clause, (2) offering real proof of a large number of individuals actually leaving their positions in response to vaccine requirements,[6]

---

[5] One of Oklahoma's declarations—its Exhibit 2—is not properly before the Court as it is unsigned. *See* Mot. Ex. 2. For the sake of argument, Defendants treat that exhibit as if it were faultless.

[6] Oklahoma cites a research project published by the Kaiser Family Foundation ("KFF"), claiming "[a]bout two-thirds of unvaccinated persons are estimated to quit their jobs if they are forced to take the COVID-19 vaccine." Mot. at 4–5, note 5 (citing Liz Hamel et al., *FFF COVID-19 Vaccine Monitor:*

and (3) demonstrating through evidence no replacement workers will be available. *Cf.* November OMB Determination, 86 FR 63422. Oklahoma fails to offer any such proof.

Oklahoma also fails to show standing based on being "coerc[ed]" to require vaccination "as a condition of being eligible for *new* contracts . . . [and] to be eligible for renewals of existing ones." Mot. at 6 (emphasis in original). It offers no evidence of any existing contract that is "on the chopping block due to the vaccine mandate." *Id.* And, to prove future contracts are imperiled, Oklahoma provided only an e-mail from the President of the University of Oklahoma ("OU") advising that, as a result of the EO, all university employees must vaccinate against COVID-19. Mot. at 6, Ex. 6. There is no proof in the record of any federal agency issuing a solicitation to which an Oklahoma state entity could not submit a proposal due to an inability to comply with or agree to a COVID-19 safety clause, and OU's decision to interpret the EO and the Task Force Guidance in the manner that it did (*i.e.*, by requiring all OU employees to vaccinate) cannot demonstrate standing for Oklahoma in this suit. *See Hollis v. Biden*, No. 1:21-CV-163-GHD-RP, 2021 WL 5500500, at *4 (N.D. Miss. Nov. 23, 2021) (finding, in a suit challenging EO 14042, that university-employee plaintiffs had no standing to sue the Federal Government as they had "failed to identify a single contract that potentially connects them to the federal contractor vaccine requirement" and the state system's decision

_____

*September 2021*, KAISER FAMILY FOUNDATION (Sept. 28, 2021), https://perma.cc/U6HH-8KPW (captured Dec. 4, 2021). Oklahoma makes no attempt to prove the reliability of that conclusion, the research project itself, or the KFF. The material's reliability aside, Oklahoma also oversimplifies what the KFF stated, which: concluded that vaccine "requirements do have the potential to further increase vaccine uptake somewhat;" and, instead of estimating mass exodus from employment, summarized the results of a recent poll of unvaccinated workers, advising that "about a third of unvaccinated workers say they would be likely to get vaccinated while two-thirds say they would be unlikely to do so." *Id.* That initial reaction by workers does not equal an estimation that people actually will separate from their employment. Nor does Oklahoma address the disparity between this temperature gauge by the KFF and the real-world examples of almost uniform vaccine acceptance in private companies relied upon in the November OMB Determination. 86 FR at 63422. *See also infra* at 22. There also is no evidence in the record—from any source, including KFF—of a particularized or estimated impact on Oklahoma or its citizenry.

to require all university employees to vaccinate for COVID-19 due to the EO did not provide standing). Moreover, even if a state entity were to reject the inclusion of a COVID-19 safety clause in a federal contract and thereafter fear an unwarranted disadvantage on that basis in subsequent procurements, legal remedies exist to ensure that a procurement is lawfully compliant. *See infra* at 36–37. All of Oklahoma's economic-harm allegations are "conjectural" and "hypothetical," not "actual," "imminent," or "concrete," *Lujan*, 504 U.S. at 560, and it has consequently failed to demonstrate standing on this ground.

*Sovereign Power.* Oklahoma alleges the EO interferes with the state's exercise of "sovereign 'power to create and enforce a legal code.'" Mot. at 5 (citation omitted). In support of this argument, Oklahoma only points to a gubernatorial executive order rescinding prior mask requirements for state buildings or office spaces, and prohibiting state agencies from requiring COVID-19 vaccination as a condition of admittance to any public building. *Id.* at 6 (citing Okla. Admin. Code 1:2021-16). As Oklahoma has not identified a single contract where the COVID-19 safety clause would preempt the identified state law, however, Oklahoma fails to demonstrate any injury-in-fact based on EO-related interference with Oklahoma's enforcement of its legal code. *Cf. Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir 2008). Moreover, the main focus of Oklahoma's suit is not on protecting its sovereign power, but rather on preventing purported harm to a subset of Oklahoma's citizenry (namely, Oklahomans who work for federal contractors who do not wish to receive the COVID-19 vaccine). To the extent Oklahoma seeks to litigate on its citizens' behalf, it cannot do so, as explained below. Oklahoma has not proven standing on this ground either.

*Parens Patriae.* Last, Oklahoma invokes *parens patriae* standing, asserting "it 'has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general.'" Mot. at 4 (quoting *Snapp*, 458 U.S. at 607). But "[a] State does not have standing

as *parens patriae* to bring an action against the Federal Government." *Snapp*, 458 U.S. at 610 n.16. Although a state may have standing to vindicate its own injuries, *see Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (state was a coastal property owner), Oklahoma asserts an injury on behalf of a certain subset of its citizens: federal contractor employees who do not wish to be vaccinated. Whatever injuries these citizens may claim because they are employed by a federal contractor, the states are not in a position to bring suit on their behalf. *See, e.g, Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992) ("the State does not have standing as a *parens patriae* to bring an action on behalf of its citizens against the federal government because the federal government is presumed to represent the State's citizens"); *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220 (10th Cir. 2012) (finding Wyoming could not sue on behalf of its citizens but only to protect its own sovereign interest). Further, regarding any potential harm to contractors themselves, they may have—and indeed are in a better position than Oklahoma to pursue—available legal remedies. *See supra* at 10, *infra* at 36–37. This is not the proper place to litigate any such entirely speculative harms. Oklahoma therefore also lacks standing on this ground as well,[7] and thus has no standing to pursue its claims.

## II.   Even assuming this Court reaches the merits, none of Oklahoma's various theories establishes a substantial likelihood of success.

### A.   The vaccine requirement does not violate FPASA.

The Federal Property and Administrative Services Act ("FPASA"), 40 U.S.C. § 101 *et seq.*, and the consistent decisions of federal appellate courts for decades provide ample support for the EO's lawfulness. *See also* 86 FR at 50985. FPASA's purpose is "to provide the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying

---

[7] This Court should thus decline to follow the standing analysis in *Kentucky v. Biden*, No. 3:21-55, 2021 WL 5587446 (E.D. Ky. Nov. 30, 2021), because it is based on the incorrect premise that "States are permitted 'to litigate as parens patriae to protect quasi-sovereign interests—*i.e.*, public or governmental interests that concern the state as a whole." *Id.* at *3 (quoting *Massachusetts*, 549 U.S. at 520 n.17).

property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. § 101(a). Thus, FPASA expressly empowers the President to "prescribe policies and directives the President considers necessary to carry out [FPASA]," so long as those policies and directives are "consistent with [FPASA]." 40 U.S.C. § 121(a). This is a "particularly direct and broad-ranging authority over those larger administrative and management issues that involve the Government as a whole." *AFL-CIO v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979) (en banc); *see also City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 914 (10th Cir. 2004) (noting the "relatively broad delegation of authority" granted to the President by FPASA).

Since the 1960s, federal appellate courts have routinely held that FPASA authorizes the president to manage government contracting through executive orders.[8] *See, e.g.*, *Farmer v. Phila. Elec. Co.*, 329 F.2d 3, 7 (3d Cir. 1964); *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 (5th Cir. 1967). Courts have concluded, for example, that FPASA authorizes the President to require government contractors to comply with wage and price controls, *Kahn*, 618 F.2d 784, to post notices at all of their facilities informing employees that they cannot be forced to join a union, *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003), and to require contractors to confirm employees' immigration status through e-Verify, *Chamber of Com. of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 729 (D. Md. 2009).[9]

Oklahoma's argument that the President lacks authority to direct government contracting is further undermined by Congress's implicit endorsement of an expansive view

---

[8] Contrary to Oklahoma's assertion, Mot. at 11, FPASA does not delegate authority to the Task Force. It delegates authority to the President, who in EO 14042 asked the Task Force to issue nonbinding guidance. 86 FR at 50,985. As detailed herein, *see supra* at 3, *infra* at 20–22, that guidance is not operative until the OMB Director—who *is* acting under a delegation of authority from the President—approves it. Whether Congress would have delegated authority to the Task Force is not relevant.

[9] The recent merits conclusion in *Kentucky* cannot be squared with these longstanding interpretations of FPASA. Indeed, the *Kentucky* court's conclusion is difficult to reconcile with its own holding that the "OMB Determination provided ample support for the premise that a vaccine mandate will improve procurement efficiency." 2021 WL 5587446, at *13.

of the President's power under FPASA. Presidents have regularly exercised their authority under FPASA since it was enacted. *See Kahn*, 618 F.2d at 790–91 ("Since 1941, though, the most prominent use of the President's authority under the FPASA has been a series of anti-discrimination requirements for Government contractors"); *see also, e.g.*, EO No. 12072, 43 FR 36869 (Aug. 16, 1978); EO 13465, 73 FR 33285 (June 11, 2008); EO 13950, 85 FR 60683 (Sept. 22, 2020). "Past [Presidential] practice does not, by itself, create power, but 'long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent.'" *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981). "[T]he President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting Congressional reversal, it is entitled to great respect." *Kahn*, 618 F.2d at 790. And Congress has revised FPASA since 1949, including a complete recodification in 2002, but none of those amendments modified or restricted the power being used by the President here.[10] "If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536–37 (2015) (quoting A. Scalia & B. Garner*, Reading Law: The Interpretation of Legal Texts* 322 (2012)).

Oklahoma's invocation of various clear-statement rules from different contexts does not justify radically departing from the way that FPASA has always been interpreted. At any rate, EO 14042 does not run afoul of the "major questions" doctrine, a proviso to ordinary *Chevron* deference presuming that Congress does not sub silentio give unelected *agency* heads power to regulate on questions of major public significance. *See Food & Drug Admin. v. Brown*

---

[10] *See, e.g.*, Pub. L. No. 99-500, §101(m) [title VIII, §832], 100 Stat. 1783-345 (1986); Pub. L.  No. 99-591, §101(m) [title VIII, §832], 100 Stat. 3341-45 (1986); Pub. L. No. 104-208 § 101(f) [Title VI, § 611], 110 Stat. 3009-355 (1996); Pub. L. No. 107-217, 116 Stat. 1062, 1068 (2002).

*& Williamson Tobacco Corp.*, 529 U.S. 120, 132, 147 (2000) (discussing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)). By contrast, EO 14042 is presidential authority (not agency authority), and the federal government is not asking this Court for *Chevron* deference. Further, EO 14042 does not change the balance of federal–state authority or push the constitutional envelope. Rather than directly regulating anyone, EO 14042 merely sets conditions on who the government will conduct business with—something private-sector business leaders do all the time. *Cf. Arbitraje Casa de Cambio, S.A. de CV. v. United States*, 79 Fed. Cl. 235, 240-41 (Fed. Cl. 2007) (noting that when contracting with other parties, the government engages in "transactions such as private parties, individuals or corporations also engage in among themselves"). Here, the Federal Government has chosen to conduct business with companies and entities that are requiring their employees to be vaccinated because doing so will ensure that the government receives the benefit of its bargain in a cost-effective and efficient manner. As stated, FPASA "vest[s]" the President with "broad discretion" to manage federal procurement. *Reich*, 74 F.3d at 1330. Oklahoma provides no compelling reason why this Court should ignore how FPASA has been interpreted for more than 50 years.[11]

Oklahoma likewise fails to provide any support for the proposition that the President's authority to "prescrib[e] policies and directives" is less expansive than the FAR Council's authority to "prescribe regulations." Mot. at 7–8; (citing 40 U.S.C. § 121(a)). As an initial matter, EO 14042 and its implementing regulations are not actions taken by the President in a regulatory capacity—acting as a manager would, the President has issued a policy setting forth the government's preferences as a market participant. Moreover, the words "regulation,"

---

[11] Pre-FPASA practice provides additional support. In 1941, President Franklin Roosevelt issued an executive order instructing that "[a]ll contracting agencies of the Government of the United States shall include in all defense contracts hereafter negotiated by them a provision obligating the contractor not to discriminate against any worker because of race, creed, color, or national origin." Executive Order 8802, 6 FR 3109 (June 27, 1941).

"policy," and "directive" are neither statutorily defined words nor terms of art, and cases use them interchangeably. *See, e.g.*, *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 173 (4th Cir. 1981) (Butzner, J., concurring-in-part and dissenting-in-part) ("Implicit in [FPASA], I believe, is authorization for the President to promulgate orders and regulations . . . ."). As a matter of ordinary meaning, all three are synonyms. *See, e.g.*, *Regulation*, Oxford English Dictionary (3d ed. 2009) ("[A] directive established and maintained by an authority."). And while the FAR Council may issue regulations, its authority to direct Government-wide procurement policy is not exclusive. 41 U.S.C. § 1303(a)(2)(A). Section 3 of the EO recognizes the sources of authority in both 41 U.S.C. § 1303(a) and 40 U.S.C. § 121(a) by (1) directing the FAR Council to revise the FAR, and (2) until the FAR is revised, directing agencies "to exercise any applicable authority" to implement the Government-wide policies and procedures described in the Executive Order and any subsequent OMB Determinations.

Against this backdrop, EO 14042 falls well within the "broad discretion" that FPASA delegates to the President. *See id.* Courts have "read this as requiring that the executive order have a 'sufficiently close nexus' to the values of providing the government an 'economical and efficient system for . . . procurement and supply.'" *Chao*, 325 F.3d at 366 (quoting *Kahn*, 618 F.2d at 788, 792); *see also Liberty Mut.*, 639 F.2d at 170. Even the cases relied on by Oklahoma hold that Presidential policies to direct government procurement need only be "reasonably related to [FPASA]'s purpose of ensuring efficiency and economy in government procurement." *Liberty Mut.*, 639 F.2d at 170. Courts have "emphasized the necessary flexibility and 'broad-ranging authority'" that FPASA provides. *Chao*, 325 F.3d at 366. The standard is "lenient" and can be satisfied even when "the order might in fact increase procurement costs" in the short run. *Id.* at 366–67. Courts find a nexus even if one can "advance an argument claiming opposite effects or no effects at all." *Id.* "[T]his

close nexus requirement [] mean[s] little more than that President's explanation for how an Executive Order promotes efficiency and economy must be reasonable and rational." *Napolitano*, 648 F. Supp. 2d at 738 (one sentence explanation sufficient).

EO 14042 easily satisfies this "lenient" standard; the President explained:

> This order promotes economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract . . . . These safeguards will decrease the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government.

EO 14042 § 1. COVID-19 hobbled the economy for months; it continues to disrupt American life. Federal procurement is no exception. The President, as the ultimate manager of procurement operations, determined that workplace safeguards aimed at preventing COVID-19's spread will "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." *Id.* Slowing COVID-19's spread promotes efficiency and economy because federal procurement—like any business endeavor—suffers when people contracting with the federal government get sick and miss work. While Oklahoma may disagree with the President's policy or consider it unwise, the EO's explanation is sufficient to show the required nexus between the policy and promoting economy and efficiency. *Compare* EO 14042 § 1 *with Chao*, 325 F.3d at 366–67 (finding close nexus to economy and efficiency based on two sentences).

Notably, courts have upheld executive action under FPASA involving diverse policy agendas that bear less of a relationship to economy and efficiency than reducing the number of contractor employees who are sick with COVID-19 and, therefore, unable to provide services the government has contracted for—and is paying for. *See, e.g.*, *Kahn*, 618 F.2d at 790

17

(collecting cases for the proposition that FPASA has been "most prominent[ly]" used to impose "a series of anti-discrimination requirements for Government contractors"); *City of Albuquerque*, 379 F.3d 901 (urban renewal); *Chao*, 325 F.3d 360 (rights of union members); *AFGE v. Carmen*, 669 F.2d 815 (D.C. Cir. 1981) (conservation of gasoline during an oil crisis); *Napolitano*, 648 F. Supp. at 729 (immigration status through e-Verify).[12]

Oklahoma ignores all these cases, arguing that the EO is "too attenuated" from any conceptions of economy and efficiency. Mot. at 8. But courts have upheld executive action even where the nexus to economy and efficiency "may seem attenuated." *See Chao*, 325 F.3d at 366 (discussing *Kahn*, 618 F.2d 784); *Nat'l Ass'n of Mfrs. v. Perez*, 103 F. Supp. 3d 7, 19–20 (D.D.C. 2015). Further, no such attenuation exists here: as recently as September 2021, unvaccinated persons had a 5.8-times greater risk of testing positive for COVID-19 infection than did persons who were fully vaccinated, and an 14-times greater risk of dying from COVID-19. CDC, Rates of COVID-19 Cases and Deaths by Vaccination Status (date posted November 22, 2021), https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status. Other data indicates that, "[f]or all adults aged 18 years and older, the cumulative COVID-19-associated hospitalization rate was about 8 times higher in unvaccinated persons." CDC, Rates of laboratory-confirmed COVID-19 hospitalizations by vaccination status (dated posted December 2, 2021), https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination. And with the highly transmissible Delta variant, contractors providing essential services to the Government could be crippled if a substantial number of their unvaccinated employees get sick. The connection between this state of affairs and the economy and

---

[12] For similar reasons, Oklahoma's claim that the title of the statute "does not sound like a statute Congress intended to allow anyone in the federal government to mandate anything on any Americans" is meritless. Mot. at 12. For decades, Presidents have been exercising their authority under FPASA to manage and oversee federal contracting—just as EO 14042 does here.

efficiency of procurement and supply is not only reasonable, but fully explained in the November OMB Determination. *See infra* at 21–22.

Finally, *Alabama Association of Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485 (2021), and *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021), do nothing to advance Oklahoma's arguments. Those cases involve different standards from different statutes. Neither concerns FPASA, which gives the President "broad-ranging authority," *Kahn*, 618 F.2d at 789, that "certainly reach[es] beyond any narrow concept of efficiency and economy in procurement," *Reich*, 74 F.3d at 1333. Unlike the regulatory actions challenged in those cases, the EO concerns the government's role as a commercial marketplace participant, where it enjoys "unrestricted power . . . to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins*, 310 U.S. at 127. The Executive Branch's right to contract, and its relationship to those with whom it contracts, places this case on vastly different footing.

### B. Oklahoma is not likely to succeed on its Administrative Procedure Act ("APA") claims.

The November OMB Determination renders Oklahoma's challenges to the first one moot,[13] as the November OMB Determination expressly "rescinds and supersedes [the] prior notice." 86 FR at 63418. It contains substantive changes, including a new date by which

---

[13] Oklahoma does not clearly indicate which agency action it challenges under the APA. To the extent it also challenges the Task Force Guidance or the FAR Memo, the APA does not apply because neither is a final agency action. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The Task Force is not an agency and exists solely to advise the President. *Rodden v. Fauci*, No. 3:21-CV-317, 2021 WL 5545234, at *3 (S.D. Tex. Nov. 27, 2021); *see also Meyer v. Bush*, 981 F.2d 1288, 1297-98 (D.C. Cir. 1993) (holding that an analogous task force was not an "agency" given its lack of "substantial independent authority"). And the Task Force Guidance has no standalone legal force; it becomes binding only following the OMB Director's economy-and-efficiency determination. The FAR Memo makes clear that the legal direction here emanates from the EO, rather than the non-binding FAR guidance. And, the FAR Council's amendment to the FAR, the conclusion of the policymaking process set forth in the EO, has yet to occur. Because neither is a final agency action, any APA challenge would fail.

contractors must comply with the EO's vaccination requirements. *Id.* at 63418–20. Oklahoma has nonetheless chosen to challenge the prior Determination, even though it is a "well-settled principle of law" that "when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot." *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016); *see also Princeton Univ. v. Schmid*, 455 U.S. 100, 102–03 (1982) (holding that "substantially amend[ing]" regulations even after litigation has commenced suffices to moot claims); *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005) ("By eliminating the issues upon which this case is based, adoption of the new rule has rendered the appeal moot.").

In any event, the APA does not apply to either OMB Determination.  "[P]residential action is not subject to judicial review under [the APA]." *Nat'l Res. Def. Council, Inc. v. U.S. Dep't of State* (*NRDC*), 658 F. Supp. 2d 105, 109 (D.D.C. 2009) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992); *Dalton v. Specter*, 511 U.S. 462, 470 (1994)). And the EO delegated to the OMB Director the President's existing authority to determine whether the Task Force Guidance "will promote economy and efficiency in Federal contracting." *See* EO 14042, § 2(c). It did so under 3 U.S.C. § 301, which authorizes the President "to designate and empower the head of any department or agency in the executive branch, . . . to perform without approval, ratification, or other action by the President [] any function which is vested in the President by law," including the President's power to direct government contracting under FPASA. When exercising delegated authority, the official "stands in the President's shoes" and "cannot be subject to judicial review under the APA." *NRDC*, 658 F. Supp. 2d at 109 & n.5, 111; *see also Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C.

Cir. 2002); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016).[14]

Even if Oklahoma challenged the November OMB Determination, the arbitrary-and-capricious claims would still fail because the actions all have "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). This standard of review is "very deferential to the agency." *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012). A court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

Indeed, the OMB Director issued her economy and efficiency determination because she concluded that "[t]he safety protocols that are set forth" in the guidance "are meant to ensure that COVID-19 does not easily spread within the workplace, so that Federal contractor employees can continue to be productive." 86 FR at 63423. The requirement promotes economy and efficiency in federal contracting because decreasing worker absences lowers costs. As OMB explains, "[r]educing the number of infected people mechanically reduces transmission," and "evidence also indicates that vaccines also reduce transmission by people who contract 'breakthrough' infections." *Id.* at 63,422. In conjunction with the other safety protocols proposed in the Task Force Guidance, the vaccine requirements will "prevent infection and illness and preserve the productivity" of federal contractors. *Id.*

The November OMB Determination also explains any "departure from prior practice." Mot. at 16. Vaccines became especially necessary in summer 2021 due to the "emergence of

---

[14] Oklahoma repackages several of its FPASA claims as APA violations, again arguing that only the FAR Council may issue procurement regulations. Mot. at 15. For the reasons explained above, *see supra* p. 16, the EO and any subsequent OMB Determination do not run afoul of 41 U.S.C. § 1303(a) or 40 U.S.C. § 121(a).

the Delta variant, which . . . spreads more easily than previously discovered variants" and thus represented a new "imminent threat to the health and safety of the American people." *Id.* at 63,423 ("The CDC has determined that the best way to slow the spread of COVID-19, including preventing infection by the Delta variant, is for individuals to get vaccinated."). And around the same time, "vaccines [were] widely available for free, [so] the cost" of including a COVID-19 safety clause was lowered. Additionally, by that time, data showed that "numerous private companies have undertaken" vaccine requirements successfully. 86 FR at 63422.

Oklahoma claims that the November OMB Determination did not properly consider costs to the States. Mot. at 16. But the November OMB Determination makes clear that it did consider the costs to covered contractors, including Oklahoma, and determined that "[b]ecause vaccines are widely available for free, the cost of implementing a vaccine mandate is largely limited to administrative costs associated with distributing information about the mandate and tracking employees' vaccination status. Such costs are likely to be small." 86 FR at 63422. OMB also weighed concerns about employee retention, explaining that data from private companies led it to conclude that "few employees [will] quit because of the vaccine mandate" and "even if some non-negligible number of workers were to quit rather than comply with a vaccine mandate," the short-term cost of replacing those workers is outweighed by "long-lasting" benefits of vaccination. *Id.*

Nor is the November OMB Determination a post hoc rationalization. No principle of law prevents the Executive Branch from "'deal[ing] with [a] problem afresh' by taking new agency action," as the Acting OMB Director did here. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907–08 (2020) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)). In sum, the November OMB Determination was not arbitrary and capricious.

**C.  Oklahoma's 41 U.S.C. § 1707 claims are not likely to succeed.**

Oklahoma argues that Defendants violated the notice-and-comment requirements outlined in 41 U.S.C. § 1707. While Oklahoma does not specify which Executive action allegedly ran afoul of 41 U.S.C. § 1707, its claim fails with respect to each.

*1. Section 1707 challenges to the September OMB Determination and EO must fail.*

As explained, *see supra* at 19–20, any challenge to the September OMB Determination under 41 U.S.C. § 1707 is moot, *see Wyoming*, 414 F.3d at 1212 ("Moreover, the alleged procedural deficiencies of the [rule] are now irrelevant because the replacement rule was promulgated in a new and separate . . . process."), and Oklahoma has not brought any new challenges to the November OMB Determination. Setting mootness aside, § 1707 does not apply to exercises of Presidential authority like the EO and the Acting OMB Director's Determinations. Section 1707 applies only to an "executive agency," a defined term in the statute. 41 U.S.C. § 133; *see also* 41 U.S.C. Chapter 17 ("Agency Responsibilities and Procedures"). That statutory definition does not include the President. *See id.* Because the President is not an agency under the statute, and because the Acting OMB Director acted pursuant to a delegation from the President, § 1707's procedural requirements do not apply to either the EO or to the Acting OMB Director's Determinations. *See* EO 14042 § 3(a). *See NRDC*, 658 F. Supp. 2d at 109 & n.5, 111; *supra* at 23–24.

In any event, any future challenge to the November OMB Determination would also fail for the additional reason that the Determination properly invokes § 1707(d)'s waiver for "urgent and compelling circumstances." *See Kentucky*, 2021 WL 5587446, at *11-12 (concluding that EO 14042 and its implementing guidance "did not run afoul of the proper administrative procedures"). Those circumstances exist because, among other reasons, waiting sixty days before the revised Task Force Guidance could take effect would mean that its revised January

23

18 deadline would be illusory; the original guidance's December deadline would take effect before the new deadline could kick in. Relatedly, waiting sixty days under § 1707 would have precipitated regulatory uncertainty. Instead of harmonizing the vaccination deadline for federal contractors with the January 18 vaccination deadline for private companies under other regulatory actions, contractors and subcontractors have no clear understanding of their compliance obligations. *See* Federal Acquisition Regulation: Non-Retaliation for Disclosure of Compensation Information, 81 FR 67732, 67733 (Sept. 30 2016) (a FAR amendment invoking § 1707's urgent-and-compelling-circumstances waiver in order to harmonize deadlines across regulatory actions and to clarify compliance obligations); Federal Acquisition Regulation; Contractor Responsibility, Labor Relations Costs, and Costs Relating to Legal and Other Proceedings, 66 FR 17754, 17755 (Apr. 3, 2001) (the FAR council invoking § 1707's urgent-and-compelling-circumstances waiver to immediate stay a FAR rule because "otherwise the rule imposes burdens that the Government and contractors are not prepared to meet").

The Acting OMB Director also properly designated her determination as "temporary" and noted she is "soliciting comment on all subjects of this determination," consistent with § 1707(e), if applicable. *Id.* Indeed, the November OMB Determination provides for a 30-day comment period, ending December 16.  *See* 86 FR 63418, 63418–21.

> 2. *The Task Force Guidance and FAR Memo are not "policies" subject to 41 U.S.C. § 1707.*

Section 1707's procedural notice requirements also do not apply to the Task Force Guidance or FAR Memo because they are, at most, nonbinding guidance. The Task Force Guidance has no legal consequences until the OMB Director has made an economy-and-efficiency determination. Task Force Guidance at 1; *see also Rodden*, 2021 WL 5545234, at *2 ("[T]he Task Force guidance is just that—'guidance'—and is nonbinding on the agencies it seeks to guide.").

Likewise, the FAR Memo does not direct an agency to take any specific action, but instead encourages contracting officers to "follow the direction[s] … issued by their respective agencies" for how to utilize the memo's guidance. FAR Memo at 2; *see also id.* (FAR Council developed the suggested COVID-19 safety clause "pursuant to section 3(a) of" the EO and to "support agencies in meeting the applicability requirements and deadlines set forth in the order."). It has no independent effect and none of its guidance is operational unless an agency chooses to incorporate it into a procurement contract. Moreover, the FAR Memo is not the FAR Council's final word on the COVID-19 safety clause. The EO instructs the FAR Council to "take initial steps to implement" the contract clause, EO 14042 § 3(a) (emphasis added), and in turn, the FAR Memo suggests a COVID-19 safety clause for contracting officers to use in the interim, subject to agency- and contract-specific deviations developed by each agency. FAR Memo at 4–5. Both actions are nonbinding guidance and not "policies," and accordingly, are not subject to § 1707.

### D. Oklahoma is not likely to succeed on its constitutional claims.

#### 1. *The challenged actions do not offend the Tenth Amendment.*

Oklahoma cannot succeed on a Tenth Amendment claim by simply invoking general maxims of federalism. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.  The powers specifically delegated to the federal government by the Constitution "are not powers that the Constitution 'reserved to the States.'" *United States v. Comstock*, 560 U.S. 126, 144 (2010); *accord New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States[.]"). As long as federal action rests on a constitutionally delegated power, "there can be no violation of the

Tenth Amendment." *United States v. Mikhel,* 889 F.3d 1003, 1024 (9th Cir. 2018) (citation omitted); *accord United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013).

As explained above, *see supra* § II.A–B, EO 14042 and the OMB Determinations were issued pursuant to the President's authority under FPASA, a statute that is an evident exercise of Congress's legislative power under the Constitution, including the Spending and Property Clauses (which Oklahoma does not dispute).[15] *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 480 (1982). And where (as here) a federal statute is validly enacted under one of Congress's enumerated powers, and the Executive Branch exercises authority lawfully delegated under that statute, the Tenth Amendment is no bar to federal action unless it unlawfully "commandeers" states' legislative processes or executive officials to enact or administer a federal regulatory program. *See Kelley v. United States*, 69 F.3d 1503, 1509 (10th Cir. 1995) ("Having concluded that [the statute] was a proper exercise of the commerce power by Congress, the only remaining question we must decide is whether Congress, in enacting [the statute], somehow commandeer[s] the legislative processes of the States." (cleaned up)); *accord Brackeen v. Haaland*, 994 F.3d 249, 299 (5th Cir. 2021) (en banc) (op. of Dennis, J.), *petition for cert. filed*, No. 21-380 (U.S. Sept. 8, 2021); *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 122 (2d Cir. 2002). As the Supreme Court has explained, the Tenth Amendment's anti-commandeering principle acknowledges a

---

[15] Because FPASA rests squarely on these sources of Congress's constitutional authority, Oklahoma's attempt to challenge EO 14042 and its implementing guidance under the Commerce Clause, Mot. 19–20, is beside the point. Similarly, because the President issued EO 14042 pursuant to congressionally delegated authority, Oklahoma's argument pertaining to the scope of the President's authority under Article II should play no role in this Court's Tenth Amendment analysis. *See* Mot. 18–19. In particular, Oklahoma suggests that *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), "is dispositive" of its Tenth Amendment claim. Mot. at 18–19. But *Youngstown* is not dispositive because it is not even relevant. In *Youngstown*, the President concededly acted outside congressionally delegated authority and thus sought to justify his actions by reference to his inherent Article II powers. 343 U.S. at 585–87. By contrast, the President acted here pursuant to authority expressly delegated to him under FPASA.

constitutional limitation of "the circumstances under which Congress may use the States as implements of [federal] regulation." *New York*, 505 U.S. at 161. For example, the federal statute at issue in *New York* unconstitutionally "'commandeer[ed]' state governments" by forcing state legislatures or executive officials to enact state regulation according to Congress's instructions. *Id.* at 175. In *Printz v. United States*, 521 U.S. 898 (1997), the federal statute "conscript[ed]" local law enforcement officials by requiring them to perform background checks in connection with firearms sales. *Id.* at 935. And in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), the federal statute "commandeered the state legislative process" by "command[ing] state legislatures to . . . refrain from enacting [new] state law[s]." *Id.* at 1478–79.

EO 14042 and its implementing guidance do none of these things. They neither utilize state governments "as implements of [federal] regulation," *New York*, 505 U.S. at 161, nor "regulate the States' sovereign authority to 'regulate their own citizens,'" *Murphy*, 138 S. Ct. at 1479 (citation omitted). Indeed, this case does not involve regulations of any sort, but instead concerns the federal government's exercise of its procurement powers. But Oklahoma still contends that the challenged actions contravene the Tenth Amendment's anti-commandeering principle by requiring Oklahoma to spend state resources to be eligible for federal contracts. Mot. at 20. There is no support for that argument. EO 14042 directs federal agencies to include in certain categories of federal procurement contracts a provision requiring contractors—whether private entities or state agencies or subdivisions—to ensure that covered employees are vaccinated. And where, as here, "Congress evenhandedly [manages] an activity in which both States and private actors engage" "[t]he anticommandeering doctrine does not apply." *Murphy*, 138 S. Ct. at 1478; *accord Brackeen*, 994 F.3d at 322–25 ("'That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no

constitutional defect.' Such a federal law thus does not commandeer state actors[.]" (citation omitted) (quoting *South Carolina v. Baker*, 485 U.S. 505, 514–15 (1988))); *Ohio v. United States*, 849 F.3d 313, 322–23 (6th Cir. 2017); *see also Printz*, 521 U.S. at 936 (O'Connor, J., concurring) ("Congress is also free to amend the interim program to provide for its continuance on a contractual basis with the States if it wishes[.]"). Therefore, Oklahoma's anti-commandeering argument cannot establish a Tenth Amendment violation.

Oklahoma's general references to federalism and state sovereignty are similarly unavailing. *See* Mot. 17–18. In addressing a Tenth Amendment claim, a court has "no license to employ freestanding conceptions of state sovereignty when measuring" federal authority under the Constitution. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985). Apart from a narrow anti-commandeering inquiry, the only question under the Tenth Amendment is whether the federal government acts pursuant to one of its powers under the Constitution; if it does, a court "necessarily must also conclude that the [plaintiffs'] efforts to invoke abstract principles of federalism through the Tenth Amendment fail." *Town of Johnston v. Fed. Hous. Fin. Agency*, 765 F.3d 80, 86 (1st Cir. 2014); *see also Garcia*, 469 U.S. at 549 ("States unquestionably do retain a significant measure of sovereign authority," but "only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." (cleaned up)).

Oklahoma also appears to suggest that a Tenth Amendment problem exists whenever federal action regulates subject matter that is also regulated by the states. *See e.g.*, Mot. at 18 ("[T]he States' police powers . . . [are] separate and apart from anything within federal control. . . . If there is any power to mandate vaccinations, it belongs only to the State."). But there is no general "doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise

of the powers of the other." *Case v. Bowles*, 327 U.S. 92, 101 (1946). Indeed, it is axiomatic that the federal government does not "invade[] areas reserved to the States by the Tenth Amendment simply because it exercises *its* authority" under the Constitution, even "in a manner that *displaces* the States' exercise of their police powers." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981) (emphasis added); *accord Oklahoma ex rel. Okla. Dep't of Pub. Safety v. United States*, 161 F.3d 1266, 1272 (10th Cir. 1998). Thus, "'the Federal Government, when acting within a delegated power, may override countervailing state interests,' whether those interests are labeled traditional, fundamental, or otherwise." *Brackeen*, 994 F.3d at 310 (citation omitted). In any event, the Supreme Court and the courts of appeals have repeatedly held that generally applicable state requirements, such as licensing laws, cannot be applied to federal contracts under principles of intergovernmental immunity. *See United States v. Virginia*, 139 F.3d 984, 987 (4th Cir. 1998) (Luttig, J.) (invalidating application of state licensing requirements and collecting authorities).

### 2. *FPASA does not violate the nondelegation doctrine.*

Oklahoma contends that FPASA violates the Constitution's nondelegation doctrine if the statute authorizes the President to issue EO 14042. Mot. at 20–21. To the contrary, FPASA's delegation of authority fits comfortably within the bounds of constitutionally permissible delegations. Congress may lawfully delegate decision-making authority if it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (citation omitted). A delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority." *Id.* at 372–73 (citation omitted); *accord Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality

op.) ("[A] delegation is permissible if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of his authority.'" (cleaned up)).

The intelligible-principle standard is so deferential that the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001) (citation omitted). In fact, the Supreme Court has struck down congressional delegations only twice—both in 1935—and only because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Gundy*, 139 S. Ct. at 2129 (quoting *Mistretta*, 488 U.S. at 373 n.7). Since then, the Court "has countenanced as intelligible seemingly vague principles in statutory text such as whether something would 'unduly or unnecessarily complicate,' . . . be 'generally fair and equitable,' in the 'public interest,' … [or] authoriz[es] the recovery of excessive profits." *In re Nat'l Sec. Agency Telecomms. Recs. Litig.*, 671 F.3d 881, 896 (9th Cir. 2011) (citing multiple cases); *see also Gundy*, 139 S. Ct. at 2129 (collecting cases); *id.* at 2130–31 (Alito, J., concurring in the judgment) ("[S]ince 1935, the Court has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards.").

In light of this longstanding precedent, the statute at issue here reflects an intelligible principle that falls well within permissible bounds. As explained, FPASA sets forth a general policy—the promotion of economy and efficiency in the federal government's procurement of property and services, *see* 40 U.S.C. § 101—and authorizes the President to issue orders designed to further those specific statutory goals in that narrow, definable context, *see id.* § 121(a). The statute's criteria establish a clear boundary for the President's actions, and the statute compares favorably to other congressional delegations that have been sustained against challenges under the nondelegation doctrine. *See Whitman*, 531 U.S. at 474–75 (listing cases).

30

Thus, every court to consider the question has held that FPASA's delegation of authority is valid. *See Kahn*, 618 F.2d at 785–86, 793 n.51 ("Although broad, [the economy-and-efficiency] standard can be applied generally to the President's actions to determine whether those actions are within the legislative delegation."); *City of Albuquerque*, 379 F.3d at 914–15 (finding FPASA's economy-and-efficiency standard provided an "'intelligible principle' to guide the exercise" of the statute's "relatively broad delegation of authority" (citations omitted)).

Oklahoma cites no authority and offers no serious argument to the contrary. Instead, it simply asserts that Congress cannot delegate its authority to address significant issues. Mot. at 21. But as Oklahoma's own authority explains, "the [Supreme] Court has not adopted a nondelegation principle for major questions." *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Mem.) (Kavanaugh, J., respecting the denial of certiorari). Oklahoma contends that Congress could not have delegated its authority to impose vaccination requirements on covered contractor employees under FPASA's "generalized delegation." Mot. at 21. But that is not the standard. "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Touby v. United States*, 500 U.S. 160, 165 (1991). As the Supreme Court acknowledged, "Congress simply [could not] do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372. In sum, only if this Court "could say that there is an *absence* of standards for the guidance of the [President's] action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would [the Court] be justified in overriding [Congress's] choice of means for effecting its declared purpose" in FPASA. *See Yakus v. United States*, 321 U.S. 414, 426 (1944) (emphasis added).That is not the case here.

>   3.  *EO 14042's vaccine requirement does not violate the Fourth Amendment.*

Oklahoma also suggests that requiring covered contractor employees to be vaccinated violates the Fourth Amendment, Mot. at 21–23, which "protects citizens from unreasonable

searches and seizures by government actors," *United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir. 1996). Setting aside the fact that an employee's Fourth Amendment rights are not implicated here, Oklahoma cannot assert the Fourth Amendment rights of third parties. "It is well-established that 'the Fourth Amendment is a personal right that must be invoked by an individual.'" *United States v. Poe*, 556 F.3d 1113, 1121 (10th Cir. 2009) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). A "party challenging a search or seizure" must therefore assert that a challenged governmental action implicated his or her *own* "legitimate expectation of privacy." *United States v. Thomas*, 372 F.3d 1173, 1176 (10th Cir. 2004). Because Oklahoma does not purport to defend its *own* Fourth Amendment rights (nor could it), its claim is foreclosed.[16]

In any event, Oklahoma's claim could not succeed on the merits because EO 14042's vaccination requirement does not remotely resemble a Fourth Amendment "search" or "seizure." Oklahoma begins by suggesting that this requirement is a "search" because it is a government "compelled intrusion into the body" that infringes upon an employee's privacy interest. Mot. at 21–22 (citation omitted). But an "invasion of privacy[] is not alone a search unless it is done *to obtain information*." *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012) (emphasis added); *accord id.* at 407; *Gaytan v. New Mexico*, No. 19-cv-0778, 2021 WL 1634383, at *4 n.8 (D.N.M. Apr. 27, 2021); *United States v. Rivera*, No. 11-cr-0196, 2012 WL 12919987, at *3 (D. Wyo. Mar. 22, 2012); *see also Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) ("When the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection . . . .'" (citation omitted)). Oklahoma's own authorities—which involve the collection of biological samples *to*

---

[16] By the same token, Oklahoma lacks prudential standing to assert third parties' Fourth Amendment claims. *See Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013) ("It is . . . a 'fundamental restriction on our authority' that 'in the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.'" (alteration adopted and citation omitted)); *accord The Wilderness Soc'y v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011).

*be analyzed for evidence of drug or alcohol use*—acknowledge this distinction. *See Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 606, 616–18 (1989); *Schmerber v. California*, 384 U.S. 757, 767–772 (1966).[17] By contrast, the federal government, in obligating a federal contractor to ensure that covered employees are vaccinated, is not obtaining any information or otherwise "'searching' [an employee] for something within the meaning of the Fourth Amendment." *See Doe v. Bd. of Educ. of City of Chi.*, --- F. Supp. 3d ----, 2020 WL 1445638, at *8 (N.D. Ill. Mar. 24, 2020). And even assuming that a vaccine requirement could be considered a "search" akin to a drug test requirement for federal employees, a person required by his or her employer to be vaccinated has no Fourth Amendment claim because, for the reasons explained above, *see supra* § II.A, B.3, there is a reasonable and "legitimate special need" to impose a vaccine requirement for federal contractor employees. *See Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1198–1201 (10th Cir. 2017).

Nor does EO 14042 effect a "seizure" of a covered contractor employee, because his or her "freedom of movement" is not being terminated or restrained by receiving a vaccine as a condition of employment. *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012); *accord Brendlin v. California*, 551 U.S. 249, 254 (2007); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998).

Moreover, the Fourth Amendment's seizure analysis is not implicated where "an individual chooses [to] voluntarily . . . cooperate." *United States v. Easley*, 911 F.3d 1074, 1079 (10th Cir. 2018), *cert denied*, 139 S. Ct. 1644 (2019). An individual who chooses to be vaccinated to start or continue employment with a covered contractor is not being coerced into receiving a vaccination. *Smith v. Biden*, No. 1:21-cv-19457, 2021 WL 5195688, at *8 (D.N.J. Nov. 8, 2021) ("Plaintiffs are . . . presented with a difficult choice—comply with the vaccine mandate or risk

---

[17] Oklahoma also claims that the court in *B.A.B., Jr. v. Board of Education of City of St. Louis*, 698 F.3d 1037 (8th Cir. 2012), treated "[f]orcible vaccinations" as "searches and seizures" under the Fourth Amendment. Mot. at 21. But nothing in *B.A.B.* supports this assertion.

losing their employment. They are, however, presented with a choice and are not being coerced[.]"), *appeal filed*, No. 21-3091 (3d Cir. Nov. 10, 2021); *see also Easley*, 911 F.3d at 1080 ("A person has not been seized merely because she feels social pressure to conform her behavior to match that of [her peers].").[18]

#### 4. *Oklahoma cannot proceed with its Take Care Clause or separation-of-powers claims.*

Oklahoma argues further that Defendants have violated the Take Care Clause and the separation-of-powers doctrine because they have exceeded their statutory authority in issuing and implementing EO 14042. Mot. at 23–24. As an initial matter, these "constitutional" claims are nothing more than Oklahoma's statutory objections dressed up in constitutional garb. But Oklahoma cannot turn what is otherwise a straightforward statutory claim into a constitutional issue merely by alleging that Defendants' failure to act within the confines of FPASA encroaches on Congress's Article I powers or amounts to a violation of the President's constitutional responsibilities under Article II, Section 3. As the Supreme Court explained in *Dalton v. Specter*, 511 U.S. 462 (1994), permitting a plaintiff to assert a separation-of-powers claim like Oklahoma's would "eviscerat[e]" the well-established "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution." *Id.* at 474. The Court in *Dalton* thus squarely rejected the proposition "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471.

At any rate, because EO 14042 and its implementing guidance are valid exercises of delegated authority under FPASA, *supra* § II.A, Oklahoma's Take Care Clause and separation-

---

[18] Because Oklahoma cannot show a Fourth Amendment violation based on EO 14042's vaccination requirement, its cursory argument invoking the unconstitutional-conditions doctrine fails *a fortiori*. *See, e.g.*, *Petrella v. Brownback*, 787 F.3d 1242, 1265 (10th Cir. 2015) ("[I]f no constitutional rights have been jeopardized, no claim for unconstitutional conditions can be sustained." (quoting *Reedy v. Werholtz*, 660 F.3d 1270, 1277 (10th Cir. 2011)).

of-powers claims lack merit. The Court should reject these claims on this ground alone. *See N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979) ("Before deciding [a] constitutional question," a court must consider whether other "grounds might be dispositive.").

Additionally, a court should reject a Take Care Clause claim where (as here) "judicial intervention . . . would impinge on the *discretion* that Congress has afforded to the President and entrust to the courts the 'executive and political' duties of determining how to 'faithfully execute' [a federal statute]." *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 803 (D. Md. 2020); *accord Las Ams. Immigrant Advoc. Ctr. v. Biden*, --- F. Supp. 3d ----, 2021 WL 5530948, at *4 (D. Or. Nov. 24, 2021) ("[A] Take Care challenge in this case would essentially open the doors to an undisciplined and unguided review process for all decisions made by the Executive Department." (citation omitted)). Congress delegated to the President the duty to "prescribe policies and directives" that he "considers necessary" to manage the federal procurement system. 40 U.S.C. § 121(a). These duties are thus "beyond the purview of the courts because they are not ministerial." *Las Ams. Immigrant Advoc. Ctr.*, 2021 WL 5530948, at *4. As the Supreme Court explained, a "ministerial duty"—a "simple, definite duty" in which "nothing is left to discretion"—is "[v]ery different [than] the duty of the President in the exercise of the power to see that the laws are faithfully executed." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498–99 (1867). In cases where the President must "exercise . . . Executive discretion," the duty "imposed on the President is in no just sense ministerial. It is purely executive and political." *Id.* Thus, "[a]n attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized . . . as 'an absurd and excessive extravagance.'" *Id.* (citation omitted); *see also Lujan*, 504 U.S. at 577 (finding it improper for courts "to assume a position of authority over" the President's duty to "take

Care that the Laws be faithfully executed"). The Court should thus reject Oklahoma's claim challenging the exercise of presidential authority under FPASA under the Take Care Clause.

### III.   Oklahoma does not face irreparable harm.

Oklahoma bears the burden of demonstrating irreparable harm that is *likely*, not merely possible. *Winter*, 555 U.S. at 20. Speculative harm is not enough, and the harm shown "must be both certain and great," not "merely serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (citations omitted). The showing also must be "clear and unequivocal." *Colorado*, 989 F.3d at 886 (evaluating evidence offered to prove irreparable harm). Oklahoma has not carried its burden here.

"It is . . . well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). Though Oklahoma attempts to shield itself from a similar conclusion here, it has not proven any likelihood of a scenario where monetary remedies would be justified even assuming sovereign immunity were not, in some cases, a bar to such relief. There is no evidence of a "hemorrhag[ing] . . . labor supply" or imminent threat to state tax income. *See supra* 9–11. Further, as demonstrated below, none of the contracts identified by Oklahoma are subject to the EO's express requirements. *See infra* at 37–39.

Moreover, if Oklahoma's claims regarding irreparable harm relate to its *residents'* contracts (where the EO expressly requires inclusion of the COVID-19 safety clause), those contractors would not necessarily suffer the harm Oklahoma imagines as claims properly brought in relation to procurement contracts are subject to judicial oversight, including the potential award of damages pursuant to the Contract Disputes Act, 28 U.S.C. § 1491(a)(2). Monetary damages in relation to other, non-procurement contracts also might be available

pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). And to the extent that Oklahoma asserts irreparable harm on the *prospect* of a COVID-19 safety clause being included in a new procurement, the *prospect* that one or more of its residents might be interested in competing for that procurement, and the *prospect* that all such residents would be unable to meet that procurement's requirement of compliance with a COVID-19 safety clause, those contractors might challenge the procurement. *See* 28 U.S.C. § 1491(b)(1). The Court of Federal Claims exercises oversight over procurement awards and has injunctive powers to address the "alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *Id.* The notion that the EO's requirement that the Executive Branch seeking the inclusion of the COVID-19 safety clause in federal contracting automatically creates irreparable and unredressable economic harm is simply not accurate.

Further, even if economic harm were sufficient to demonstrate irreparable injury, Oklahoma fails to offer any proof of such harm. As a source of its economic injury, Oklahoma generally identifies various contracts between the Federal Government and the state (only some of which Oklahoma attempts to prove exist through evidence) but only offers proof regarding contracts with five federal agencies. Mot. at 5–6 & Exs. 1–3. None of the identified contracts with those five agencies demonstrates any injury to Oklahoma as a result of the EO, however, and thus those contracts cannot be a source of irreparable harm to the state.

*Air Force Joint Use Agreement ("JUA").* Oklahoma first attempts to show economic injury through a JUA between the Oklahoma Space Industry Development Authority and the Department of the Air Force ("DAF"). Mot. at 5 & Ex. 1. That JUA, however, became effective April 1, 2021, runs through March 31, 2026, Ex. A, Moriarty Decl. ¶ 3, and falls outside the EO's express requirements, *see id.* ¶ 4, EO 14042 § 5(a). The DAF also has no intention of seeking the COVID-19 safety clause's inclusion in the JUA. Ex. A, Moriarty Decl.

¶ 5.

*USDA Contracts*. Oklahoma also tries to rely on a series of agreements between the U.S. Department of Agriculture's Natural Resources Conservation Service ("USDA" and "NRCS") and the Oklahoma Conservation Commission ("OCC"). Mot. at 5 & Ex. 2. None of those contracts is within the EO's requirements. Most predate the EO and are not up for renewal in the near future; many also fall below the SAT. Ex. B, O'Neill Decl. ¶¶ 11–15. The contracts also can only be amended through bilateral agreement—meaning Oklahoma would have to accede to the inclusion of the COVID-19 safety clause—and the USDA has no intention of seeking the inclusion of that clause in any of the agreements. *Id.* ¶¶ 13, 18. While one NRCS contract is expiring in December 2021, that contract is not up for renewal and thus the USDA also will not seek any adoption of the COVID-19 safety clause there. *Id.* ¶ 15.c. And, since the other contract identified by the OCC involves the provision of a grant, it too falls outside the EO's express requirements. *See id.* ¶ 16; EO 14042 § 5(b)(i).

*Fish and Wildlife Contract*. Oklahoma also identifies one contract with the U.S. Fish and Wildlife Service ("USFWS"). Mot. Ex. 2 at 3. That contract, effective July 1, 2021, is for a value of $100,000. Ex. C, Knight Decl. ¶ 7. It is therefore not subject to the EO's express requirements. *Id.* ¶ 9. The FWS does not intend to insist on the inclusion of the COVID-19 safety clause in this contract, or to terminate said contract. *Id.* ¶ 10.

*EPA Contract*. Oklahoma further identifies one contract between the OCC and the Environmental Protective Agency ("EPA"). Mot. Ex. 2 at 3. The EPA however has no record of any active contract with the OCC. Ex. D, White Decl., ¶ 4. The EPA believes the contract identified in Oklahoma's evidence relates to a grant, placing it outside the EO's requirements. Ex. E, Bonnell Decl. ¶ 6–9. The EPA does not intend to insist on the inclusion of the COVID-19 safety clause in the grant agreement. *Id.* ¶¶ 9–10, EO § 5(b)(i).

*CDC Contracts.* Finally, Oklahoma attempts to rely upon four contracts between the CDC and the Oklahoma State Department of Health ("OSDH"). Mot. at 5–6 & Ex. 3. The CDC only has two active contracts with OSDH, however, and both fall below the SAT and are thus outside the EO's express requirements. Ex. F, Lopez Decl. ¶¶ 7–9; EO 14042 § 5(b)(iii). Though the CDC sought bilateral modifications of those contracts, it intends to rescind that request. Ex. A., Lopez Decl. ¶ 10.

COVID-19 safety protocols do not become a requirement until they are incorporated into a given contract, through modification of an existing contract, or through the inclusion of the provision as part of the solicitation for a new contract or the extension, renewal, or exercise of an option on an existing contract. Oklahoma has thus entirely failed to demonstrate its qualification to assert imminent harm, *i.e.*, that the United States has indicated that for a contract expiring soon, or for a contract to be awarded imminently, renewal/award would be contingent on incorporation of a COVID-19 safety clause.[19] *See Nagim v. Walker*, No. 10-CV-02973-WYD-KLM, 2011 WL 1542460, at *2 (D. Colo. Mar. 8, 2011), *report and recommendation adopted*, No. 10-CV-02973-WYD-KLM, 2011 WL 1542157 (D. Colo. Apr. 25, 2011) (discussing failures of proof, and conclusory nature of claims, when evaluating irreparable harm). And, since Oklahoma offers no proof of any contract subject to the EO's express requirements—let alone one that the Federal Government will soon cancel or award elsewhere because of a refusal by Oklahoma to include a COVID-19 safety clause—it cannot demonstrate any infringement on its "sovereign capacity" to enforce its own legal code. *See* Mot. at 4–5; *see also supra* at 11.

---

[19] Consistent with the EO, the Task Force Guidance sets forth a phase-in period for the COVID-19 safety clause to be added to contracts, generally keyed to new contracts awarded on or after November 14 and any changes to existing contracts made on or after October 15. *See* September Guidance at 12.

Oklahoma's other arguments regarding irreparable harm are also unavailing, as discussed above. *See supra* at Part I. Further, the EO is not directed towards any infringement on Oklahoma's rights. In order to promote the safe and effective performance of federal contracts in the midst of a global health emergency, EO 14042 merely sets the terms on which the Federal Government will enter into contracts. "Like private individuals and businesses, the Government enjoys the unrestricted power to . . . determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins*, 310 U.S. at 127. Though Oklahoma frames its purported injury as one to its sovereign power—in an effort to dictate the very thing that the Supreme Court has said cannot be "restricted"— nothing in EO 14042 purports to "hold[] a gun to Oklahoma's head," Mot. at 6; it merely directs federal-contracting policy. Inasmuch as Oklahoma disagrees with EO 14042, it is free to decline to deal with the United States as a contractual counterparty. "Those wishing to do business with the Government must meet the Government's terms; others need not." *Kahn*, 618 F.2d at 794. What Oklahoma is not free to do, and yet seeks to do in this case, is to compel the United States to contract with Oklahoma (and even with private parties) on terms of Oklahoma's choosing. If it can do so, and this articulation of harm is sufficient to demonstrate the requisite irreparable injury, then any state could effectively superintend federal policy contracting decisions by framing its injury as Oklahoma has. To the extent that states had opposing policy views, any federal policy under this theory would inherently cause irreparable harm sufficient to warrant emergency relief.

Finally, Oklahoma's delay in seeking relief from this Court further confirms the absence of any irreparable injury. Oklahoma waited eight weeks from the issuance of the EO and almost six weeks after the September Guidance's publication to file this suit, leaving only 16 days until the then-applicable last-vaccine-shot deadline. Inexplicably, Oklahoma then

waited nine more days until filing its motion for injunctive relief. This timing is not consistent with the notion that Oklahoma is in danger of being irreparably harmed. "As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury." *Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994) (citation omitted); *see also GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) (noting delay "undercuts the sense of urgency . . . and suggests that there is, in fact, no irreparable injury" and "may justify denial of a preliminary injunction") (quoting *Le Sportsac, Inc. v. Dockside Rsch., Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979)).

## IV. The equities and the public interest weigh against injunctive relief.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these considerations tilt decisively in Defendants' favor.

*First*, enjoining EO 14042 would harm the public interest by hampering the efficiency of the contractors on which the Federal Government relies. The COVID-19 pandemic has interfered with numerous aspects of the government's work, *e.g.*, by forcing office closures; interfering with employees' access to paper-based or sensitive records; limiting official travel; and causing staffing shortages. *See generally* Pandemic Response Accountability Committee, Top Challenges Facing Federal Agencies (June 2020), https://perma.cc/GGF4-F4FV. These disruptions have affected the work of federal employees and federal contractors alike. Requiring federal covered contractor employees to become fully vaccinated against COVID-19, with exceptions only as required by law, reduces disruptions caused by worker absences associated with illness or exposure to the virus, generating meaningful gains in contracting efficiency. *See* November OMB Determination, 86 FR 63421–23. Enjoining EO 14042 would

prevent these gains and would likely interfere with the government's ability to resume normal, pre-pandemic operations.

*Second*, enjoining EO 14042 would harm the public interest in slowing the spread of COVID-19 among millions of federal contractors and the members of the public with whom they interact. As the Supreme Court has recognized, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Accordingly, numerous courts reviewing "executive action designed to slow the spread of COVID-19" have concluded that "[t]he public interest in protecting human life— particularly in the face of a global and unpredictable pandemic—would not be served by" an injunction. *Tigges v. Northam*, 473 F. Supp. 3d 559, 573–74 (E.D. Va. 2020).[20]

*Third*, the balance analysis here should not be centered—as Oklahoma would like—on "state sovereignty and individual autonomy and dignity," Mot. at 1; rather, it should be grounded in the choice of whether to contract with the Executive Branch. Although Oklahoma attempts to restrict the Federal Government's right to engage freely as a commercial player, the balance must account for the public interest served by the Federal Government's ability to address circumstances impacting the economy and efficiency of federal procurement and supply. *See Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1178 (10th Cir. 2016) ("[G]overnment enjoys a broad freedom to deal with whom it chooses on such terms as it chooses; no one has a 'right' to sell to the government that which the government does not wish to buy.") (quoting *Perkins*, 310 U.S. 127-28, *Coyne-Delany Co. v. Capital Dev. Bd.*, 616 F.2d 341, 342 (7th Cir. 1980). The terms on which the Executive Branch wishes to contract involve a COVID-19 safety protocols, including a vaccination

---

[20] *See also, e.g.*, *Am.'s Frontline Drs. v. Wilcox*, No. EDCV 21-1243, 2021 WL 4546923, at *8 (C.D. Cal. July 30, 2021); *Valdez v. Grisham*, ---F. Supp. 3d---, 2021 WL 4145746, at *13 (D.N.M. Sept. 13, 2021), *appeal filed*, No. 21-2105 (10th Cir. Sept. 15, 2021); *Brnovich v. Biden*, 2:21-cv-01568 (D. Az.).

requirement, but that is no different than the government setting other conditions of engagement in its standardized-contact language. Vaccination is not being "imposed" or "coerce[d]" in any way here. Mot. at 1, 6, 8, 9, 10, 20, 23. While the decision to contract with the Executive Branch, or to remain employed with a covered contractor subject to the EO, may involve a complicated choice, that does not equate to an absence of choice; no one is being "'force[d] . . . out of a job.'" Mot. at 25 (quoting *Vencor, Inc. v. Webb*, 829 F. Supp. 244, 251 (N.D. Ill. 1993)). *Cf. Beckerich v. St. Elizabeth Med. Ctr.*, ---F. Supp. 3d---, 2021 WL 4398027, at *7 (E.D. Ky. Sept. 24, 2021) (noting, in an employee suit against an employer requiring vaccination, that "no Plaintiff in this case is being forcibly vaccinated."), *denying reconsideration*, 2021 WL 4722915 (E.D. Ky. Sept. 30, 2021); *Smith*, 2021 WL 5195688, at *8 (noting plaintiff employees are not subject to coercion and have a choice in the face of an employer-imposed vaccine requirement, partly as a result of EO 14042). Weighing the balance against Defendants here would fundamentally challenge the Executive Branch's rights to engage freely on the terms it deems necessary, contrary to long-standing precedent.

While it is not for Oklahoma to pass judgment on the wisdom of Federal Government-contracting policy, it is worth noting that the contracts at issue here show that the Government has proceeded judiciously, and has tailored its approach to the particular equities implicated in each contractual arrangement. For all of the contracts on which Oklahoma relies, the United States has either not asked to modify the contracts at all or intends to withdraw any such request. *See generally* Exs. A–F.

*Finally*, granting the requested injunction against Defendants would not preserve the relative positions of the parties since entering the requested relief would upend the status quo by (1) preventing further implementation of EO 14042, which has been in effect for almost three months; and (2) interfering with the Federal Government's ability to determine the terms

on which it will enter into contracts. *See, e.g.*, *Nken*, 556 U.S. at 428–29 (explaining that enjoining a government policy is an act of "judicial intervention" that "*alter[s]* the legal status quo") (citation omitted). Further, granting the relief sought against Defendants would generate the absurd result of allowing challengers to obtain a preliminary injunction against *any* new government policy, in order to maintain the prior "status quo" until a decision on the merits. *But see Brown v. Gilmore*, 122 S. Ct. 1, 2 (2001) (Rehnquist, C.J., in chambers) (explaining that "an injunction against the enforcement of a presumptively valid" enactment should only be granted in extraordinary circumstances); *accord Winter*, 555 U.S. at 24.

Against these weighty and substantial federal interests, Oklahoma has presented only unsupported or unsupportable claims of harm. While Oklahoma suggests that EO 14042 will result in a summary, across-the-board invalidation of numerous federal contracts worth many millions of dollars, Oklahoma has identified no current contract that Defendants (allegedly) improperly modified. While Oklahoma unquestionably disagrees with the policy determinations that undergird EO 14042, the harm to Defendants from allowing Oklahoma (or any state) to dictate federal contract policy far outstrips any harm to Oklahoma from allowing the United States to supervise and direct the terms on which it will contract.

In sum, granting the pending motion would harm the public interest far more than denying the motion would harm Oklahoma, and the motion should therefore be denied.

## V. In all events, this court should not enter relief extending beyond federal contracts with Oklahoma and should only enjoin enforcement of the challenged provisions.

Although preliminary relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress Oklahoma's alleged injuries. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular

injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018) (citation omitted). At a minimum, any relief granted to Oklahoma should be tailored to the specific harm found to exist (*e.g.*, to the particular contract(s) impacted by the EO).[21] Further, any injunctive relief granted should merely block enforcement—not inclusion—of the COVID-19 safety clause. Allowing COVID-19 safety clauses to be included but not enforced during the pendency of this litigation would mean that contractors within the EO's scope of express authority would not have to require their employees to be vaccinated.[22] But if EO 14042 and its implementing guidance are ultimately upheld, the policy can be put into effect without further delay.

## CONCLUSION

For the foregoing reasons, Oklahoma's motion for a temporary restraining order and preliminary injunction should be denied.

---

[21] Oklahoma only seeks an injunction against the enforcement or implementation of, or the giving effect to, the federal vaccine requirement in Oklahoma. *See* Mot. at 25. In the event the Court believes broader relief necessary, Defendants note that nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also, e.g.*, *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) ("Allowing one circuit's statutory interpretation to foreclose . . . review of the question in another circuit" would "squelch the circuit disagreements that can lead to Supreme Court review."). Further, EO 14042 and its implementing guidance have been challenged in numerous other cases, underscoring why this Court should not attempt to decide its legality for all parties. *See, e.g.*, *Smith*, 2021 WL 5195688 (denying preliminary injunction regarding EO 14042); *Hollis*, 2021 WL 5500500 (same); *Brnovich v. Biden*, 2:21-cv-01568 (D. Az.) (same; second preliminary injunction pending); *Kentucky v. Biden*, 3:21-cv-00055-GFVT (E.D. Ky.) (granting preliminary injunction, only enjoining enforcement); *Georgia v. Biden*, 1:21-cv-163 (S.D. Ga.) (preliminary injunction request pending); *Missouri v. Biden*, 4:21-cv-1300 (E.D. Mo.) (same); *Texas v. Biden*, 3:21-cv-309 (S.D. Tex.) (same); *Louisiana v. Biden*, 1:21-cv-3867 (W.D. La.) (same).

[22] Allowing COVID-19 safety clauses to be included but not enforced will not precipitate layoffs or a rush to vaccination if the injunction is dissolved. Covered contractor employers have flexibility to "determine the appropriate means of enforcement" and to craft "polic[ies] that encourage[] compliance." Safer Federal Workforce, Federal Contractor FAQs, Compliance, https://perma.cc/RGR9-ZTES. In other words, covered contractors would not need to immediately discharge unvaccinated employees if the injunction is dissolved. Rather, covered contractors should provide for a "period of counseling and education, followed by additional disciplinary measures if necessary," before terminating employees. *Id.*

Dated: December 6, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRAD P. ROSENBERG
Assistant Branch Director

*/s/ Kristin A. Taylor*
KRISTIN A. TAYLOR (TX Bar. 24046952)
MADELINE M. MCMAHON
JODY D. LOWENSTEIN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
(202) 353-0533 (direct)
(202) 616-8470
kristin.a.taylor@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On December 6, 2021, I electronically submitted this document to the clerk of court of the U.S. District Court for the Western District of Oklahoma using the court's electronic case filing system. I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Kristin A. Taylor
KRISTIN A. TAYLOR (TX Bar. 24046952)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
(202) 353-0533 (direct)
(202) 616-8470
kristin.a.taylor@usdoj.gov