## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

THE STATE OF OKLAHOMA et al.,

     Plaintiffs,

 v.            No. CIV-21-1069-G

JOSEPH R. BIDEN et al.,

     Defendants.

## DEFENDANTS' RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

Defendants submit this response to Plaintiffs' supplemental brief addressing the Supreme Court's recent decisions in *National Federation of Independent Business v. Occupational Safety and Hazard Administration* (*NFIB*), 142 S. Ct. 661 (2022) (per curiam), and *Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam). As explained below, Plaintiffs' reliance on *NFIB* is misplaced. The Supreme Court's statutory analysis in *NFIB* rested on principles of statutory construction that apply only where an administrative agency's action would bring about an enormous and transformative expansion of its regulatory authority—not where (as here) the President exercises well-established power to manage the federal government's proprietary interests. In contrast, the Supreme Court's decision in *Missouri* provides this Court with relevant instruction: namely, that the President's "longstanding practice" of using his authority under the Federal Property and Administrative Services Act ("Procurement Act"), 40 U.S.C. § 101 *et seq.*, to address a wide range of concerns related to federal contractor operations is a strong indication that Executive Order 14042, 86 Fed. Reg. 50,985 (Sept. 14, 2021), is a legitimate exercise of such authority. *See Missouri*, 142 S. Ct. at 652. Accordingly, just as the Supreme Court concluded that the Executive Branch may make COVID-19 vaccination a

"condition of participation" in Medicare and Medicaid, *id.* at 655, this Court should hold that the President, like any other contractor, may make COVID-19 vaccination a condition of participation in federal contracting.

**1.** In *NFIB*, the Supreme Court considered whether the Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. § 651 *et seq.*, authorized the Occupational Safety and Health Administration ("OSHA") to issue an emergency temporary standard requiring "virtually all employers with at least 100 employees" to impose COVID-19 vaccination-or-testing obligations on their employees. 142 S. Ct. at 662, 665. Based on its observation that OSHA's mandate applies to "84 million Americans" and represents a significant expansion of OSHA's regulatory authority, the Court relied on the proposition that Congress is expected "to speak clearly when authorizing an agency to exercise [such] powers of vast economic and political significance." *Id.* at 665 (quoting *Ala. Ass'n of Realtors* v. *Dep't of Health and Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam)). The Court held that Congress had not "plainly authorized" OSHA's vaccination-or-test standard because the OSH Act permits OSHA to regulate only "*occupational* hazards," and COVID-19 is not a hazard unique to the workplace. *Id.* at 665–66.

In Plaintiffs' view, *NFIB* compels this Court to apply a similar statutory analysis in this case. *See* Pls.' Supp. Br. at 2. Plaintiffs suggest that "it is beyond cavil" that Executive Order 14042 implicates "matters of 'vast economic and political significance,'" and thus it could only have been authorized by a clear statement from Congress. *Id.* at 2–6. But Plaintiffs are mistaken. *NFIB* is inapposite to the resolution of the statutory question before this Court for at least three reasons.

*First*, the "major questions" principles applied in *NFIB* are relevant only when an administrative action represents an "enormous and transformative expansion in [an agency's]

2

*regulatory* authority." *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (emphasis added); *accord NFIB*, 142 S. Ct. at 665 ("Permitting OSHA to regulate the hazards of daily life . . . would significantly expand OSHA's regulatory authority . . . ."); *see also, e.g., Ala. Ass'n of Realtors*, 141 S. Ct. at 2489; *King v. Burwell*, 576 U.S. 473 (2015); *Gonzales v. Oregon*, 546 U.S. 243 (2006); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). In promulgating Executive Order 14042, the President did not exercise "*regulatory* authority" of any kind. Rather, the President exercised the federal government's *proprietary* authority, as the purchaser of goods and services from those with whom it contracts. *See Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940) ("Like private individuals and businesses, the Government enjoys the unrestricted power … to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."); *cf. Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy*, 367 U.S. 886, 896 (1961) (explaining that the federal government's authority to operate "as proprietor" is "quite different from" its "power to regulate . . . as lawmaker"); *NASA v. Nelson*, 562 U.S. 134, 148, 150 (2011) (explaining that the "Government has a much freer hand in dealing with citizen employees than it does when it brings its sovereign power to bear on citizens at large" and rejecting argument that, "because [certain individuals] are contract employees and not civil servants, the Government's broad authority in managing its affairs should apply with diminished force" (internal quotation marks and citations omitted)). Unlike OSHA's vaccination-or-test standard, which directly regulated private employers pursuant to Congress's Commerce Clause authority, Executive Order 14042 imposes no generally applicable regulation on any industry, entity, or individual. Instead, as an exercise of Congress's powers under distinct constitutional provisions, including the Spending Clause, Executive Order 14042 reflects the President's management decision to do business with only those entities willing to perform work for the federal government under certain

contractual conditions.

*Second*, the fact that Congress, through the Procurement Act, delegated authority to the *President* distinguishes this case from those in which the Supreme Court questioned an *administrative agency's* authority to address a "major question."[1] *See, e.g.*, *NFIB*, 142 S. Ct. at 665 (OSHA); *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (Centers for Disease Control and Prevention); *King*, 576 U.S. at 485–86 (Internal Revenue Service); *Utility Air*, 573 U.S. at 324 (Environmental Protection Agency); *Gonzalez*, 546 U.S. at 267 (Department of Justice); *Brown & Williamson Tobacco Corp.*, 529 U.S. at 160 (Food and Drug Administration). The Court's application of "major questions" principles has been animated in significant part by its concern that administrative agencies lack direct political accountability for their decisions. *See, e.g.*, *Brown & Williamson*, 529 U.S. at 150 (noting concerns that certain policy determinations should be made by Congress, "the body elected by the people," and "not some agency made up of appointed officials"); *NFIB*, 142 S. Ct. at 668–69 (Gorsuch, J., concurring) (explaining that the "major questions doctrine" was designed to ensure that the power to enact new regulations would remain "with the people's elected representatives" and would be "subject to the robust democratic processes the Constitution demands"). But the President is directly elected by and "accountable to the people." *Free Enter. Fund v. Public Co. Act. Oversight Bd.*, 561 U.S. 477, 513 (2010). There is thus no question that the President will be held responsible for actions he personally directs, because in all matters of executive action, "[t]he buck stops with the President." *Id.* at 493.

The Court has also applied "major questions" principles out of a concern that agencies might reach beyond their statutory authority. *See, e.g.*, *NFIB*, 142 S. Ct. at 665 (expressing

---

[1] Plaintiffs suggest that the Safer Federal Workforce Task Force exercised authority under the Procurement Act in issuing its COVID-19 workplace safety guidance for federal contractors. *See* Pls.' Supp. Br. at 2, 9. That is incorrect, as Defendants have already explained. *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 4–5, 13 n.8, ECF No. 25 ("Defs.' Opp'n").

concern that OSHA's standard "extend[ed] beyond the agency's legitimate reach"); *Utility Air*, 573 U.S. at 324 (expressing concern that EPA was "laying claim" to power outside the scope of its statutory authority). But that concern does not apply here, where the President possesses inherent power under Article II to exercise general administrative control "throughout the Executive Branch of government of which he is the head." *Building & Construction Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). And although the President invoked *statutory* authority in issuing Executive Order 14042, in passing the Procurement Act, Congress understood that it was legislating in an area in which the President already exercises power under his constitutional responsibilities.

*Third*, and finally, even if "major questions" principles were relevant to the statutory question before this Court, they would not preclude Executive Order 14042. In applying these principles, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Utility Air*, 573 U.S. at 324 (quoting *Brown & Williamson Tobacco*, 529 U.S. at 160). The Procurement Act's text plainly delegates to the President the authority to determine what "policies and directives" are "necessary to carry out" the statute's objective of promoting "an economical and efficient system" for federal procurement. 40 U.S.C. §§ 101, 121. Under longstanding judicial precedent, a presidential action fits squarely within this statutory delegation so long as it bears a "sufficiently close nexus" to the Procurement Act's goal of economy and efficiency. *See, e.g.*, *AFL-CIO v. Kahn*, 618 F.3d 784, 792 (D.C. Cir. 1979) (en banc); *see also* Defs.' Opp'n at 16–18 (collecting cases). Here, as Defendants have explained, *see* Defs.' Opp'n at 18–19, 21, a strong nexus exists between the federal contractor vaccination requirement and those goals, *see Kentucky v. Biden*, --- F. Supp. 3d ---, 2021 WL 5587446, at * (E.D. Ky. Nov. 30, 2021) (finding "ample support for the premise that a vaccine mandate will improve procurement efficiency"); *see also*

Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 Fed. Reg. 63,418 (Nov. 16, 2021). Nothing in *NFIB*—which involved a different standard, from a different statutory scheme, with a different history—casts doubt on that conclusion. *See* Defs.' Opp'n at 19.

For these reasons, *NFIB*'s statutory analysis is inapposite to the statutory question before this Court.

**2.** The Supreme Court's decision in *Missouri*, on the other hand, offers relevant guidance for this Court's resolution of whether Executive Order 14042 is a valid exercise of the President's authority under the Procurement Act. In *Missouri*, the Supreme Court reviewed a Department of Health and Human Services ("HHS") regulation requiring hospitals and other healthcare facilities that participate in Medicare or Medicaid to ensure that their staff are either vaccinated against COVID-19 or receive a religious or medical exception. 142 S. Ct. at 650. The Court held that this "vaccination requirement . . . is a straightforward and predictable example of the 'health and safety' regulations that Congress has authorized [HHS] to impose." *Id.* at 653. And even though the regulation "effectively mandated vaccination for 10 million healthcare workers," *id.* at 655 (Thomas, J., dissenting), the Court declined to apply the "major questions" principles invoked in *NFIB*, *see id.* at 650–55.

Like this case, *Missouri* involved a broad grant of statutory authority related to the expenditure of federal funds. *Compare id.* at 652 ("Congress has authorized the Secretary to impose conditions on the receipt of Medicaid and Medicare funds that 'the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services.'" (quoting 42 U.S.C. § 1395x(e)(9))), *with* 40 U.S.C. §§ 101, 121 (authorizing the President to "prescribe policies and directives that the President considers necessary" to

promote "an economical and efficient system" for federal procurement). Crucially, in determining the scope of HHS's authority, the Supreme Court looked to the agency's "longstanding practice . . . in implementing the relevant statutory authorities." *Missouri*, 142 S. Ct. at 652. Based on HHS's historical practice of imposing "conditions that address the safe and effective provision of healthcare, not simply sound accounting," the Court rejected a narrow reading of the statute's broad language because it was inconsistent with this historical precedent. *Id.*

Here, the Executive Branch's longstanding practice of issuing executive orders regarding federal procurement is similarly instructive—and underscores the validity of Executive Order 14042. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring in the judgment) ("[T]he government's early, longstanding, and consistent interpretation of a statute"—especially without any resistance from Congress over many decades—is "powerful evidence of its original public meaning."); *accord Missouri*, 142 S. Ct. at 652. In the decades following the Procurement Act's enactment in 1949, three successive presidents issued orders forbidding contractors from discriminating on the basis of race, creed, color, or national origin, *see Kahn*, 618 F.2d at 790 (citing orders), in an effort to prevent the federal government's suppliers from "increasing its costs and delaying its programs by excluding from the labor pool available minority workmen," *Contractors Ass'n of E. Pa. v. Secretary of Lab.*, 442 F.2d 159, 170 (3d Cir. 1971). President Carter issued an order requiring government contractors to comply with wage and price standards for noninflationary behavior on the theory that slowing inflation would decrease government procurement costs. *See Kahn*, 618 F.2d at 792–93 (citing Exec. Order No. 12,092, 43 Fed. Reg. 51,375 (Nov. 3, 1978)). President George W. Bush issued an order requiring government contractors to post notices of certain labor rights, explaining that "[w]hen workers are better informed of their rights, . . .

their productivity is enhanced." *Chao*, 325 F.3d at 367 (quoting Exec. Order No. 13,201, 66 Fed. Reg. 11,221, 11,221 (Feb. 17, 2001)). President Bush also issued an order requiring contractors to use the E-Verify system to check the lawful immigration status of their employees, reasoning that contractors with "rigorous employment eligibility confirmation policies" would be "more efficient and dependable procurement sources." *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726, 738 (D. Md. 2009) (quoting Exec. Order No. 13,465, 73 Fed. Reg. 33,285 (June 6, 2008)). Finally, President Obama issued an order requiring federal contractors to provide their employees with paid sick leave in order to "improve the health and performance of employees of Federal contractors" and make contractors more "competitive . . . in the search for dedicated and talented employees." Exec. Order No. 13,706, 80 Fed. Reg. 54,697, 54,697 (Sept. 7, 2015); *see also, e.g.*, *Nat'l Ass'n of Manufacturers v. Perez*, 103 F. Supp. 3d 7, 19–20 (D.D.C. 2015) (upholding an executive order issued by President Obama under his Procurement Act authority that required federal contractors and subcontractors to post notices describing employees' rights under federal labor laws (citing Exec. Order No. 13496, 74 Fed. Reg. 1107 (Jan. 30, 2009))).

Notably, Congress recodified—without substantive change—both the Procurement Act's statement of purpose and the operative provision authorizing the President to set procurement policies to achieve the statute's goals. *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("This Act makes no substantive change in existing law"). This Court should therefore presume that Congress adopted the view, as expressed in longstanding judicial precedent, *see, e.g.*, *Kahn*, 618 F.2d at 789, that the Procurement Act confers broad authority on the President. *See, e.g.*, *Consolidation Coal Co. v. Off. of Workers' Comp. Progs.*, 864 F.3d 1142, 1148 (10th Cir. 2017) ("Congress is presumed to be

aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." (quoting parenthetically *Lorillard v. Pons*, 434 U.S. 575, 580 (1978))).

As the Court indicated in *Missouri*, all of this history and "longstanding practice . . . in implementing the relevant statutory authorit[y]" is a strong indication that the Procurement Act grants the President broad authority and discretion to manage the federal procurement system and that EO 14042 is a permissible exercise of that authority. *See* 142 S. Ct. at 652.

The Supreme Court also recognized in *Missouri* that the federal government may exercise longstanding powers in new ways when faced with new challenges. There, the Court found it unsurprising that HHS's "vaccine mandate [went] further than what [HHS] has done in the past to implement infection control" because the agency "has never had to address an infection problem of [the] scale and scope" of the COVID-19 pandemic. 142 S. Ct. at 653. "[S]uch unprecedented circumstances provide no grounds for limiting the exercise of authorities the agency has long been recognized to have." *Id.* at 654; *accord Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020) ("[T]he fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command" (cleaned up)).

That reasoning applies equally here. It is immaterial that Presidents have not previously directed inclusion of a vaccination requirement in federal contracts. *See PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2261 (2021) ("[T]he non-use[] of a power does not disprove its existence." (citation omitted)). What matters is that Presidents have previously exercised their Procurement Act authority to respond to novel challenges with nationally significant implications, and courts have consistently upheld those orders. *See supra* pp. 7–8. And *Missouri* confirms that the "unprecedented circumstances" of the COVID-19 pandemic "provide no

grounds for limiting the exercise of authorities the [Executive Branch] has long been recognized to have," and that such authorities may be used to impose vaccination requirements like the ones challenged here. *See Missouri*, 142 S. Ct. at 654.

*Missouri* also confirms that several of Plaintiffs' constitutional claims are meritless. Plaintiffs argue that Executive Order 14042 infringes on Oklahoma's "police powers" and that the Procurement Act violates the non-delegation doctrine if it authorizes the Executive Order. Pls.' Mot. for TRO & Prelim. Inj. & Br. in Supp. at 17–21, ECF No. 9. The state plaintiffs in *Missouri* raised similar "police power" and "non-delegation" arguments, but the Supreme Court rejected them *sub silentio*. *Compare* Missouri *et al.*'s Response to Application for a Stay at 21, *and* Louisiana *et al.*'s Response to Application for a Stay Pending Appeal at 23–24, 26–27, *with Missouri*, 142 S. Ct. at 650–55.

\* \* \*

In sum, Plaintiffs have misapprehended the Supreme Court's decision in *NFIB*, which turned on interpretive principles that apply only where an agency's action would represent an enormous and transformative expansion of its regulatory authority. Here, in contrast, the statutory question concerns the President's exercise of well-established authority to manage the federal government's proprietary interests. And as explained above, *Missouri* teaches that the President's "longstanding practice" of using his authority under the Procurement Act to address a panoply of concerns related to federal contractor operations strongly indicates that Executive Order 14042 is a valid exercise of such authority. *See* 142 S. Ct. at 652. Therefore, just as the Supreme Court concluded that the Executive Branch may make COVID-19 vaccination a "condition of participation" in Medicare and Medicaid, *id.* at 655, this Court should hold that the President may make COVID-19 vaccination a condition of participation in federal contracting.

Dated:  January 28, 2022          Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRAD P. ROSENBERG
Assistant Branch Director

*/s/ Jody D. Lowenstein*
JODY D. LOWENSTEIN
Mont. Bar No. 55816869
MADELINE M. MCMAHON
KRISTIN A. TAYLOR
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 598-9280
Email: jody.d.lowenstein@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On January 28, 2022, I electronically submitted this document to the clerk of court of the U.S. District Court for the Western District of Oklahoma using the court's electronic case filing system. I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Jody D. Lowenstein
JODY D. LOWENSTEIN
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch